# Exhibit C

# United States Court of Appeals
## For the First Circuit

No. 19-2005

STUDENTS FOR FAIR ADMISSIONS, INC.,

Plaintiff, Appellant,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Howard, Chief Judge
and Lynch, Circuit Judge.[*]

William S. Consovoy, with whom Thomas R. McCarthy, J. Michael Connolly, Cameron T. Norris, Patrick Strawbridge, Consovoy McCarthy PLLC, Adam K. Mortara, John M. Hughes, and Bartlit Beck LLP were on brief, for appellant Students for Fair Admissions, Inc.

Eric S. Dreiband, Assistant Attorney General, with whom Elliot M. Davis, Acting Principal Deputy Assistant Attorney General, Thomas E. Chandler, and Matthew J. Donnelly were on brief, for the United States, amicus curiae.

Gordon M. Fauth, Jr., Litigation Law Group, Lee C. Cheng, and

---

[*]    Judge Torruella heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's decision.  The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

Asian American Legal Foundation on brief for the Asian American Coalition for Education and the Asian American Legal Foundation, amici curiae.

Wencong Fa, Joshua P. Thompson, and Pacific Legal Foundation on brief for Pacific Legal Foundation, Reason Foundation, Center for Equal Opportunity, Individual Rights Foundation, and the Chinese American Citizens Alliance - Greater New York, amici curiae.

Randall B. Clark, C. Boyden Gray, Adam R.F. Gustafson, James R. Conde, T. Elliot Gaiser, and Boyden Gray & Associates on brief for Economists Michael Keane, Hanming Fang, Christopher Flinn, Stefan Hoderlein, Yingyao Hu, Joseph Kaboski, Glenn Loury, Thomas Mroz, John Rust, and Matthew Shum, amici curiae.

Jun Xiao, Yong Li, Xiaoying Yu, and Haiying Li, on brief pro se.

Timothy J. Perry, Perry Krumsiek, LLP, T. Russell Nobile, Robert D. Popper, and Judicial Watch, Inc. on brief for Judicial Watch, Inc., amicus curiae.

Cody J. Wisniewski on brief for Mountain States Legal Foundation, amicus curiae.

Dwight Duncan and Dennis J. Saffran on brief for National Association of Scholars, amicus curiae.

Seth P. Waxman, with whom Paul R.Q. Wolfson, Danielle Y. Conley, Brittany Blueitt Amadi, William F. Lee, Felicia H. Ellsworth, Andrew S. Dulberg, Debo P. Adegbile, Michelle Liszt Sandals, Greg Schmidt, Emma Simson, Alex Hemmer, Wilmer Cutler Pickering Hale and Dorr LLP, Ara B. Gershengorn, and Harvard University, Office of the General Counsel were on brief, for appellee President and Fellows of Harvard College.

David Hinojosa, with whom Jon M. Greenbaum, Genevieve Bonadies Torres, Lawyers' Committee for Civil Rights Under Law, Lawrence E. Culleen, Elisabeth S. Theodore, Nancy L. Perkins, Janine M. Lopez, Emma Dinan, Camille Heyboer, Arnold & Porter Kaye Scholer LLP, Niyati Shah, Marita Etcubanez, Eri Andriola, Asian Americans Advancing Justice, Oren M. Sellstrom, and Lawyers for Civil Rights were on brief, for Students, Alumni, and Prospective Students of Harvard College, amici curiae.

Jin Hee Lee, with whom Sherrilyn Ifill, Janai Nelson, Samuel Spital, Rachel Kleinman, Cara McClellan, Michaele N. Turnage Young, Jennifer A. Holmes, NAACP Legal Defense and Educational Fund, Inc., Kate R. Cook, Kenneth N. Thayer, and Sugarman, Rogers, Barshak & Cohen, P.C. were on brief, for Coalition for a Diverse Harvard, Association of Black Harvard Women, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance,

Z 000054

Harvard Minority Association of Pre-Medical Students, Harvard Phillips Brooks House Association, Harvard Progressive Jewish Alumni, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard-Radcliffe Asian American Association, Harvard-Radcliffe Asian American Women's Association, Harvard-Radcliffe Black Students Association, Harvard-Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans at Harvard College, Task Force for Asian American Progressive Advocacy and Studies, and 21 Colorful Crimson, amici curiae.

Jessica L. Ellsworth, Stephanie J. Gold, Jo-Ann Tamila Sagar, Hogan Lovells US LLP, Peter McDonough, and American Council on Education on brief for American Council on Education and 40 Other Higher Education Organizations, amici curiae.

Samuel P. Groner, Harrison D. Polans, Fried, Frank, Harris, Shriver & Jacobson, LLP, Steven M. Freeman, and Amy Feinman on brief for Anti-Defamation League, amicus curiae.

Madeleine K. Rodriguez, Dean Richlin, Hemmie Chang, Sarah Burg, Rachel Hutchinson, Jacqueline Chávez, Foley Hoag LLP, Kenneth Kimerling, and Asian American Legal Defense and Education Fund on brief for Asian American Legal Defense and Education Fund and Other Asian American Education and Youth-Serving Organizations and Higher Education Faculty.

Jaime A. Santos, Sabrina M. Rose-Smith, William Evans, and Goodwin Procter LLP, on brief for the National Association of Basketball Coaches, Women's Basketball Coaches Association, Geno Auriemma, James A. Boeheim, John Chaney, Tom Izzo, Michael W. Krzyzewski, Joanne P. McCallie, Nolan Richardson, Bill Self, Sue Semrau, Orlando Smith, Tara Vanderveer, Roy Williams, Jay Wright, and 326 Additional Current or Former College Head Coaches, amici curiae.

Matthew S. Hellman, Ishan K. Bhabha, and Jenner & Block LLP, on brief for Brown University, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, Johns Hopkins University, Massachusetts Institute of Technology, Princeton University, Stanford University, University of Chicago, University of Pennsylvania, Vanderbilt University, Washington University in St. Louis, and Yale University, amici curiae.

Maura Healey, Attorney General of Massachusetts, Elizabeth N. Dewar, State Solicitor, Ann E. Lynch, Assistant Attorney General of Massachusetts, David Ureña, Assistant Attorney General of Massachusetts, Xavier Becerra, Attorney General of California, Philip J. Weiser, Attorney General of Colorado, Kathleen Jennings, Attorney General of Delaware, Karl A. Racine, Attorney General for the District of Columbia, Clare E. Connors, Attorney General of Hawai'i, Kwame Raoul, Attorney General of Illinois, Aaron M. Frey,

Z 000055

Attorney General of Maine, <u>Brian E. Frosh</u>, Attorney General of Maryland, <u>Keith Ellison</u>, Attorney General of Minnesota, <u>Aaron D. Ford</u>, Attorney General of Nevada, <u>Hector Balderas</u>, Attorney General of New Mexico, <u>Letitia James</u>, Attorney General of New York, <u>Josh Shapiro</u>, Attorney General of Pennsylvania, <u>Peter Neronha</u>, Attorney General of Rhode Island, and <u>Mark R. Herring</u>, Attorney General of Virginia, on brief for Massachusetts, California, Colorado, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Mexico, New York, Pennsylvania, Rhode Island, and Virginia, amici curiae.

 <u>Derek T. Ho</u>, <u>Bradley E. Oppenheimer</u>, <u>Minsuk Han</u>, <u>Joseph L. Wenner</u>, and <u>Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.</u> on brief for Professors of Economics, amicus curiae.

 <u>Sarah E. Harrington</u> and <u>Goldstein & Russell, P.C.</u> on brief for 678 Social Scientists and Scholars on College Access, Asian American Studies, and Race, amici curiae.

 <u>Anton Metlitsky</u>, <u>Patrick D. McKegney</u>, <u>Apalla U. Chopra</u>, <u>Bradley N. Garcia</u>, <u>Anna O. Mohan</u>, and <u>O'Melveny & Myers LLP</u> on brief for Walter Dellinger, amicus curiae.

 <u>Mark S. Davies</u>, <u>Thomas M. Bondy</u>, <u>Katherine M. Kopp</u>, <u>Sheila A. Baynes</u>, <u>Sarah H. Sloan</u>, <u>E. Joshua Rosenkranz</u>, <u>Darren S. Teshima</u>, and <u>Orrick, Herrington & Sutcliffe LLP</u> on brief for Amgen Inc., Apple Inc., Applied Materials, Inc., Cisco Systems, Inc., Cummins Inc., General Electric Company, Gilead Sciences, Inc., GlaxoSmithKline LLC, Intel Corporation, Micron Technology, Inc., Microsoft Corporation, Twitter, Inc., and ViiV Healthcare Company, amici curiae.

 <u>Keffe B. Clemons</u> on brief for Verizon Services Corp., amicus curiae.

---

November 12, 2020

---

LYNCH, **Circuit Judge**.   Students for Fair Admissions,
Inc. ("SFFA") brought suit on November 17, 2014, against the
President and Fellows of Harvard College and the Board of Overseers
(collectively, "Harvard").   The suit alleged that Harvard
College's admittedly race-conscious undergraduate admissions
process violates Title VI of the Civil Rights Act of 1964, 42
U.S.C. § 2000d et seq. ("Title VI") by discriminating against Asian
American applicants in favor of white applicants.

SFFA asserts that Harvard fails to meet the Supreme
Court's standards for the use of race in admissions which are
asserted to be justified by diversity in these ways: (1) it engages
in racial balancing of its undergraduate class; (2) it
impermissibly uses race as more than a "plus" factor in admissions
decisions; (3) it considers race in its process despite the
existence of workable race-neutral alternatives; and (4) it
intentionally discriminates against Asian American applicants to
Harvard College.   SFFA seeks a declaratory judgment, injunctive
relief, attorneys' fees, and costs.

The district court denied Harvard's motion to dismiss
SFFA's suit for lack of Article III standing.   See Students for
Fair Admissions, Inc. v. President & Fellows of Harvard Coll.
("SFFA I"), 261 F. Supp. 3d 99, 111 (D. Mass. 2017).

After a fifteen-day bench trial at which thirty
witnesses testified, the district court issued a 130-page opinion

Z 000057

with findings of fact and conclusions of law.  See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. ("SFFA II"), 397 F. Supp. 3d 126, 132 (D. Mass. 2019).  It made numerous factual findings, including as to competing expert witness testimony and credibility determinations about the testimony of witnesses.  See id. at 158-83.  The district court found that Harvard had met its burden of showing its admissions process did not violate Title VI.  See id. at 197, 199, 201, 204. It entered judgment for Harvard on all counts.  See id.

SFFA appeals from this judgment, and Harvard renews its argument that SFFA lacks standing.[1]

After careful review of the record, we hold that SFFA has associational standing to bring its claims and that under governing Supreme Court law Harvard's race-conscious admissions program does not violate Title VI.[2]

---

[1]    The district court dismissed two of SFFA's original claims before trial: that Harvard uses race to fill more than just the last few places in its class and that Harvard considers race in its admissions process generally.  SFFA does not challenge the dismissal of these claims on appeal.

[2]    We acknowledge and thank all of the amici curiae for their helpful submissions in this matter.  The following amici submitted briefs in support of SFFA: the United States; the Asian American Coalition for Education and the Asian American Legal Foundation; the Pacific Legal Foundation and the four other institutions on the brief; Michael Keane and the nine other economists on the brief; Jun Xiao and the three other individuals on the brief; Judicial Watch, Inc.; the Mountain States Legal Foundation; and the National Association of Scholars.  The following amici filed briefs in support of Harvard: Students, Alumni, and Prospective Students of Harvard College; the American

Z 000058

## I.  Facts

We recount the relevant basic facts before we turn to our legal analysis.

1)  SFFA

SFFA is a validly incorporated 501(c)(3) nonprofit organization. Its bylaws state that it was formed to "defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means."

SFFA was incorporated on July 30, 2014. Its original board of directors had three self-appointed members: Edward Blum, President, Abigail Fisher, Secretary, and Richard Fisher, Treasurer. In November 2014, when it filed suit against Harvard, SFFA's bylaws also provided for "affiliate members" who

---

Council on Education and the forty other higher education organizations on the brief; the Anti-Defamation League; the Asian American Legal Defense Fund and the forty-five other Asian American education and youth-serving organizations and faculty on the brief; the National Association of Basketball Coaches, the Women's Basketball Coaches Association, and the 339 current and former coaches on the brief; Brown University and the fourteen other colleges and universities on the brief; Massachusetts and the fifteen other states on the brief; the eighteen Professors of Economics; the 678 Social Scientists and Scholars on College Access, Asian American Studies, and Race; Walter Dellinger; and the Coalition for a Diverse Harvard and the twenty-five other organizations on the brief. Amgen, Inc. and thirteen other corporations submitted a brief in favor of preserving diversity and inclusion efforts like those previously approved by the Supreme Court.

Z 000059

"support[ed] the purposes and mission of the Corporation."   All members of SFFA were affiliate members.   Membership was free, but affiliate members could not vote for any officers or directors of the organization.   SFFA had forty-seven affiliate members when it sued Harvard, including Asian American members who had applied to and been rejected by Harvard.   Several of these members submitted declarations stating that they voluntarily joined SFFA, supported its mission, had been in contact with SFFA, received updates about this litigation, and were able to express their views on it.

In June 2015, SFFA amended its bylaws to eliminate "affiliate members" and replace them with "general members." Unlike affiliate members, general members have the right to vote for a member-elected director and must pay membership dues to SFFA. As of 2017, SFFA's membership had increased to approximately 20,000 members.

2)   Harvard's Admissions Process

Harvard's admissions process is complex and highly competitive.   Each year, Harvard College attempts to admit a class of roughly 1,600 students.   For its class of 2019, Harvard received around 35,000 applications.   Because of the size of the applicant pool relative to Harvard's available slots, Harvard cannot admit all applicants who would succeed academically.   Harvard has determined that academic excellence alone is not sufficient for admission.   Rather, Harvard seeks students who are not only

- 8 -

academically excellent but also compelling candidates on many dimensions.

Harvard's application process[3] is accurately described as having six components: (1) Harvard's pre-application recruitment efforts; (2) students' submission of applications; (3) Harvard's "first read" of application materials; (4) admissions officer and alumni interviews; (5) subcommittee meetings of admissions officers to recommend applicants to the full admissions committee; and (6) full admissions committee meetings to make and communicate final decisions to applicants. Harvard also uses a system of "tips" for certain applicants. Tips may be considered during or after the third stage.

a)   Pre-Application Recruitment Efforts by Harvard

Harvard engages in significant recruitment efforts. Each admissions cycle, it buys the names and contact information of students who do well academically and on standardized tests from ACT and the College Board, the two main organizations that administer standardized tests used in college admissions. Harvard uses this information to assemble a "search list." That list in relevant years has had more than 100,000 students. Students on

---

[3]     Because SFFA's allegations of discrimination relate only to United States citizens or permanent residents, the following discussion is limited to the application process for domestic applicants. The statistical analyses performed by the parties' experts exclude data from foreign applicants.

Z 000061

the search list receive communications encouraging them to consider applying to Harvard.  A student's presence on the search list has no effect on whether Harvard will admit them.[4]  Harvard purchases information about high school students of all races, including Asian Americans.  It purchases information for some groups of students, such as African American or Hispanic students and for students from states Harvard has labeled "Sparse Country,"[5] who have lower standardized test scores than other students.

Harvard specifically recruits minority students -- including African American, Hispanic, and Asian American students -- through its Undergraduate Minority Recruitment Program ("UMRP").  Low-income applicants and those who are the first in their family to go to college are encouraged to apply through the Harvard Financial Aid Initiative ("HFAI").  Despite these efforts to expand its applicant pool, the demographics of Harvard's

---

[4]     Students on the search list are twice as likely to be admitted to Harvard as students who are not on the search list. But correlation does not imply causation.  Because the search list mechanically includes students who do well academically and have high test scores -- students who would be stronger applicants to Harvard than those who have less impressive academic and testing credentials -- it does not follow that being on the search list causes these students to be admitted at higher rates.

[5]     Harvard uses "Sparse Country" as a shorthand for areas of the United States that are sparsely populated.  Sparse Country includes twenty states: Alabama, Alaska, Arizona, Arkansas, Idaho, Louisiana, Maine, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, Vermont, West Virginia, and Wyoming.

Z 000062

applicants and its admitted students do not mirror those of the United States on many criteria, including race.

b)   Information Contained in Submitted Applications

Applicants apply to Harvard by Early Action or Regular Decision. The review process is identical for both. Early Action students receive admissions decisions more quickly.

Harvard uses the Common Application, a standardized application that applicants fill out once to apply to different colleges and universities of their choice. As part of the Common Application, students submit a great deal of information, including about their standardized test scores, transcripts, extracurricular and athletic activities, awards, parents' and siblings' educational information, parents' occupations and marital status, teacher and guidance counselor recommendations, intended field of study, personal statement, and additional supplemental essays or academic material. Some information -- like racial identity -- can, but need not, be submitted.

c)   Consideration of Submitted Applications: Harvard's "First Read" of Application Materials

During the admissions cycles directly challenged by SFFA, Harvard's admissions office was led by William Fitzsimmons, the Dean of Admissions and Financial Aid, Marlyn McGrath, the Admissions Director, and Sally Donahue, the Financial Aid Director. Harvard staffs its admissions office with approximately

Z 000063

seventy people, forty of whom are admissions officers.  Admissions officers read applications and decide which applicants will be offered admission.  New admissions officers are trained and supervised by more experienced admissions officers.  This training includes instruction on how to consider race.

All admissions officers are given a copy of Harvard's reading procedures, which explain how to evaluate applications.[6] The reading procedures include guidelines for assigning numerical ratings to applicants in certain categories.  The guidelines detail the factors admissions officers should consider when assigning these numerical ratings.

Before admissions officers begin reading applications, they divide the applications based on geography.  Admissions officers are organized into subcommittees dedicated to reviewing applications from specific regions.[7]  Within each subcommittee, admissions officers further specialize by reading all applications from certain high schools.  Each high school has a dedicated "first reader" for applications from that high school.  First readers do

---

[6]    The following descriptions reflect the reading instructions given to admissions officers for the class of 2018 and were in effect during the period analyzed via statistical analysis in this lawsuit.  Harvard has since revised them for later class years.  Any relevant changes are discussed below.

[7]    To limit inter-geographic discrepancies in application evaluations, each admissions officer serves on at least two subcommittees.

Z 000064

not always have an applicant's complete application when reviewing a file.  For example, an application might be missing an alumni interview report or a teacher recommendation when it is first reviewed.  Every application has a set of numerical ratings assigned by the first reader.  Some applications are also given additional rounds of ratings by additional readers.[8]  Faculty members might also review files.[9]

There are six types of ratings assigned during the reading stage:  academic ratings, extracurricular ratings, athletic ratings, school support ratings, personal ratings, and overall ratings.  Each rating is numeric.  Higher numbers often, but not always,[10] indicate a worse rating.  Each of the six categories has subjective components and none are formulaically

---

[8]  New admissions officers have their first fifty applications reviewed by second readers.  Otherwise, second readers are rare and used if the case is complex, if the case raises issues of policy, or if the case would be helped by a second reader's subject-matter knowledge or geographic expertise.  The chair of the docket may also serve as a third reader.  This title is a misnomer, as an application need not receive a second read to be given a third read.

[9]  Faculty members review files if they have specific expertise relevant to an application.  For example, a Visual and Environmental Studies professor might review an applicant's film.  Some faculty members also volunteer to review files from certain regions.

[10]  In some categories, ratings of five or six denote special circumstances (e.g., home or employment responsibilities that preclude participation in extracurricular activities) and are not necessarily worse than lower numbers.

Z 000065

assigned.  Admissions officers fine tune their ratings with "+" and "-" marks.  For example, an applicant with a "3+" academic rating would be stronger than an applicant with a "3", who would in turn be stronger than an applicant with a "3-" rating.  Ratings of "1" are exceedingly rare and are predictive of admission in most categories.[11]  These ratings are preliminary and do not dictate a student's admission to Harvard.  It is not uncommon for students with worse ratings to be admitted over students with better ratings.  We describe the six categories to which these numeric ratings are assigned.

1.   Academic Rating

The academic rating is designed to quantify a student's academic ability and is based largely, though not exclusively, on grades and standardized test scores.  Other factors that go into the rating include less quantifiable characteristics like a student's demonstrated love of learning, potential for future academic improvement, teacher and guidance counselor letters and, if available, academic or faculty evaluations.

_____

[11]     During the period analyzed by the parties' experts, .07% of applicants received an overall rating of 1 and all were admitted.  Of the .45% of applicants who received an academic rating of 1, 68.9% were admitted.  Of the .31% of applicants who received an extracurricular rating of 1, 49.1% were admitted.  Of the .82% of applicants who received an athletic rating of 1, 86% were admitted.  And of the .03% of students who received a personal rating of 1, 69.6% were admitted.  Schools support ratings of 1 are relatively more frequent and less predictive of admission.

Z 000066

An academic rating of "1" signifies "summa cum laude" potential. Harvard's reading procedures describe "1" applicants as genuine scholars with near-perfect standardized test scores and grades. They may have even demonstrated an ability to produce original scholarship. "2" applicants have "magna cum laude" potential and are excellent students with top grades. If they submit SAT scores, they are typically in the mid- to high-700s in each testing area. ACT scores for "2" students are typically at or above 33. "3" students have "cum laude" potential and have SAT scores in the mid-600s to low-700s or ACT scores between 29 and 32. Finally, "4," "5," and "6" applicants have "adequate preparation," "marginal potential," and "marginal or worse" achievement, respectively, with lower grades and standardized test scores.

2.   Extracurricular Rating

The extracurricular rating measures a student's commitment to non-academic pursuits, broadly defined. A score of "1" indicates "truly unusual achievement," a score of "2" reflects "strong secondary school contribution in one or more areas such as class president, newspaper editor, etc.," a score of "3" represents "solid participation but without special distinction," and a score of "4" corresponds to little or no participation. The reading procedures instruct admissions officers to give scores of "5" or

Z 000067

"6" if special circumstances precluded the applicant from engaging in more traditional extracurriculars.

### 3.   Athletic Rating

The athletic rating measures an applicant's commitment to athletic pursuits.  "1" ratings are reserved for recruited varsity athletes.  A "2" rating represents a "[s]trong secondary school contribution in one or more areas" of athletics with "possible leadership role(s)."  A "3" is "active participation," and "4" indicates little to no participation.  Unlike "4" ratings in other categories, an athletic rating of "4" is not a negative. "5" or "6" ratings indicate circumstances that hinder or prevent participation in athletics.

### 4.   School Support Ratings

Admissions officers also assess the strength of an applicant's high school support by reading teacher and guidance counselor recommendations.  Each recommendation receives its own rating.  "1" indicates "strikingly unusual support," typically indicated by phrases in recommendations like "the best ever."  A "2" corresponds to "very strong support," a "3" is "above average positive support," "4" is "somewhat neutral or slightly negative," and a "5" is "negative or worrisome."  Admissions officers assign general school support ratings, but teacher and guidance counselor recommendations can also affect other rating scores (e.g., the academic and personal ratings).

- 16 -

Z 000068

5.   Personal Rating

The personal rating features heavily in this litigation. It attempts to measure the positive effects applicants have had on the people around them and the contributions they might make to the Harvard community.  Factors considered include an applicant's perceived leadership, maturity, integrity, reaction to setbacks, concern for others, self-confidence, likeability, helpfulness, courage, kindness, and whether the student is a "good person to be around."  Admissions officers generally assess an applicant based on the applicant's admissions essays, teacher and guidance counselor recommendations, accomplishments, and alumni interview report, but almost any information in a student's application can factor into the personal rating.

According to Harvard's written reading procedures, a score of "1" is "outstanding," a score of "2" is "very strong," and a score of "3" is "generally positive."  Applicants who receive ratings of "4," "5," or "6" are typically described as "bland or somewhat negative or immature," having "questionable personal qualities,"  or  having  "worrisome  personal  qualities," respectively.[12]

---

[12]   These descriptions were updated in 2018 to be more descriptive.  For example, in the updated instructions, an applicant with a "1" personal rating is described as follows: "Truly outstanding qualities of character; student may display enormous courage in the face of seemingly insurmountable obstacles in life.  Student may demonstrate a singular ability to lead or

Z 000069

Harvard maintains that race itself does not play a role in a student's numerical personal score.  It does admit that experiences tied to an applicant's race -- for example, experiences with prejudice or discrimination and how the applicant has overcome this adversity -- could inform their personal rating.  Before 2018, the reading procedures Harvard distributed to its admissions officers did not mention whether race should be included in assigning the personal rating.  After SFFA brought this suit, Harvard modified these instructions to explicitly say that "an applicant's race or ethnicity should not be considered in assigning the personal rating."  These updated instructions took effect beginning with the class of 2023.

6.   Overall Rating

Before the admissions officers take a candidate to the committee stage, they assign an overall rating to each applicant. This rating takes all available information into account and is not a formulaic weighting of the other ratings.  Harvard's reading procedures include guidelines for assigning an overall rating: a "1" signifies an "exceptional" candidate with >90% chance of admission; a "2" is a strong student with a 50-90% chance of admission; a "3" is a "solid contender" with a 20-40% chance of

---

inspire those around them.  Student may exhibit extraordinary concern or compassion for others.  Student receives unqualified and unwavering support from their recommenders."

Z 000070

admission, a "4" is a "neutral" candidate with respectable credentials, and a "5" is an applicant with below-average credentials.

Unlike the other ratings, Harvard acknowledges that admissions officers can and do take an applicant's race into account when assigning an overall rating. Race can be, but need not be, a basis for a "tip." So can other factors. We discuss tips later, after a description of interviews and the committee deliberations.

d)   Admissions Officer and Alumni Interviews

Concurrent with the admissions office's review of applications, Harvard uses its alumni and admissions officers to interview applicants. Harvard provides all interviewers with an Interview Handbook. The Handbook provides guidance about what information interviewers should not discuss (e.g., the applicant's chance of admission) or questions they should not ask (e.g., interviewers "should not ask questions that suggest students are being ethnically screened or go through a 'special' admissions process"). Alumni interviewers have access to some of the same information as Harvard's admissions officers. The information they receive does not include teacher and guidance counselor recommendations or transcripts. After conducting an interview, alumni give written comments and assign applicants numerical scores that are broadly similar to the scores assigned by an

Z 000071

admissions officer.   However, alumni only assign academic,
personal, extracurricular, and overall scores.   They do not assign
athletic or school support ratings.

e)   Subcommittee Meetings and Recommendations to Full Committee

          After reading applications, assigning preliminary
scores, and gathering any additional information from faculty and
alumni, Harvard decides those applicants to whom it will offer
admission.   Admissions subcommittees meet to discuss the
applicants in their region over three to five days.   First readers
typically serve as advocates for applicants they believe should be
admitted.   Not every applicant is discussed, but it is common for
members of the committee to discuss candidates not singled out by
first readers.

          The subcommittees make recommendations to the full
admissions committee.   Their recommendations are not dispositive.
The final decisions are made only at the full committee meeting.
It is not uncommon for applicants who were not recommended for
admission by a subcommittee to later be admitted (and vice versa).
The subcommittees consider a variety of factors, including race,
when making their recommendations.

f)   Full Committee Meetings and Final Decisions on Offers to Admit

          Harvard then holds a full committee meeting -- comprised
of forty members -- to finalize decisions.   Any applicant may be
discussed at the full committee meeting, though the focus is

Z 000072

typically on those recommended by the various subcommittees. All committee members have access to each student's application. This application frequently includes additional information that was not available when the first reader assigned ratings to the applicant. The applicants presented are discussed one by one, and every member of the full committee votes on admission. An applicant must secure a majority of the full committee's vote to be offered admission.

After the full committee votes on applications, it typically has a pool of more than 2,000 tentative admits, more than can be admitted. To finalize the class, it conducts a "lop process" to winnow down the pool even further. Before deciding which applications will be lopped, members of the admissions committee are informed of various demographic characteristics of the admitted applicants, including race. Admissions officers then compile a "lop list" of applicants who might be lopped. This list includes information about tentative admits -- race, athletic rating, legacy status, and socioeconomic status -- relating to some of Harvard's admissions tips. After enough applicants have been lopped, Harvard sends decisions to applicants.

g)  "Tips" Given to Benefit ALDC Applicants and Non-ALDC
    Applicants

Since at least 1990, Harvard has used a system of "tips" in its application review process. Tips are plus factors that

- 21 -

might tip an applicant into Harvard's admitted class.  The tip system is an overlay of Harvard's process and tip factors can be considered at multiple points in Harvard's review.  Tips can be incorporated in Harvard's ratings and during the committee review stage.

Harvard has memorialized a non-exhaustive list of tip factors in a handbook it gives to admissions officers and alumni interviewers.  The factors contained in Harvard's written materials are outstanding and unusual intellectual ability, unusually appealing personal qualities, outstanding capacity for leadership, creative ability, athletic ability, legacy status, and geographic, ethnic, or economic factors.  Harvard admits that race is considered.

1.   Harvard's Consideration of Race

Harvard's use of tips that take race into account is the focus of many of SFFA's claims.  We consider how and when Harvard claims to consider race.  It admits that race can be considered during Harvard's "first read" of application materials only when assigning an applicant's overall rating.  It also admits that an applicant's race can be considered in both subcommittee and full committee meetings.  Harvard denies that race is considered in assigning an applicant's personal rating during the "first read."

We describe the background against which Harvard's tip taking race into account is used.  Admissions officers are

- 22 -

Z 000074

provided, from time to time, with summaries containing demographic information.  These "one-pagers" provide a snapshot of various demographic characteristics of Harvard's applicant pool and admitted class and compares them to the previous year.  In addition to race, these sheets summarize the applicant pool on a variety of other dimensions (e.g., gender, geographic region, intended concentration, legacy status, whether a student applied for financial aid, etc.).  Information from this sheet is periodically shared with the full admissions committee, and the committee uses this information in part to ensure that there is not a dramatic drop-off in applicants with certain characteristics -- including race -- from year to year.  Harvard keeps abreast of the racial makeup of its admitted class in part because doing so is necessary to forecast yield rates.  The yield rate is the percent of admitted applicants who accept an offer of admission.[13]  Empirically, Asian American and white students accept offers of admission at higher rates than African American, Hispanic, Native American, and multiracial applicants.

---

[13]    An alternative interpretation of "yield rate by race" is the number of students of a particular race admitted divided by the total number of students admitted.  We discuss this statistic when reviewing the district court's findings of fact.

Z 000075

2.    ALDCs: Athletes, Legacy Applicants, Dean's Interest List
      Applicants, and Children of Faculty or Staff

        Harvard also provides tips to ALDC (recruited athletes,
legacy applicants, applicants on the Dean's Interest List,[14] and
children of faculty or staff) applicants.  ALDC applicants make up
less than 5% of applicants to Harvard but around 30% of the
applicants admitted each year.   These applicants have a
significantly higher chance of being admitted than non-ALDC
applicants.  SFFA does not challenge the admission of this large
group of applicants who can and do receive tips.

        The racial makeup of ALDC applicants is different than
non-ALDC applicants.   Around 67.8% are white, 11.4% are Asian
American, 6.0% are African American, and 5.6% are Hispanic.   In
contrast, only 40.3% of non-ALDC applicants are white, 28.3% are
Asian American, 11% are African American, and 12.6% are Hispanic.

3)    Prior Analyses of Harvard's Use of Race in Harvard's
      Admissions Process

        Because SFFA argues, and Harvard denies, that its claims
are supported by prior reviews of Harvard's admissions policies,
we describe those analyses.

_____

        [14]    The Dean's Interest list is a list of applicants the
Dean of Admissions gives special attention to.   It primarily
includes the children or relatives of donors, and it includes a
rating of how important the donor is to Harvard.

Z 000076

a)   <u>1990 U.S. Department of Justice Office of Civil Rights ("OCR")</u>
     <u>Report</u>

In 1990, OCR investigated potential claims of anti-Asian bias in Harvard's admissions process but concluded there was no difference in the numeric ratings given to white and Asian American applicants.

At the time, Harvard reviewed applications using a process like the one challenged in this lawsuit in the sense that it used a rating system and tips for race and ALDC applicants. OCR's report stated that "descriptions of Asian American applicants were found that could have implications for the stereotyping of Asian American applicants." But "[t]hey could not be shown to have negatively impacted the ratings given to these applicants." The OCR report concluded that Harvard did not use a quota system for Asian Americans, that its rating system was not designed or implemented to harm Asian Americans, and that, "taken as a whole, there was no significant difference between the treatment of Asian American applicants and the treatment of white applicants."

b)   <u>Harvard's Office of Institutional Research Studies</u>

Harvard has conducted its own studies of its admissions process in the past decade.

The first of these -- commissioned in part due to a widely publicized November 2012 article by Ron Unz in <u>The American</u>

Z 000077

Conservative titled "The Myth of the American Meritocracy" -- was conducted by Harvard's Office of Institutional Research (OIR). This review started in December 2012 and went through several stages. OIR's initial rough, preliminary logistic regression models, which omitted many variables actually considered in Harvard's admission process (like socioeconomic or family circumstances), showed that Harvard was better able to predict the racial makeup of its admitted class if it included race as an explanatory variable in the regression.

After this analysis by OIR, Harvard's Dean of Admissions requested further analysis on Harvard's use of low-income tips. OIR's next analysis used application data for the classes of 2009 to 2016 and found that "low income students clearly receive a 'tip' in the admissions process" but that "the tip for legacies and athletes is larger" than for low income applicants. It also found that "there are demographic groups that have negative effects." The admittedly limited model suggested but did not conclude that Asian American applicants were statistically significantly less likely to be admitted to Harvard than white applicants. OIR explained that the model "has several limitations" and that expanding the set of explanatory variables in the model "might result in a better fitting model, one that accounts for more of the variation in individual applicants and their potentially unique contributions to the entering class."

Z 000078

Harvard's Dean of Admissions then asked OIR to investigate whether Harvard's tip for low-income applicants was consistently applied across applicants of different races. Specifically, given the concerns raised about Harvard's treatment of Asian American applicants, he wanted an analysis of the effect of being both Asian American and low-income. OIR inserted an interaction term into the logistic regression model used in its previous report in order to capture the effect of being both Asian American and low income.[15] This term had a statistically significant positive coefficient, suggesting that, holding all else constant, being both Asian American and low income results in an applicant having a higher chance of admission than the sum of the effect of being Asian American or low-income alone suggests. This model, however, admittedly suffered from the same problems and limitations as OIR's earlier models in that it omitted many variables that Harvard actually considered in its admissions process.

---

[15]    An interaction term between two categorical (i.e., non-numeric) variables in a logistic regression model captures whether the effect of having one characteristic changes when another characteristic is also present. See Reference Manual on Scientific Evidence [hereinafter, "FJC Reference Manual"] (3d ed. 2011) at 316-17. Here, the interaction term measures whether being both Asian American and low-income simultaneously results in a greater or lower change in an applicant's admission chances beyond the effects of being either Asian American or low-income independently.

Z 000079

4)   <u>Harvard's Articulation of Its Justification for Its Use of Race to Accomplish Diversity</u>

a)   <u>The Khurana Committee</u>

In 2015, Harvard created the "Committee to Study the Importance of Student Body Diversity" (the "Khurana Committee"). This committee was chaired by Rakesh Khurana, the dean of Harvard College.  The report it issued (the "Khurana Report") was part of Harvard's effort to explain the benefits Harvard derives from diversity, including racial diversity, as required by Supreme Court precedent.  Indeed, the Khurana Committee recognized that "[t]he question before [it] is one the Supreme Court has asked public institutions of higher education to answer in connection with the consideration of an applicant's race" in admissions.

The Khurana Committee sought input from a variety of sources at Harvard.  In reaching its conclusions, it relied on discussions with students, alumni, faculty, athletic coaches, extracurricular advisors, the deans of admissions and student life, residential faculty deans, and other committees on admissions, financial aid, and educational policy.  Based on its findings, it "emphatically embrace[d] and reaffirm[ed] the University's long-held . . . view that student body diversity -- including racial diversity -- is essential to [Harvard's] pedagogical objectives and institutional mission."

- 28 -

Z 000080

The Khurana Report began by reiterating the mission of Harvard College: "to educate the citizenry and citizen leaders for our society."  It detailed how Harvard has pursued this mission over time and how student body diversity is essential to achieving it.  At its founding, Harvard's student body was limited by the socioeconomic, geographic, and political factors of the 17th century.  Harvard educated the small subset of men who had completed high school, had the means to travel to Harvard, and wanted to pursue post-secondary education.

Leading up to the Civil War, Harvard's President called for increased diversity.  In a report to Harvard's Board of Overseers, he recognized the "disastrous condition of public affairs."  He wrote that Harvard must assemble a student body "from different and distant States" to "remove prejudices, by bringing them into friendly relations."

Successive presidents of Harvard reaffirmed the importance of diversity.  In the late 19th century, President Charles William Eliot revised the Harvard curriculum to promote tolerance, mutual understanding, and camaraderie.  He wrote that diversity "promotes thought on great themes, converts passion into resolution, cultivates forbearance and mutual respect, and teaches . . . candor, moral courage, and independence of thought."  A century later, President Neil Rudenstine praised these reforms in his own 1996 evaluation of diversity at Harvard.  He wrote that

Z 000081

President Eliot recognized that a diverse student body was "capable of shaping lifelong attitudes and habits" and "indispensable to the healthy functioning of a democratic society."  In 2015, then-President Drew Gilpin Faust said at the beginning of Harvard's academic year that diversity is "an integral part of everyone's education."  She said she meant not just racial diversity but also other types, including religious, ethnic, national, political, and gender diversity.  By "everyone," she said she meant not just students but also the wider Harvard community, including faculty and staff.

The Khurana Report made Harvard's reasons for accomplishing diversity by its limited use of race even more explicit.  In our view, at least these specific goals are articulated in this report: (1) training future leaders in the public and private sectors as Harvard's mission statement requires; (2) equipping its graduates and itself to adapt to an increasingly pluralistic society; (3) better educating its students through diversity; and (4) producing new knowledge stemming from diverse outlooks.

The Khurana Report recognized that Harvard, historically and currently, trains leaders.  Signers of the Declaration of Independence attended Harvard.  Today, Harvard College graduates "are founding and running global companies in technology, retail, finance, and healthcare, among others."  Graduates will become

Z 000082

leaders not just in the United States but throughout the world. The Khurana Report stated that global companies want to hire and promote graduates who have been educated in diverse settings. Businesses have internalized diversity and inclusion as core values.  It concluded that if Harvard does not provide its students with the opportunity to engage with other students in a diverse undergraduate environment, "[its] students likely would be constrained in their pursuit of excellence, and [Harvard] would be remiss in failing to provide them with the skills they need to flourish after graduation."

The Khurana Report also stated that providing a diverse learning environment is necessary not only for Harvard to prepare its students to become leaders but also for it to train leaders at all.  It quoted the Supreme Court in Grutter v. Bollinger: "In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity."  539 U.S. 306, 332 (2003).  The Khurana Report said that Harvard "must demonstrate to the world that individuals of all races, ethnicities, all backgrounds may thrive, succeed, and lead" to continue to train leaders.  If Harvard cannot produce a diverse set of graduates, it may no longer produce leaders.

Next, the Khurana Committee said that Harvard's students graduate into a world that has become increasingly diverse.  The

Z 000083

Khurana Report quoted from the amicus brief Harvard filed in Fisher II:  "Whatever their field of endeavor, Harvard's graduates will have to contend with a society that is increasingly complex and influenced by developments that may originate far from their homes.  To fulfill their civic and other responsibilities, Harvard's graduates cannot be blind either to the challenges facing our increasingly pluralistic country or to the unresolved racial divisions that stubbornly persist despite decades of substantial efforts to resolve them."  The Khurana Report said student body diversity encourages students to "examine ways of processing the world dissimilar to their own" and that through classroom discussion with others "one learns to negotiate pluralism."  The Khurana Report said that racial diversity in particular is important because Harvard's graduates enter a society where "negative life experiences attributable to differences in racial and ethnic heritage" are still commonplace.  It concluded that Harvard "would fail in a foundational aspect of [its] mission if [it] disregarded that fact as [it] prepare[s] [its] students for such a complex and heterogeneous society."

Third, the Khurana Committee detailed how diversity is important to Harvard's goal of educating students, faculty, and staff.  One of these goals is transformational.  In addition to encouraging students to embrace their own identities, Harvard wants its students to take on an additional, complementary one.

Z 000084

It wants them to become members of "the community of educated men and women."  Harvard views this identity as "inclusive of but not bounded by race or ethnicity."  It "is sensitive to and understanding of the rich and diverse range of others' identities" and "opens empathic windows to imagining how other identities might feel."  To achieve this transformation, Harvard creates opportunities for students to interact with others who are unlike themselves.

The Khurana Report cited a book, Making the Most of College, by Professor Richard J. Light, a professor at Harvard's Graduate School of Education.  The book, based on in-depth interviews of thousands of Harvard students, provided examples of how diversity, including racial diversity, can promote learning, empathy, and understanding.  The Khurana Report observed that certain conversations described in the book "likely could not have occurred as candidly as [they] did" at Harvard had "any or all of [the students involved] been white."  The Khurana Committee recognized that certain learning environments are not possible unless some students "share[] a relationship to the issue that [others] simply [do] not have."  And the educational benefits of diversity cannot be obtained "[i]f the only contact students had with others' lived experiences was on the page or on the screen" because "it would be far too easy to take short cuts in the exercise of empathy, to keep a safe distance from the ideas, and the people,

Z 000085

that might make one uncomfortable."  Personal contact is essential.
It also said that the conversations in the book make clear that
students who have some characteristics in common can and do have
different perspectives from each other.  The Khurana Report drew
two conclusions: (1) race "plays an irreplaceable role in
[Harvard's] conception of a diverse student body" and (2) Harvard
cannot and does not treat race monolithically because students of
the same race do not "share the same views, experiences, or other
characteristics."

Finally, the Khurana Committee said that diversity is
important to producing new knowledge.  Its report quoted from an
amicus brief filed by Harvard and other colleges and universities
in Regents of the University of California v. Bakke: diversity
"broadens the perspectives of teachers and thus tends to expand
the reach of the curriculum and the range of scholarly interests
of the faculty."  The Khurana Report said that entirely new fields
of study, like Women's Studies, Latin American Studies, and Labor
Studies, were created in part because universities like Harvard
admitted more women, Latinx, and low-income students.  It also
said that older fields -- like Classics and Philosophy -- were
reshaped by "new perspectives on gender and sexuality, race,
ethnicity, and social class."  And it said that the social
sciences, natural sciences, and medicine have all been transformed
by a more diverse student body.  A homogeneous research community

Z 000086

leads to "shared blind spots" that different perspectives can reveal.   It concluded that diversity is necessary to create knowledge.

5)   Harvard's Committees to Study Race-Neutral Alternatives

a)   The Ryan Committee

In 2014, in response to the creation of an external, unaffiliated website accusing its admissions process of being unfair, Harvard formed a committee to examine race-neutral alternatives to its race-conscious admissions process (the "Ryan Committee").   The Ryan Committee was chaired by Professor James Ryan, then the Dean of Harvard's Graduate School of Education. This committee met only a few times before disbanding in December 2014.

b)   The Smith Committee

In June 2017, Harvard established the "Committee to Study Race Neutral Alternatives in Harvard College Admissions" (the "Smith Committee").   This committee was chaired by Michael Smith, then the Dean of Harvard's Faculty of Arts and Sciences. Like the Khurana Committee, the Smith Committee was part of Harvard's effort to ensure compliance with Supreme Court precedent.   It issued a report (the "Smith Report") examining whether Harvard could achieve its interest in diversity without considering race in its admissions process.

Z 000087

The Smith Report began with a summary of the ways Harvard already recruits diverse applicants. Harvard identifies low-income students and encourages them to apply with informational mailings highlighting Harvard's financial aid program. Harvard's admissions process is need-blind, which means that an applicant's inability to pay tuition will not harm their chances of being admitted. It sends representatives -- admissions officers, current undergraduates, and alumni -- to conduct recruitment events throughout the United States. These events include secondary schools and regions that have not historically sent students to Harvard. It has created a "First Generation" program to encourage students who would be the first in their family to attend college to apply. As part of this program, it connects current first-generation Harvard students with potential applicants to answer their questions. As discussed earlier, Harvard encourages racially diverse applicants to apply through UMRP and low-income applicants to apply through HFAI.

Once it has admitted diverse applicants, Harvard encourages them to matriculate. It provides admitted students with a price calculator so that they can determine if Harvard is affordable. And it has worked to make Harvard affordable. Since 2004, Harvard has steadily reduced the effective tuition that low-income students pay. Since 2012, Harvard has expected no parental contribution from families earning less than $65,000 a year and a

Z 000088

parental contribution limited to 10% of family income for students from families earning less than $150,000 a year. It widely publicizes this information. Harvard also hosts a weekend-long on-campus event for admitted students. It provides financial aid to low-income admitted applicants to ensure that they can attend the event. Admittees are encouraged to meet each other and current students, including those with similar backgrounds. To facilitate this, Harvard hosts an Economic Diversity and First Generation Students Reception and a multicultural reception.

## 1. Expanding Recruitment or Modifying Admissions Criteria

The Smith Committee then considered six of SFFA's race-neutral proposals to increase diversity by expanding Harvard's recruitment efforts or modifying its admissions criteria: (1) increasing efforts to recruit racially and socioeconomically diverse students; (2) expanding partnerships with schools or organizations that serve applicants of modest socioeconomic backgrounds; (3) increasing financial aid; (4) adopting place-based preferences; (5) increasing transfer admissions; and (6) increasing the weight for socioeconomic background.

The Smith Report concluded that Harvard already devotes significant resources to recruitment efforts and that expanding them further would not increase diversity. It said that a more racially diverse applicant pool is itself not helpful. Harvard needs a recruitment process that is directed at students who are

Z 000089

likely to be accepted.  Expanding the applicant pool beyond those students would increase the number of disappointed applicants and could even discourage younger students from applying in the future. Harvard also reevaluates these programs at least twice a year to determine how they can be improved or expanded.

It also concluded that expanding partnerships with schools or organizations that serve applicants of modest socioeconomic means would be insufficient for it to meet its diversity goals.  Harvard already engages in significant outreach. The Report concluded that Harvard's "current efforts are so substantial that we do not believe that seeking out additional partnerships of this nature, or deepening current partnerships could yield more than an incrementally small number of applicants who would be admitted to Harvard and would not otherwise have applied."

Next, the Committee determined that increasing financial aid further would not increase diversity.  According to Harvard's financial aid office, 90% of families already pay the same or less to send their child to Harvard than they would pay to send their child to a state school.  70% of African American students' families and 60% of Hispanic students' families qualify for zero parental contribution under Harvard's financial aid program.  The Committee found no evidence that "members of any racial or ethnic group are choosing to attend other schools instead of Harvard on

- 38 -

Z 000090

the basis of the need-based financial aid available at those institutions." It relied on statistical evidence showing that Harvard's previous expansions of financial aid did not result in significant increases in the number of African American or Hispanic applicants or admitted students. It concluded that increasing financial aid was not a viable race-neutral alternative.

The Smith Committee also rejected place-based preferences like admitting the top student from each zip code or high school. It found such preferences "fundamentally incompatible with the core mission of the Harvard admissions process, which is to recruit, admit, and enroll the most extraordinary students in the world, wherever they may be found." Such preferences were also practically impossible to implement, as Harvard "does not have room to admit even one student" from every high school or zip code in the United States. And even if Harvard did have room, the committee found that it would be impossible to identify the best student from each area because Harvard does not rank applicants on a single dimension.

The Smith Committee found that increasing the number of transfer students would also not increase diversity. Harvard's ability to admit transfer students is limited by the space it has. 98% of undergraduate students live on campus. Some years, it does not have space for any transfer students at all. To increase the transfer students it admits, Harvard would need to admit fewer

Z 000091

freshmen to reserve spots for transfer students.  This would only increase diversity if the transfer applicant pool were more diverse than Harvard's freshman applicant pool.  But the Smith Committee found that the transfer pool is "less diverse and less impressive than the pool of freshman applicants."

Finally, the Smith Committee found that increasing the weight it places on socioeconomic background in admissions would not further Harvard's diversity goals.  Harvard "believes that excellence can and should be found in all backgrounds" and determined that "[a] focus on socioeconomic circumstances that outweighed all other factors could equally reduce the depth and breadth of the Harvard class as well as its excellence in many dimensions."  In order to reach a level of racial diversity similar to what it currently achieves, Harvard would need to give applicants from lower socioeconomic backgrounds such an extreme tip that it would "overwhelm other considerations in the admissions process" and result in "significant changes in the composition of the admitted class."  Harvard would admit substantially fewer students with the highest academic, extracurricular, personal, and athletic ratings.  As academic excellence "remains an institutional imperative" at Harvard, the Smith Report concluded that these changes were not feasible.  The Smith Committee also found that using socioeconomic status as a proxy for race would result in many non-white students in Harvard's class coming from

Z 000092

modest socioeconomic circumstances.  Achieving racial diversity in this way would come "at the cost of other forms of diversity, undermining rather than advancing Harvard's diversity-related educational objectives."

2.   Eliminating Admissions Practices

Next, the Smith Committee evaluated whether Harvard should eliminate three of its core admissions practices: (1) early action; (2) deferred admission and tips for ALDC applicants; and (3) consideration of standardized test scores.

Harvard already tried eliminating Early Action.  Harvard thought that eliminating Early Action would "encourage an even greater number of diverse students to apply and matriculate" and eliminated Early Action from 2007 to 2011.  It found that doing so "reduced [its] ability to attract a broadly diverse and academically excellent class."  Considering Harvard's "direct experience and experimentation with Early Action, the committee [did] not believe that abolishing Early Action again would contribute to diversity on campus."

The Smith Committee next concluded that eliminating ALDC tips and deferred admission would not be adequate race-neutral alternatives.  If Harvard were to eliminate its consideration of race and make no other changes, the Smith Report says that the share of African American admitted students would be 5.6% and the share who are Hispanic or Other would be 8.9%.  If it were to

Z 000093

eliminate the consideration of race and eliminate deferred admission and ALDC tips, the report says that the share of African American admitted students would be 5.3% and the share who are Hispanic or Other would be 9.3%. The Smith Committee found that eliminating these admissions practices resulted in negligible, and sometimes negative, changes to diversity.

The Smith Committee also defended Harvard's use of deferred admission and ALDC tips. It found them consistent with Harvard's values. Deferred admission allows Harvard to admit students who would benefit from a gap year. Giving tips to athletes allows Harvard to admit students who have demonstrated "discipline, resilience, and teamwork" and allows Harvard to field competitive athletic teams, which fosters a sense of community on campus. Preferencing legacy applicants "helps to cement strong bonds between the university and its alumni," fosters community-building, and encourages alumni to donate their time and money to support Harvard. Harvard's tip for "Dean's List" students is "far too small for the cessation of any such practice to contribute meaningfully to campus diversity." Finally, giving tips to the children of faculty and staff is important to workforce retention. Eliminating this tip would disadvantage Harvard relative to other schools in recruiting faculty and staff.

Finally, the Smith Committee found that eliminating consideration of standardized test scores would come at a

Z 000094

significant cost to Harvard's other educational objectives. Relative to Harvard's current admitted classes, "the proportion of students with the highest academic ratings would decline by 17%, and the proportion of students with the highest extracurricular or personal ratings would decline by 7%." The Smith Committee also found that standardized tests are imperfect measures but "provide useful information that the committee would lose if it excluded any consideration of them."

After considering all of the race-neutral alternatives proposed by SFFA, the Smith Committee concluded that "they will not work at Harvard [] at this time." The Smith Committee recommended that Harvard revisit race-neutral alternatives in 2023.

## II.   Procedural History and Descriptions of the District Court's Rulings

The district court conducted a fifteen-day bench trial from October 15, 2018 to November 2, 2018. Closing arguments were held on February 13, 2019. Below, we describe the district court's rulings. As to all of its conclusions, we provide further descriptions during our legal analysis. Our description of the district court's legal conclusions is brief because we review those conclusions de novo. See, e.g., AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc., 928 F.3d 110, 116 (1st Cir. 2019).

- 43 -

Z 000095

1)   <u>The District Court Held That SFFA Had Article III Standing</u>

Before trial, the district court held that SFFA had associational standing to sue Harvard under <u>Hunt</u> v. <u>Washington State Apple Advertising Commission</u>, 432 U.S. 333 (1977).  See <u>SFFA I</u>, 261 F. Supp. 3d at 111.  It held that SFFA satisfied <u>Hunt</u>'s requirements because SFFA included members who had standing to sue Harvard themselves, because the lawsuit was germane to SFFA's purpose, and because the injunctive relief sought by SFFA does not require the participation of its members who have standing.  <u>See id.</u> at 110-11.  It rejected Harvard's argument that it had to apply an additional test from <u>Hunt</u> -- the "indicia of membership" test -- to determine if SFFA was a traditional voluntary membership organization capable of having associational standing because it found that SFFA "adequately represents the interests of its current members without needing to test this further based on the indicia-of-membership factors." <u>Id.</u> at 109.

Harvard challenges SFFA's standing in defense of the outcome reached.

2)   <u>The District Court Held That Harvard's Limited Use of Race in Its Admissions Program Survives Strict Scrutiny</u>

The district court utilized Supreme Court precedent to apply strict scrutiny to evaluate Harvard's race-conscious admissions program.  <u>SFFA II</u>, 397 F. Supp. 3d at 189. Specifically, the district court articulated the requirements in

- 44 -

Z 000096

Fisher v. University of Texas at Austin ("Fisher II"), 136 S. Ct.
2198 (2016), Fisher v. University of Texas at Austin ("Fisher I"),
570 U.S. 297 (2013), Parents Involved in Community Schools v.
Seattle School District No. 1, 551 U.S. 701 (2007), Gratz v.
Bollinger, 539 U.S. 244 (2003), Grutter v. Bollinger, 539 U.S. 306
(2003), and Regents of the University of California v. Bakke, 438
U.S. 265 (1978).   To survive strict scrutiny, Harvard's use of
race must further a compelling interest and be narrowly tailored
to do so.   See Fisher II, 136 S. Ct. at 2208, 2210.

        The court held that Harvard had a compelling interest in
student body diversity that was sufficiently precise to permit
judicial scrutiny.   SFFA II, 397 F. Supp. 3d at 192.   It credited
the Khurana Report and the witness testimony at trial.   Id. at
134, 192.

        It held that Harvard met its burden under strict scrutiny
and Supreme Court precedent to show its use of race in admissions
was narrowly tailored.   It held that Harvard did not engage in
racial balancing, did not use race as a mechanical plus factor,
and did not have workable race-neutral alternatives.   SFFA II, 397
F. Supp. 3d at 192-201.

a)   The District Court Held That Harvard Did Not Engage in Racial
     Balancing

        A race-conscious admissions program cannot be narrowly
tailored if it implements a quota or racial balancing.   See Fisher

Z 000097

I, 570 U.S. at 311; Grutter, 539 U.S. at 334.  The district court found that Harvard's admissions program "intends to treat every applicant as an individual," that "[e]very applicant competes for every seat," and that Harvard has no target numbers for members of certain races or permissible levels of fluctuation.  SFFA II, 397 F. Supp. 3d at 196.  It found that Harvard's admissions office's use of "one-pagers" did not evidence racial balancing.  Id. at 197.

SFFA did not offer expert testimony to support its racial balancing claim.  Id. at 177.  The court found that "the racial composition of Harvard's admitted classes has varied in a manner inconsistent with the imposition of a racial quota or racial balancing."  Id. at 176.  It found that the share of Asian American applicants admitted to Harvard has increased roughly five-fold since 1980 and roughly two-fold since 1990.  Id. at 177. It also found that there had been more year-over-year variation in Asian American applicants admitted to Harvard than there had been in Asian American applicants to Harvard.  Id.

b)   The District Court Held That Harvard Did Not Use Race as a Mechanical Plus Factor

If a university considers race, it cannot do so in a mechanical way.  See Gratz, 539 U.S. at 270-71.  The district court found that there was no evidence of any mechanical use of tips in Harvard's individualized, holistic review process.  SFFA II, 397

Z 000098

F. Supp. 3d at 198.   It found that Harvard considers race contextually.  Id.  Harvard's tip was "comparable to the size and effect" of tips sanctioned by the Supreme Court in Grutter and Fisher II.  See id.

c)   The District Court Held That Harvard Had No Workable Race Neutral Alternatives

A race-conscious admissions program is not narrowly tailored if a university uses it despite workable race-neutral alternatives.  See Fisher I, 570 U.S. at 312.  The district court found that eliminating race as a factor in admissions, without taking any remedial measures, would reduce African American representation at Harvard from 14% to 6% and Hispanic representation from 14% to 9%.  SFFA II, 397 F. Supp. 3d at 178. It found that at least 10% of Harvard's class would not be admitted if Harvard did not consider race and that race is a determinative tip for approximately 45% of all admitted African American and Hispanic students.  Id.

The court examined six race-neutral alternatives proposed by SFFA and statistically modeled by the parties' experts: (1) eliminating Early Action; (2) eliminating ALDC tips; (3) improving recruiting efforts and financial aid; (4) admitting more transfer applicants; (5) eliminating standardized testing; and (6) instituting place-based quotas.  See id. at 179.  The court also considered combinations of these alternatives.  Id.  It held that

- 47 -

none of these race-neutral alternatives were workable.  Id. at
183.

3)   The District Court Held That Harvard Did Not Intentionally
     Discriminate Against Asian Americans

At trial, the parties presented non-statistical and
statistical evidence on whether Harvard intentionally
discriminated against Asian American applicants.  See id. at 153,
203.

On the non-statistical evidence, the court found that
Harvard's pre-application search list was primarily a marketing
tool, that the 1990 OCR report did not evidence racial bias, and
that the trial testimony showed that Harvard's admissions officers
were not biased and did not stereotype Asian Americans.  Id. at
154-58.

The statistical evidence presented at trial was
extensive.  The parties' experts[16] reviewed descriptive statistics[17]
related to Harvard's admissions process, presented logistic

---

[16]   Harvard relied on the expert testimony of David Card, an
economics professor at the University of California, Berkeley.
See SFFA II, 397 F. Supp. 3d at 158-59 n.40.  SFFA relied on the
expert testimony of Peter Arcidiacono, an economics professor at
Duke University.  Id.

[17]   The term "descriptive statistics" refers generally to
statistics that summarize data (like the mean, median, or standard
deviation).  They are often "building blocks" in statistical
analyses.  See FJC Reference Manual at 213, 230.

Z 000100

regression models[18] of Harvard's academic, extracurricular, athletic, school support, and personal ratings, and created logistic regression models of Harvard's admissions process. See id. at 158-77.

Both Professors Card and Arcidiacono used applicant-level admissions data[19] for applicants to Harvard's classes of 2014 through 2019 to build their models. Id. at 159, 162. The dataset included "hundreds of variables relating to each applicant's demographic characteristics, personal background, geographic information, test scores, high school grades, ratings assigned by Harvard's admissions officers, and Harvard's admissions decision." Id. at 159. The experts had access to aggregate information for the classes of 2000 to 2017 and a sample of actual application files for applicants from the classes of 2018 and 2019. Id. Harvard also presented statistics on the racial make-up of its admitted classes from 1980 to 2019. Id. at 160.

---

[18]   Logistic regression models can be used to measure the effect of one explanatory variable (here, race) on a response variable (here, depending on the model, Harvard's numerical ratings or admission to Harvard) while controlling for other explanatory variables (e.g., standardized tests scores, grades, parental income, etc.). See generally Alan Agresti, Foundations of Linear and Generalized Linear Models 165, 202 (2015). Professors Card and Arcidiacono agreed that logistic regressions are the most useful tool to understand the effect of race on Harvard's admissions process. SFFA II, 397 F. Supp. 3d at 165.

[19]   Their dataset contained only domestic applicants and did not consider transfer applicants or incomplete applications. Id. at 159 n.41.

Z 000101

The district court first made factual findings related to the descriptive statistics. It found that Asian Americans were admitted to Harvard at a lower rate (between 5% and 6%) than white applicants (between 7% and 8%) to the classes of 2014 through 2017. Id. It found that Asian Americans tended to score better on Harvard's academic and extracurricular ratings than white applicants but had worse personal ratings than non-Asian American applicants. Id. at 161-62. Both experts presented non-regression explanations for these statistics. Id. at 162-65. The court found problems with both and determined that logistic regression models were the most useful tools to determine whether Harvard discriminated against Asian Americans because these models can isolate the effects of race by controlling for other variables affecting the modeled outcome. Id. at 165-66.

The court analyzed two sets of logistic regression models: the first set measured the effect of race on Harvard's numerical ratings, while the second set measured the effect of race on the probability of admission to Harvard. Id. at 167-72. One of the purposes of the first set of models was to determine whether Harvard's numerical ratings -- like the personal rating, which SFFA argues was influenced by race -- should be included in the second set of models. Id. at 169. The court recognized that variables that are influenced by race should be excluded from the second set of models. Id. at 166. But variables that are not

- 50 -

Z 000102

influenced by race and include information that the second set of models would not otherwise capture should be included.  Id.

To determine whether the personal rating was influenced by race, the court considered a model of it.[20]  Id. at 169-71. This logistic regression model showed that there was a negative correlation between an applicant's personal rating and Asian American identity even when controlling for various factors related to admission.  Id. at 169.  The court found that correlation does not imply causation.  It found that the correlation between race and the personal rating did not mean that race influences the personal rating.  Id. at 170.

The district court then found that Harvard's expert's model including the personal rating "results in a more comprehensive analysis."  Id. at 173.  Nonetheless, it considered a model including the personal rating and a model excluding it. Id. at 175.  The model including the personal rating showed that Asian American identity has no statistically significant effect on an applicant's chance of admission to Harvard.  Id.  The model

---

[20]   The court also considered logistic regression models for Harvard's other ratings and found that the academic, extracurricular, athletic, and school support ratings should be included in the models because they were not influenced by race. Id. at 167-72.

The court made other findings related to the differences in the experts' modeling assumptions, but the court's decision on the personal rating is the only modeling choice SFFA challenges on appeal.

Z 000103

excluding the personal rating showed that Asian American identity had a slightly negative effect on an applicant's chance of admission to Harvard. Id. The district court found the statistical evidence "inconclusive" and held that it did "not demonstrate any intent by admissions officers to discriminate based on racial identity." Id. Based on the non-statistical and statistical evidence, it held that there was no intentional discrimination. Id. at 203-04.

### III.   Legal Analysis

When, as here, the district court conducts a bench trial, we review its findings of fact for clear error. See, e.g., Sawyer Brothers, Inc. v. Island Transporter, LLC, 887 F.3d 23, 29 (1st Cir. 2018). Under this standard, "we will set aside a trial court's factual findings only if 'after careful evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong.'" Id. (quoting N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 67 (1st Cir. 2009)). We also "remain mindful that the trial court 'sees and hears the witnesses at first hand and comes to appreciate the nuances of the litigation in a way which appellate courts cannot hope to replicate.'" Paraflon Investments, Ltd. v. Fullbridge, Inc., 960 F.3d 17, 24 (1st Cir. 2020) (quoting Calandro v. Sedgwick Claims Mgmt. Servs., Inc., 919 F.3d 26, 33 (1st Cir. 2019)). We

Z 000104

review the district court's legal conclusions de novo.  See, e.g., AcBel Polytech, 928 F.3d at 116.

1)   SFFA Has Standing to Bring This Suit, Contrary to Harvard's Assertion

A federal court's power to decide a suit is limited by Article III of the U.S. Constitution, which restricts federal courts' jurisdiction to cases or controversies.  See, e.g., Warth v. Seldin, 422 U.S. 490, 498 (1975).  Federal courts have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."  Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009).

The "prerequisites for associational standing ensure that Article III's case or controversy requirement is satisfied." United States v. AVX Corp., 962 F.2d 108, 116 (1st Cir. 1992). "An association has standing to sue on behalf of its members when three requisites have been fulfilled: (1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals."  Id. (citing Hunt, 432 U.S. at 343).  Harvard does not dispute that SFFA satisfies these requirements, and, for the reasons stated in the

Z 000105

district court's opinion, we agree that it does.  See SFFA I, 261 F. Supp. 3d at 109-11.

Instead, Harvard argues that SFFA lacks standing because it is not a "genuine" membership organization as required by Hunt and in doing so misreads the Supreme Court's decision in Hunt.  Its argument hinges on the resolution of two issues: (1) whether this Court must apply the "indicia of membership" test to determine whether SFFA is a traditional voluntary membership organization and (2) if so, whether SFFA satisfies this test. Because we hold that the indicia of membership test does not apply to SFFA, we do not address whether SFFA satisfies it.

In Hunt, the Court addressed whether the Washington State Apple Advertising Commission -- "a state agency, rather than a traditional voluntary membership organization" -- could claim associational standing.  432 U.S. at 344.  To resolve the issue, it introduced a threshold hurdle that certain organizations must clear before invoking associational standing.  Id.  Dubbed the "indicia of membership" test by later courts, see, e.g., Friends of the Earth, Inc. v. Chevron Chem. Co., 129 F.3d 826, 829 (5th Cir. 1997), this test requires courts to determine if organizations that are not voluntary membership organizations, "for all practical purposes, perform[] the functions of a traditional trade association."  432 U.S. at 344.  The Court identified a number of factors to consider: whether the organization's purpose is to

- 54 -

protect and promote the interests of its non-members, whether these non-members are "the primary beneficiar[ies] of its activities," and whether non-members elect its members, are the only people who may be members, or finance the organizations' activities, including litigation costs, through assessments levied upon them. Id. at 344-45.  If these indicia of membership are present, non-membership organizations are deemed sufficiently similar to traditional voluntary membership organizations and can claim associational standing (provided that they also satisfy the traditional three-part test).  Id.

Harvard argues that we must apply the indicia of membership test to SFFA to determine whether it is, in fact, a traditional voluntary membership organization.  SFFA argues that because it is, on its face, a traditional voluntary membership organization, the indicia of membership test is inapplicable.  We agree with SFFA.

Harvard cites a number of cases applying the indicia of membership test.  However, none support the proposition that the indicia of membership test must be met here.  These cases hold the indicia of membership test is used in certain factual circumstances which are not present in this case.  See Sorenson Commc'ns, LLC v. Fed. Commc'ns Comm'n, 897 F.3d 214, 225 (D.C. Cir. 2018) (applying the indicia of membership test when it was "unclear if [the plaintiff was] the sort of organization that would qualify as a

Z 000107

'membership association,'" id. at 225, and concluding that it was
not because the plaintiff was an unincorporated online
"information forum" where users could sign up for e-mail updates,
id. 223); Heap v. Carter, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015)
(noting that the indicia of membership test is used to determine
whether an organization is the functional equivalent of a
membership organization and determining that the plaintiff lacked
associational standing because it "provided no details about who
the membership is or whether [it] truly can be considered a
voluntary membership organization or a functional equivalent");
Package Shop, Inc. v. Anheuser-Busch, Inc., CIV. A. No. 83-513,
1984 WL 6618, at *8 (D.N.J. Sept. 25, 1984) (applying the indicia
of membership test when the plaintiff was a self-described trade
association but its membership list was outdated and handwritten
and it had refused to follow corporate formalities).  Further,
this Court has routinely applied the three-part associational
standing test without also applying the indicia of membership test.
See, e.g., Merit Const. All. v. City of Quincy, 759 F.3d 122, 126–
27 (1st Cir. 2014).

Harvard's reading of Hunt is at odds with decades of
decisions[21] since Hunt that have not applied the indicia of

_____

[21]     Other courts have explicitly refused to hold that every
organization claiming associational standing must pass the indicia
of membership test.  See Brady Campaign to Prevent Gun Violence v.
Salazar, 612 F. Supp. 2d 1, 29 (D.D.C. 2009) (finding that "[t]he

Z 000108

membership test to organizations which, on their face, are voluntary membership organizations.

When suit was filed in November 2014,[22] SFFA was a validly incorporated 501(c)(3) nonprofit with forty-seven members who joined voluntarily to support its mission of "defend[ing] human and civil rights secured by law, including the right of individuals to equal protection under the law." We have already described its bylaws and membership structure and do not repeat this description. These facts are sufficient to conclude that SFFA is a valid membership organization and applying an indicia of membership test to SFFA is unwarranted. SFFA has associational standing to pursue its claims.

_____

[defendant's] standing argument is based upon a flawed reading of Hunt" because "[t]he inquiry into the 'indicia of membership' . . . is necessary only when an organization is not a 'traditional membership organization'"); California Sportfishing Prot. All. v. Diablo Grande, Inc., 209 F. Supp. 2d 1059, 1066 (E.D. Cal. 2002) ("[T]he 'indicia of membership' requirement in Hunt applies only to situations in which an organization is attempting to bring suit on behalf of individuals who are not members.").

[22]   Harvard argues that SFFA amended its bylaws after filing suit to make itself appear more like a traditional voluntary membership organization.  Because standing must be established when a suit is filed, we consider whether SFFA was a traditional voluntary membership organization as of November 2014.  See Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.").

Z 000109

2)    Harvard's Limited Use of Race in its Admissions Program
      Survives Strict Scrutiny

         Because Harvard accepts federal funds, it is subject to
Title VI.   42 U.S.C. § 2000d ("No person in the United States
shall, on the ground of race, color, or national origin, be
excluded from participation in, be denied the benefits of, or be
subjected to discrimination under any program or activity
receiving Federal financial assistance.").  Title VI's protections
are coextensive with the Equal Protection Clause of the Fourteenth
Amendment.  See Bakke, 438 U.S. at 287 ("Title VI must be held to
proscribe only those racial classifications that would violate the
Equal Protection Clause or the Fifth Amendment."); Alexander v.
Sandoval, 532 U.S. 275, 280 (2001) (describing the preceding
language in Bakke as "[e]ssential to the Court's holding").
Harvard is subject to the same limitations on its use of race in
admissions as state-run institutions.

         When Title VI applies, a university is prohibited from
considering race in its admission process "unless the admissions
process can withstand strict scrutiny."  Fisher I, 570 U.S. at
309.  Harvard admits that it considers race in its admissions
process and at times provides tips to applicants based on their
race.  Strict scrutiny applies regardless of racial animus.  See
id.  Strict scrutiny requires that the university's use of race
must further a compelling interest.  See Grutter, 539 U.S. at 326.

- 58 -

Z 000110

The Supreme Court has held that attaining student body diversity may be a compelling interest.  Fisher I, 570 U.S. at 310.   Whether an asserted interest in diversity is a constitutionally acceptable compelling interest requires that a university have made certain showings.  And even once those showings are made, the university must also show that the means utilized to further that interest are narrowly tailored, which means that the university must make additional showings.  SFFA argues that Harvard fails strict scrutiny because it engages in racial balancing, uses race as a mechanical plus factor, and has race-neutral alternatives.[23]

a)   Compelling Interest

When assessing a university's interest in student body diversity, it has long been the law that a school "bears the burden to prove 'that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate.'"  Id. (quoting City of Richmond v. J.A. Croson Co., 488 U.S. 469, 505 (1989)). "[T]he decision to pursue 'the educational benefits that flow from student body diversity' . . . is, in substantial measure, an

---

[23]   It is not entirely clear how SFFA's arguments about Harvard's use of race to benefit African American and Hispanic applicants relate to SFFA's central allegation that Harvard discriminates against Asian American applicants in favor of white applicants.  We understand SFFA's arguments as attacking the use of race to admit African American and Hispanic candidates, to the detriment of Asian American and white applicants.

Z 000111

academic judgment to which some, but not complete, judicial deference is proper." Id. (quoting Grutter, 539 U.S. at 330). But "asserting an interest in the educational benefits of diversity writ large is insufficient." Fisher II, 136 S. Ct. at 2211. A university's goals "must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." Id. SFFA's appellate challenge to us does not contest that Harvard has a compelling interest in diversity. Nonetheless, Supreme Court precedent compels us to assess whether Harvard's interest in diversity is both clearly identified, definite, and precise.

The Fisher II majority held that that the University of Texas's interest in diversity was definite and precise when it identified the educational values it sought to realize through its race-conscious admissions program. Id. These values included promoting cross-racial understanding, breaking down racial stereotypes, fostering a robust exchange of ideas, cultivating "a set of leaders with legitimacy in the eyes of the citizenry," exposing them to different cultures, and preparing them for the challenges of an increasingly diverse workforce. Id. The University of Texas commissioned a year-long study and issued a thirty-nine-page proposal giving a reasoned explanation for its decision to pursue its diversity goals. Id. The Fisher II majority also held that record evidence from admissions officers reiterating this same explanation for the university's use of race

Z 000112

further supported the precision and particularity of the program. Id.

Harvard has identified specific, measurable goals it seeks to achieve by considering race in admissions. These goals are more precise and open to judicial scrutiny than the ones articulated by the University of Texas and approved by the Fisher II majority. Harvard's interest in diversity is established both by the Khurana Report and other statements and testimony at trial.

We rely on the Khurana Report described before and do not repeat its description. The articulated purpose of the Khurana Report was to enable courts to assess whether Harvard's interest was sufficiently compelling to comply with strict scrutiny and Supreme Court precedent. The Khurana Committee produced the report after a thoughtful, rigorous study of the importance of diversity to Harvard.

As for process, the Khurana Committee relied on input and data from students, alumni, faculty and staff, and other stakeholders in Harvard's admissions process. It considered how a diverse environment prepares Harvard's graduates to enter the public and private sectors and how those sectors prefer graduates who have been exposed to a wide range of ideas and people. In our view, at least these specific goals were articulated in the Khurana Report: (1) training future leaders in the public and private sectors as Harvard's mission statement requires; (2) equipping

- 61 -

Z 000113

Harvard's graduates and Harvard itself to adapt to an increasingly pluralistic society; (3) better educating Harvard's students through diversity; and (4) producing new knowledge stemming from diverse outlooks.  These goals make clear that Harvard's interest in diversity "is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups," but "a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." Parents Involved, 551 U.S. at 722 (quoting Grutter, 539 U.S. at 324-25).  Race is one piece of Harvard's interest in diversity. It is "considered as part of a broader effort to achieve 'exposure to widely diverse people, cultures, ideas, and viewpoints.'" Id. at 723 (quoting Grutter, 539 U.S. at 330).

Testimony at trial also supported Harvard's interest in diversity.  The district court made a factual finding that "Harvard values and pursues many kinds of diversity within its classes, including different academic interests, belief systems, political views, geographic origins, family circumstances, and racial identities." SFFA II, 397 F. Supp. 3d at 133.  It found that "Harvard tries to create opportunities for interactions between students from different backgrounds and with different experiences to stimulate both academic and non-academic learning." Id. at 134.  It based these findings on the testimony of "all of the

Z 000114

Harvard admissions officers, faculty, students, and alumni that testified at trial." Id. at 133.  Harvard's interest in student body diversity and its consideration of race to attain it is also not unique.  Many other colleges and universities consider an applicant's race, in addition to many other factors, in admissions.[24]  And the business community has communicated its interest in having a well-educated, diverse hiring pool both in this case and in the prior governing Supreme Court cases.[25]

Harvard has sufficiently met the requirements of Fisher I, Fisher II, and earlier cases to show the specific goals it achieves from diversity and that its interest is compelling.

---

[24]  According to the College Board's profiles of colleges and universities, the schools that consider race are diverse on numerous dimensions, including in terms of religious affiliation, location, size, and courses of study offered.  For example, the University of Notre Dame, Georgetown University, Boston College, Villanova University, Catholic University, Lafayette College, Gonzaga University, Marquette University, the College of the Holy Cross, and Fordham University all consider race in their admissions process.    See    College    Board:    BigFuture, https://bigfuture.collegeboard.org/.  The following colleges and universities submitted an amicus brief in support of Harvard and also consider race in their admissions process: Brown University, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, Johns Hopkins University, the Massachusetts Institute of Technology, Princeton University, Stanford University, the University of Chicago, the University of Pennsylvania, Vanderbilt University, Washington University in St. Louis, and Yale University.

[25]  An amicus brief filed by 14 leading American companies says that "policies like those approved by the Supreme Court in Grutter are essential to [their] ongoing efforts to attract and benefit from the best possible people."

Z 000115

We turn to the heart of SFFA's challenge.  To survive strict scrutiny, Harvard's use of race must also be narrowly tailored and consistent with Supreme Court precedent.

b)   Narrow Tailoring

Narrow tailoring requires that "[t]he means chosen to accomplish the [university's] asserted purpose must be specifically and narrowly framed to accomplish that purpose." Fisher I, 570 U.S. at 311 (quoting Grutter, 539 U.S. at 333). "[N]o deference is owed when determining whether the use of race is narrowly tailored to achieve the university's permissible goals." Fisher II, 136 S. Ct. at 2208 (citing Fisher I, 570 U.S. at 311).

Accordingly, we give no deference to Harvard.  Under the Supreme Court's precedent, a university's admissions program cannot be narrowly tailored if it (1) involves racial balancing or quotas, see Fisher I, 570 U.S. at 311,[26] (2) uses race as a mechanical plus factor, see id. at 312, or (3) is used despite workable race-neutral alternatives, see Fisher II, 136 S. Ct. at 2208.[27]  "[I]t remains at all times the University's obligation to

_____

[26]   Grutter says that "[t]o be narrowly tailored, a race-conscious admissions program cannot use a quota system" and that racial balancing is an "unlawful interest."  539 U.S. at 323, 334.  Because the substance of these claims is similar, we review them together under the narrow tailoring prong of strict scrutiny.

[27]   There is some tension in the Supreme Court's precedent about how extensively Harvard can consider race.  If Harvard's use of race is too extensive, it could be impermissibly mechanical

Z 000116

demonstrate, and the Judiciary's obligation to determine, that admissions processes" are narrowly tailored.  See Fisher I, 570 U.S. at 311-12.

1.   There Was No Error in Holding That Harvard Did Not Engage in Racial Balancing

SFFA first argues that Harvard's admissions policy is not narrowly tailored because Harvard engages in racial balancing. The United States, as an amicus in support of SFFA, makes a similar argument.  Under the Supreme Court's precedent, racial balancing is impermissible.  See, e.g., id. at 311.  A university "is not permitted to define diversity as 'some specified percentage of a particular group merely because of its race or ethnic origin.'" Id.  (quoting Bakke, 438 U.S. at 307).  "Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'"  Parents

_____

under Gratz or used beyond the "factor of a factor of a factor" in the holistic review process approved in Fisher II.  See Gratz, 539 U.S. at 272; Fisher II, 136 S. Ct. at 2207.  But if Harvard's use of race is not extensive enough, it cannot reach its diversity goals, thus undercutting the rationale for using race at all.  See Fisher II, 136 S. Ct. at 2212 (addressing petitioner's argument that "considering race was not necessary because such consideration has had only a '"minimal impact"' in advancing the [University's] compelling interest'") (citation omitted).  To address this tension, the Fisher II majority held that "it is not a failure of narrow tailoring for the impact of racial consideration to be minor" and that "[t]he fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality."  Id.

Z 000117

Involved, 551 U.S. at 732.  However, universities may pay "some attention to numbers" without "transform[ing] a flexible admissions system into a rigid quota."  Grutter, 539 U.S. at 336 (quoting Bakke, 438 U.S. at 323).

SFFA argues that, focusing on the classes of 2009 to 2018,[28] "the percentage of [Harvard's] class by race always fell within a narrow range."  For these classes, the share of Asian Americans admitted ranged from a low of 17.5% in 2013 to a high of 20.3% in 2016 with various percentages in between.

SFFA also argues that Harvard uses "one-pagers" displaying the racial makeup of the admitted class to ensure racial balancing and to "closely monitor the racial makeup of [its] class."  In support of this argument, it cites one Harvard admissions officer's testimony that Harvard uses its one-pagers to prevent "a dramatic drop-off in some group [from] last year."

First considering the broader context, the share of admitted Asian American applicants for the classes of 1980 to 2019 has increased from a low of 3.4% in 1980 to a high of 20.6% in 2019.  The share of Asian American applicants has ranged from a low of 4.1% in 1980 and a high of 22.5% in 2014 over the same period.  The level of variation in the share of admitted Asian

---

[28]   SFFA chooses to start its analysis with Harvard's class of 2009 and end with the class of 2018 because Grutter was decided in 2003 and it argues this is the "ten-year period between Grutter and this suit."

Z 000118

American applicants is inconsistent with a quota, as is the fact that the share of admitted Asian Americans co-varies almost perfectly with the share of Asian American applicants.

Even if we were to restrict the analysis to the period SFFA favors, the same pattern holds.  The amount by which the share of admitted Asian American applicants fluctuates is greater than the amount by which the share of Asian American applicants fluctuates.  This is also true for Hispanic and African American applicants.  It is the opposite of what one would expect if Harvard imposed a quota.  The fact that Harvard's admitted share of applicants by race varies relatively little in absolute terms for the classes of 2009 to 2018 is unsurprising and reflects the fact that the racial makeup of Harvard's applicant pool also varies very little over this period.  The district court properly concluded that Harvard does not utilize quotas and does not engage in racial balancing.

Next, SFFA's argument on the impermissibility of one-pagers is foreclosed by Grutter and Fisher II.  The Grutter majority held that the "consultation of the 'daily reports,' which keep track of the racial and ethnic composition of the class" does not "'sugges[t] there was no further attempt at individual review save for race itself' during the final stages of the admissions process."  Id. (quoting id. at 392 (Kennedy, J., dissenting)).

Z 000119

The Grutter Court also pointed to two additional factors -- present here -- supporting its conclusion that the university's admissions program did not function as an unconstitutional quota: (1) the variation in the percent of minority applicants admitted each year and (2) the uncontradicted testimony by admissions officers "that they never gave race any more or less weight based on the information contained in these reports." Id.

Harvard's witnesses testified that they used one-pagers for three main reasons: (1) to assess how well its diversity recruitment efforts (e.g., via UMRP and HFAI) were working; (2) to manage its yield rates; and (3) to avoid drop offs in students with particular characteristics due to inadvertence or lack of care.

Harvard may permissibly use one-pagers to assess the effectiveness of its pre-application recruitment efforts. Given the Fisher II majority's command that universities must "continue to use . . . data to scrutinize the fairness of its admissions program [and] to assess whether changing demographics have undermined the need for a race-conscious policy," Harvard's use of one-pagers for this purpose evidences narrow tailoring because it allows Harvard to assess whether its race-conscious admissions policy is still necessary. 136 S. Ct. at 2214.

Managing yield rates is also permissible. Harvard is a residential college with a limited number of beds. It needs to

Z 000120

carefully monitor the number of applicants it admits to avoid becoming overcrowded.   Applicants with different demographics accept offers of admission at different rates.   For example, applicants from "Sparse Country" accept offers of admission at lower rates than other applicants.  Engineering admittees yield at lower rates.   And applicants of different races also enroll at differing rates.  To help manage its class size, Harvard includes geographic data, intended concentration, and race -- in addition to many other factors, like gender, ALDC status, and economic status -- on its one-pagers.  This is permissible.

One-pagers also avoid drop-offs in admitted students with certain characteristics, including race, due to inadvertence or lack of care.  An admissions officer testified that if Harvard did observe a dramatic decrease in representation of members of a particular race in its admitted class that was not due to inadvertence or lack of care, "[s]ome things can't be avoided." Harvard's use of race in this way has been approved by the Supreme Court.  See Grutter, 539 U.S. at 335 (finding Harvard's "flexible use of race" instructive and refusing to characterize its use of race as a quota when "Harvard certainly had minimum goals for minority enrollment, even if it had no specific number firmly in mind").

Z 000121

2.    There Was No Error in Holding That Harvard Did Not Use Race
      as a Mechanical Plus Factor

        Next, SFFA argues that Harvard's admissions program is
not narrowly tailored because, in its view, Harvard's
consideration of race is mechanical.  The Supreme Court has found
race-conscious admissions policies unconstitutional as mechanical
when they give pre-defined boosts to applicants solely because of
race, when they preclude individualized consideration of
applicants, and when race becomes the decisive factor in admission.
See Gratz, 539 U.S. at 271-72; see also Fisher II, 136 S. Ct. at
2207 (holding that consideration of race "does not operate as a
mechanical plus factor for underrepresented minorities" when it is
contextual).

        In Gratz, the University of Michigan's undergraduate
program graded applicants using a point system.  Id. at 255.
Applicants scoring over 100 points were guaranteed admission.  Id.
The school automatically awarded "every applicant from an
underrepresented racial or ethnic minority group . . . 20 points."
Id. at 256.  The Court found this system impermissible because it
did not allow for individualized consideration of applicants, as
required by Bakke, and because automatically distributing a fifth
of the points required for admission "mak[es] 'the factor of race
.  .  .  decisive' for virtually every minimally qualified
underrepresented minority applicant."  Id. at 272 (quoting Bakke,

- 70 -

Z 000122

438 U.S. at 317).   In contrast, the Court has found race to be sufficiently non-mechanical when its consideration is individualized and can benefit any applicant.   See Fisher II, 136 S. Ct. at 2207 (explaining that "the consideration of race, within the full context of the entire application, may be beneficial to any UT Austin applicant -- including whites and Asian-Americans" (quoting Fisher v. Univ. of Texas at Austin, 645 F. Supp. 2d 587, 606 (W.D. Tex. 2009))).

SFFA argues that Harvard's race-conscious admissions process does not pursue student-body diversity, places too much weight on race, and that Harvard's use of race has no defined end point.

SFFA's contention that Harvard elevates racial diversity above other types of diversity is not supported by the evidence. Harvard has demonstrated that it values all types of diversity, not just racial diversity.   Harvard's use of race in admissions is contextual and it does not consider race exclusively.

Next, Harvard's process does not weigh race so heavily that it becomes mechanical and decisive in practice.   Harvard's undergraduate admissions program considers race as part of a holistic review process.   This use was previously praised by the Supreme Court as a way of considering race in a non-mechanical way.   Unlike the program in Gratz, Harvard does not award a fixed amount of points to applicants because of their race.

- 71 -

The district court made a number of pertinent factual findings against SFFA's arguments, all of which are supported by the evidence.  SFFA counters by pointing to evidence that Asian American applicants with high grades and test scores are admitted at lower rates than applicants of other races.  The district court considered this evidence and found that it "likely over emphasizes grades and test scores and undervalues other less quantifiable qualities and characteristics that are valued by Harvard and important to the admissions process." SFFA II, 397 F. Supp. 3d at 165.  It credited other evidence showing that the effect of race on a student's chance of admission is "not disproportionate to the magnitude of other tips applicants may receive." Id. at 199.

The Supreme Court has also approved admissions programs where race has a larger effect on a student's chances of admission than Harvard's use of race.  In Grutter, the Supreme Court upheld the University of Michigan Law School's race-conscious admission program that, if eliminated, would have reduced the underrepresented minority population of the admitted class from 14.5% to 4%, a 72.4% decrease.  See 539 U.S. at 320.  Here, without considering race, the share of African American and Hispanic or Other students enrolled at Harvard would decrease by 45%.  See SFFA II, 397 F. Supp. at 198.  The impact of Harvard's use of race

Z 000124

on the makeup of its class is less than the one at issue in
Grutter.[29]

In Harvard's holistic admissions process, tips are used
for athletic ability, legacy status, geographic and economic
factors, race at times, and perhaps other reasons.  But the
outcomes of Harvard's admissions process do not indicate that race
is impermissibly "'decisive' for virtually every minimally
qualified underrepresented minority applicant" within it.  Gratz,
539 U.S. at 272 (quoting Bakke, 438 U.S. at 317).  According to
SFFA's own expert's analysis, Harvard rejects more than two-thirds
of Hispanic applicants and slightly less than half of all African
American applicants who are among the top 10% most academically
promising applicants to Harvard in terms of standardized test
scores and GPA.  Gratz precludes programs where race is decisive
for minimally qualified candidates.  Harvard's admissions process

---

[29]    The United States attempts to make the impact of
Harvard's use of race appear more significant than it is.  It
argues that Harvard "inflicts an 11.1% penalty" on Asian Americans
because, absent the consideration of race, their representation
would increase from 24% to 27%.  It then claims that Harvard
provides a 133% bonus to African Americans because their
representation increases from 6% to 14%.  While these calculations
are correct, similar calculations show that race was used about as
extensively in the program approved in Grutter.  That program,
using the government's language and calculations, inflicted a
penalty of 10.9% on applicants who were not underrepresented
minorities (because their representation would increase from 85.5%
to 96% absent the consideration of race) while simultaneously
giving a 263% bonus to underrepresented minority applicants
(because their representation increased from 4% to 14.5% with the
consideration of race).  See Grutter, 539 U.S. at 320.

Z 000125

is so competitive that race is not decisive for highly qualified candidates. The district court also found that some Asian American applicants are advantaged by Harvard's use of race. See SFFA II, 397 F. Supp. 3d at 178 ("The policy of considering applicants' race may improve the admission chances of some Asian Americans who connect their racial identities with particularly compelling narratives.").

Relatedly, the United States argues that Harvard "considers race at virtually every step of its admission process." It reads Fisher II as mandating that race only be considered at one step in a university's admissions process because race was considered at only one point in the University of Texas at Austin's process. This argument is not persuasive for several reasons. Its premise is questionable. The Fisher II majority does say that "race enters the admissions process . . . at one stage and one stage only." 136 S. Ct. at 2207. But the pervasiveness of the University of Texas's consideration of race was one of Justice Alito's chief criticisms in his dissent, which was joined by Chief Justice Roberts and Justice Thomas. Justice Alito cited the district court's finding that "[b]ecause an applicant's race is identified at the front of the admissions file, reviewers are aware of it throughout the evaluation," Fisher v. Univ. of Texas at Austin, 645 F. Supp. at 597, before writing that "[c]onsideration of race therefore pervades every aspect of UT's admissions

Z 000126

process," Fisher II, 136 S. Ct. at 2220 (Alito, J., dissenting).
It is difficult to imagine how a school could both consider an
applicant's race and holistically review their application, as
required by Supreme Court precedent, at only a single point in the
admissions process.  This is true because the applications
themselves frequently contain racially identifiable information,
as we have described earlier.

Regardless, there is nothing in Fisher II suggesting
that a university can only consider race once or that only a single
use of race is a necessary component of a narrowly tailored policy.
The Court made clear that as long as race is "considered in
conjunction with other aspects of an applicant's background" and
is "but a 'factor of a factor of a factor' in the holistic-review
calculus," it will not be considered impermissibly mechanical.
Fisher II, 136 S. Ct. at 2207.  Harvard has shown that its holistic
consideration of race is not impermissibly extensive.

Finally, SFFA and the United States argue that Harvard's
use of race has no end point because Harvard has not identified a
stopping point for its use of race.  It derives this argument from
Grutter's statement that the "use of race must have a logical end
point," 539 U.S. at 342, and its hope that "25 years from now, the
use of racial preferences will no longer be necessary to further
the interest approved today," id. at 343.  This argument is also
not persuasive and is insensitive to the achievement of the

Z 000127

university's legitimate goals once it has met the requirements established by the Supreme Court.  Indeed, the Supreme Court never mentioned <u>Grutter</u>'s 25-year timeline in <u>Fisher I</u> or <u>Fisher II</u>.

Harvard's failure to identify a specific level of diversity it would need to achieve before it stopped using any consideration of race is not fatal to its admissions program.  The <u>Fisher II</u> majority held that because "the University is prohibited from seeking a particular number or quota of minority students, it cannot be faulted for failing to specify the particular level of minority enrollment at which it believes the educational benefits of diversity will be obtained."  136 S. Ct. at 2210.  Importantly, the evidence is that Harvard has periodically reviewed its use of race in the past, has periodically and recently considered race-neutral alternatives, and has made it clear that it will continue to do so in the future.  <u>See</u> <u>Grutter</u>, 539 U.S. at 342 (requiring that universities conduct "periodic reviews to determine whether racial preferences are still necessary").  The same committee that reaffirmed Harvard's need to pursue racial diversity in admissions emphasized that "it will be important to reassess, periodically, the necessity of considering race and ethnicity in the admissions process."  No Supreme Court precedent requires Harvard to identify a specific end point for its use of race.

Z 000128

3.   There Was No Error in Holding That Harvard Considered Race-
     Neutral Alternatives and Legitimately Concluded That the
     Alternatives Were Not Workable

     SFFA argues that Harvard's use of race fails the narrow
tailoring prong of strict scrutiny because Harvard has disregarded
race-neutral ways to achieve its diversity goals.  See Fisher I,
570 U.S. at 312 ("Narrow tailoring . . . . involves a careful
judicial inquiry into whether a university could achieve
sufficient diversity without using racial classifications.").
Courts must not defer to a university's consideration of workable
race-neutral alternatives.  Id.  They must "be satisfied that no
workable race-neutral alternatives would produce the educational
benefits of diversity."  Id.  Universities have an "ongoing
obligation to engage in constant deliberation and continued
reflection" on whether workable race-neutral alternatives exist.
Fisher II, 136 S. Ct. at 2215.

     The Supreme Court has distinguished "conceivable"
alternatives from "workable" alternatives, requiring only the use
of workable alternatives.  Id. at 2208.  Harvard has met its
burden, including through the Smith Report, to show that it has
carefully considered all alternatives.  It has concluded that they
are not workable and would undercut its educational objectives.
"Narrow tailoring does not . . . require a university to choose
between maintaining a reputation for excellence or fulfilling a

Z 000129

commitment to provide educational opportunities to members of all racial groups." Grutter, 539 U.S. at 339 (citations omitted).

Harvard has implemented many of the policies SFFA proposes, like eliminating Early Action and increasing financial aid and outreach, but found those policies insufficient.[30]  This accords with Fisher II.  136 S. Ct. at 2212-13 (finding race-neutral alternatives unworkable when the university had introduced scholarship programs and "submitted extensive evidence of the many ways in which it already had intensified its outreach efforts").

Harvard has increased the financial aid it offers to low-income applicants since it instituted its HFAI program in 2004. It made multiple changes over the years to increase the affordability of a Harvard education.  When this case went to trial, Harvard's budget for undergraduate financial aid was around $200 million dollars and more than half of Harvard undergraduates received financial aid.  About 90% of Harvard students pay the same or less in tuition as they would at a state school.  The initial introduction of HFAI and Harvard's first increase of the zero parental contribution limit to $60,000 did have positive effects on Harvard's ability to attract and admit racially diverse

---

[30]   Some policy changes backfired.  Harvard abandoned its Early Action program for the classes of 2012 through 2015 but reinstated it after finding that "many highly talented students, including some of the best-prepared low-income and underrepresented minority students, were choosing programs [at other schools] with an early-action option."

Z 000130

applicants.  But later changes to the program had little to no effect on the racial makeup of Harvard's applicants or admitted class.  As the district court found, Harvard "has already reached, or at least very nearly reached, the maximum returns in increased socioeconomic and racial diversity that can reasonably be achieved through outreach and reducing the cost of a Harvard education." SFFA II, 397 F. Supp. 3d at 180.  Further, the Smith Report, while not entitled to any deference, does show that Harvard has carefully considered and rejected race-neutral alternatives.  The Smith Report was supported by the testimony of Harvard officials.  It was also supported by the testimony of Harvard's economic expert.

SFFA focuses its argument on "Simulation D,"[31] one of its proposed race-neutral alternatives.  Under this scenario, Harvard would eliminate its consideration of race, eliminate LDC tips, and increase the tip for low-income applicants.

If Harvard were to adopt Simulation D, its analysis shows that the admitted share of white and African American applicants would decrease (from 40% to 33% and 14% to 10%, respectively) and the share of Asian American and "Hispanic and Other" applicants would increase (from 24% to 31% and 14% to 19%, respectively). The average student's high school grade point average would remain

---

[31]  Simulation D is also called Simulation 7 elsewhere in the record.

Z 000131

unchanged, but the average SAT score would decrease from 2244 to 2180.

Harvard proved that Simulation D was not a workable alternative.  Not only would SAT scores drop, but the fraction of applicants with academic, extracurricular, personal, and athletic ratings of 1 or 2 would decrease by more than 10% (ranging from an 11% decrease for the personal rating to a 22% decrease for the athletic rating).  If Harvard were to increase its tip based on socioeconomic status, it would make sacrifices on almost every dimension important to its admissions process, including one designed to measure a student's academic excellence.  As the Fisher II majority held when it found the plaintiff's alternative of "altering the weight given to academic and socioeconomic factors in the University's admissions calculus" unworkable, "the Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence." Fisher II, 136 S. Ct. at 2213.

Next, the district court made a factual finding that removing LDC tips "would adversely affect Harvard's ability to attract top quality faculty and staff and to achieve desired benefits from relationships with its alumni and other individuals who have made significant contributions to Harvard." SFFA II, 397 F. Supp. 3d at 180.  The loss of top faculty would negatively affect the educational experience of students at Harvard and its

- 80 -

Z 000132

reputation for excellence.  See Grutter, 539 U.S. at 339.  The loss of the ability to cultivate relationships with donors and alumni through LDC tips would harm Harvard's ability to raise funds, and the staffing changes needed to accommodate a drastic shift in student concentrations would present Harvard with sizeable administrative expenses.  SFFA II, 397 F. Supp. 3d at 179-80, 182.  Under Simulation D, the number of humanities applicants admitted would drop by 14%.  See id. at 182.  The number of engineering applicants admitted would rise by 8%.  See id.

Finally, African American representation in Harvard's admitted class would decrease by about 32% under Simulation D. Harvard's consideration of race is not impermissibly extensive, but considering race is meaningful to Harvard's admissions process because it prevents diversity from plummeting.  Harvard's race-conscious admissions program ensures that Harvard can retain the benefits of diversity it has already achieved.[32]  The district

---

[32]   Dean Smith testified about how his committee evaluated race-neutral alternatives and what it considered to be an acceptable level of racial and ethnic diversity.  He said that, having seen the progress Harvard has already made in achieving racial diversity and the benefits it has had, one consideration was whether Harvard would be "moving backwards from where [it is] today."  Regarding any decline in African American representation specifically, he testified that alienation and isolation is already a problem among African American students at Harvard and that Harvard is "not looking to make that worse."  He also testified that Harvard does not view underrepresented minorities interchangeably.  The increase in representation among Hispanic and Other students under Simulation D would not cure the decrease in African American representation.

Z 000133

court found that the dramatic decline in diversity under Simulation D could adversely affect the educational experience at Harvard and increase feelings of isolation and alienation among Harvard's students.  Id. at 183.  Similarly, the Fisher II majority found that the University of Texas's compelling interest could not be met with race-neutral alternatives when it had introduced "evidence that minority students admitted [under a race-neutral regime] experienced feelings of loneliness and isolation."  136 S. Ct. at 2212.

Ample testimony in the record, including from Harvard students and alumni, supported this finding.[33]  As these witnesses' testimony makes clear, a meaningful reduction in representation -- and a 32% reduction in African American representation is clearly meaningful -- would make Harvard less

---

[33]   As an example, one student testified that, when choosing which school to attend, she "wanted to make sure that there would be other students who were people of color like myself . . . so that I could have a more safe environment, a more welcoming environment, and a better . . . learning environment."  After arriving at Harvard, she found that "students of color were a huge minority in almost every space" and that walking into a class with few or no people of color made her nervous and reticent; she would hold back in discussions to avoid being "seen or stereotyped as someone who . . . is just talking about communities of color because that's where I came from."  And she described how a large reduction in the number of Black or Latinx students would be "catastrophic" because "there are so few students of color and under-represented minority groups at Harvard as it is" and that "any sort of reduction in any of those groups would be really detrimental to the community at Harvard, both for students of color [and] students in general."  At trial, other students and recent alumni expressed similar viewpoints.

Z 000134

attractive and hospitable to minority applicants while limiting all students' opportunities to engage with and learn from students with different backgrounds from their own.  Enabling students to understand, relate to, and learn from people of different backgrounds is one of the main goals of Harvard's race-conscious admissions program.  It is a compelling interest, but under Simulation D Harvard cannot achieve it.  Harvard has carried its burden of showing that no workable race-neutral alternatives exist.

3)   The District Court Did Not Err in Finding Harvard Does Not Intentionally Discriminate Against Asian American Applicants

SFFA's final claim is that Harvard's admissions policy intentionally discriminates against Asian Americans.  It argues that the district court "could not rule out that Asian Americans are penalized in Harvard's admissions process" and says both the non-statistical and statistical evidence showed that Harvard discriminates against Asian Americans.  From this premise, it argues that Harvard cannot carry its burden of disproving intentional discrimination under strict scrutiny.[34]

---

[34]  SFFA's intentional discrimination claim does not fit neatly into the strict scrutiny framework.  Harvard disputes whether strict scrutiny applies to this claim.  It admits to using race in its admissions process.  But it has never admitted to discriminating against Asian American applicants and denies doing so.

SFFA argues that strict scrutiny applies to any challenge related to a university's race-conscious admission policy and

- 83 -

Z 000135

To make out a prima facie case of intentional discrimination on the basis of race under Title VI, a plaintiff must show that the defendant treated members of one race differently and less favorably than members of another race and that the defendant did so with a racially discriminatory purpose. See Washington v. Davis, 426 U.S. 229, 239-40 (1976) (describing the intentional discrimination standard applicable under the Equal Protection Clause of the Fourteenth Amendment); Sandoval, 532 U.S. at 280 (finding the protections of Title VI coextensive with those of the Equal Protection Clause); accord Goodman v. Bowdoin Coll., 380 F.3d 33, 43 (1st Cir. 2004) (citing Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001)).

Assuming arguendo that SFFA is correct that strict scrutiny operates on its intentional discrimination claim by shifting the burden to Harvard to disprove intentional discrimination, Harvard can succeed only if it disproves any of

---

that, under strict scrutiny, Harvard bears the burden of disproving SFFA's intentional discrimination claim. Harvard argues that SFFA's intentional discrimination claim does not get the benefit of strict scrutiny until SFFA has established that Harvard has discriminated against Asian Americans and acted with racial animus against them. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). The district court adopted SFFA's view. See SFFA II, 397 F. Supp. 3d at 190. We need not decide this issue because we hold that Harvard prevails even applying the more demanding standard advanced by SFFA.

Z 000136

these elements.   Harvard must show that it did not discriminate on the basis of race or that its discrimination was not intentional (i.e., it did not act with animus or "stereotyped thinking or other forms of less conscious bias").   Thomas v. Eastman Kodak Co., 183 F.3d 38, 42 (1st Cir. 1999).  We hold, as did the district court, that Harvard has carried this burden.

a)    The District Court Did Not Err in Concluding That the Non-Statistical Evidence Did Not Show Discrimination Against Asian American Applicants

SFFA argues that three pieces of non-statistical evidence show intentional discrimination.  First, it says that Harvard's admissions process as a whole -- and its use of a personal rating in particular -- is highly subjective, which makes it susceptible to stereotyping and bias.  Next, it argues that Harvard ignored warnings that its process might be racially biased, citing the 1990 OCR Report that, as the district court acknowledged, "found recurring characterizations of Asian American applicants that were broadly consistent with stereotypes." SFFA II, 397 F. Supp. 3d at 154.  SFFA says that because Harvard took no steps to remedy these characterizations, its process is biased against Asian Americans.  Finally, SFFA says that Harvard's "post-filing conduct" evidences past discrimination because, in response to this lawsuit, Harvard amended its written handbook on reading procedures to explicitly instruct admissions officers that they

Z 000137

should not consider race when assigning a personal rating and increased the number of Asian Americans it admitted.

Supreme Court precedent makes clear that the fact that Harvard's application process is subjective is insufficient to overcome other evidence in the record that Harvard is not biased against Asian Americans and does not stereotype them.  First, there is no requirement that universities use entirely objective criteria when considering race to admit applicants.[35]  Cf. Bakke, 438 U.S. at 317-18 (describing, and approving of, Harvard's subjective, "flexible" admissions system where "the weight attributed to a particular quality may vary from year to year depending upon the 'mix' both of the student body and the applicants for the incoming class").  Harvard presented testimony from multiple admissions officers that its admissions process, though subjective, did not facilitate bias or stereotyping.  The district court found that the "testimony of the admissions officers that there was no discrimination against Asian American applicants with respect to the admissions process as a whole and the personal

_____

[35]    Indeed, it is unclear whether Harvard could even adopt a more objective system and still comply with the Supreme Court's precedent.  A more objective system could be viewed as mechanically taking race into account.  Cf. Gratz, 539 U.S. at 270 ("[T]he University's policy, which automatically distributes 20 points, or one-fifth of the points needed to guarantee admission, to every single 'underrepresented minority' applicant solely because of race, is not narrowly tailored to achieve the interest in educational diversity.").

Z 000138

ratings in particular was consistent, unambiguous, and convincing." SFFA II, 397 F. Supp. 3d at 203. No witness who testified "had seen or heard anything disparaging about an Asian American applicant." Id. The district court was permitted to assess the credibility of witnesses and credit the testimony of Harvard's admissions officers. See Cooper v. Harris, 137 S. Ct. 1455, 1478 (2017) (upholding a district court's credibility determination that a witness "skirted the truth . . . when he claimed to have followed only race-blind criteria in drawing district lines" because a reviewing court "cannot disrespect such credibility judgments"); Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 158-59 (1st Cir. 1990) (finding, in a discrimination case, that "whether or not to credit [defendant's employee's] testimony as to his knowledge and intent was predominantly a credibility question" and that "[a]ppellate courts should always be reluctant to erase the trial judge's answer to such a query").[36]

The nature of Harvard's admissions process, as the district court recognized, offset any risk of bias. SFFA II, 397 F. Supp. 3d at 203. An applicant must secure a majority of votes at a full-body admissions committee meeting with forty admissions officers to be admitted to Harvard, which mitigates the risk that

---

[36] SFFA did not present any evidence to the contrary or "present a single Asian American applicant who was overtly discriminated against or who was better qualified than an admitted white applicant." SFFA II, 397 F. Supp. 3d at 203.

Z 000139

any individual officer's bias or stereotyping would affect Harvard's admissions process.

Nor was there error in the district court's fact finding that earlier reports did not show that Harvard discriminated against or stereotyped Asian American applicants.  The district court acknowledged that the 1990 OCR Report "found recurring characterizations of Asian American applicants that were broadly consistent with stereotypes."  Id. at 154.  This same report also concluded that "Harvard did not discriminate against Asian American applicants."  Id.  The court also considered SFFA's contention that Harvard referred to Asian American applicants as "quiet," "flat," "shy," and "understated," and that this showed stereotyping.  Id. at 157.  The district court found that using these words "with regard to such an applicant would be truthful and accurate rather than reflective of impermissible stereotyping."  Id.  It found that Harvard considers applicants holistically and that the evidence did not show "that any applicant was referred to by these types of descriptors because of their race or that there was any sort of systemic reliance on racial stereotypes."  Id. at 157, 193.  To the contrary, the evidence showed that admissions officers referred to applicants of all races using similar language, not just Asian Americans.  Id. at 157.

SFFA's last two arguments on this point are that it was only after it filed its lawsuit that Harvard both updated its

Z 000140

written reading procedures to say that race should not be considered when assigning the personal rating and increased the number of Asian American applicants it admitted.  As to the first argument, Harvard updates its reading procedures annually.  The district court found that "Harvard has made clear to its admissions officers in more recent years that they should not use race in assigning the profile ratings."  Id. at 156.

As to SFFA's second argument, while the share of Asian American applicants admitted to Harvard did increase from 19.1% for the class of 2018 to 20.6% for the class of 2019 after this lawsuit was filed, the argument made ignores the broader context.  Asian Americans constituted 20.3% of the admitted class of 2016, showing that the 20.6% share of Asian American admittees for the class of 2019 was not anomalous.  Neither was the post-filing increase from 19.1% for the class of 2018 to 20.6% for the class of 2019.  The share of Asian Americans similarly increased from 17.6% for the class of 2010 to 19.5% for the class of 2011 and from 19.3% for the class of 2015 to 20.3% for the class of 2016 before this lawsuit was filed.  Indeed, the number of Asian Americans admitted to Harvard has been steadily increasing for decades.

Because statistical evidence can "generate an inference of intentional discrimination," Haidak v. Univ. of Massachusetts-

Z 000141

Amherst, 933 F.3d 56, 75 (1st Cir. 2019), we now turn to the parties' statistical evidence.

b)   The District Court Did Not Err in Concluding That the Statistical Evidence Did Not Show Discrimination Against Asian American Applicants

SFFA's main argument with respect to the statistical evidence revolves around whether to include an applicant's personal rating in the model of Harvard's admissions process.  If the personal rating is included, as done by Harvard's expert, being Asian American has a statistically insignificant effect on an applicant's chance of admission.  If the personal rating is excluded, as done by SFFA's expert, it shows that being Asian American has a statistically significant[37] negative effect on an applicant's chance of admission to Harvard.  SFFA argues that it was clear error for the district court to consider a model including the personal rating.  It also says the district court

---

[37]   An explanatory variable has a "statistically significant" effect if, assuming the effect of the explanatory variable on the response variable were actually zero, the effect observed in the model is different enough from zero that it is unlikely to be due to chance.  "Different enough" is quantified using a significance level.  The experts in this case used a significance level of 5%.  For example, the experts called the effect of Asian American identity on the chance of admission to Harvard statistically significant if, assuming being Asian American actually had no effect on admission chances, the probability of observing an effect of Asian American identity at least as extreme as the effect observed in the model was less than 5%.  We use the same terminology.

Z 000142

erred when it concluded that Harvard had disproved intentional discrimination after it credited one model including the personal rating and another excluding it.  We find no error.

1.   The District Court Did Not Err in Finding the Statistical Evidence Did Not Show the Personal Rating Was Influenced by Race

As a matter of basic principles of statistical analysis, whether the personal rating used in the admissions process should be included in the regression model hinges on whether the personal rating is influenced by race and whether that rating includes information that is not otherwise controlled for in the experts' admissions models.  See FJC Reference Manual at 313-16, 322-24 (explaining that experts typically assume that "changes in explanatory variables affect the dependent variable, but changes in the dependent variable do not affect the explanatory variables" and the concept of omitted variable bias)

SFFA argues that race influences the personal rating and should be excluded, while Harvard argues to the contrary that race is only correlated with the personal rating and excluding the personal rating would introduce omitted variable bias into the model.

The district court acknowledged that the model without the personal rating was "econometrically reasonable" and "provide[d] evidence that is probative of the effect of race on

- 91 -

Z 000143

the admissions process" but made a factual finding that "including the personal rating results in a more comprehensive analysis" and so was more accurate. SFFA II, 397 F. Supp. 3d at 173. Considering all of the evidence, it concluded that "the majority of the disparity in the personal rating between white and Asian American applicants was more likely caused by race-affected inputs to the admissions process . . . or underlying differences in the attributes that may have resulted in stronger personal ratings" than Harvard admissions officers' biases. See id. at 171.

There is a clear and important distinction between race being correlated with the personal rating and race influencing the personal rating. Race correlating with the personal rating means that there is a statistical relationship between race and the personal rating. Race influencing the personal rating means that this statistical relationship is causal. It means that Harvard assigns applicants higher or lower personal scores because of their race. The distinction between correlation and influence is very important.[38] See Samaan v. St. Joseph Hosp., 670 F.3d 21, 33 (1st

---

[38] SFFA implies throughout its brief that to see a negative correlation between Harvard's personal rating and Asian American ethnicity and not attribute it to racial bias is to conclude that "maybe the stereotypes about Asian Americans are true." This is a false dichotomy. SFFA ignores the possibility that factors external to Harvard's admissions process but correlated with race could account for the racial disparity in personal ratings.

Racial differences in Harvard's other ratings help illustrate SFFA's logical error. For example, Asian Americans do better than any other racial group on Harvard's academic rating. No one looks

Z 000144

Cir. 2012) ("Correlation is not causation."); Wessmann v. Gittens, 160 F.3d 790, 804 (1st Cir. 1998) ("Even strong statistical correlation between variables does not automatically establish causation."). If race is only correlated with the personal rating, excluding it from regression models could make it appear as if Harvard discriminates when it does not. If race influences the personal rating, including it in the experts' regression models could make it appear as if Harvard does not discriminate when it does.

The district court found that even when controlling for a number of other factors, race is correlated with the personal rating. SFFA II, 397 F. Supp. 3d at 169-70. Based on this fact, SFFA argues that the court was required to find that race influences the personal rating. The district court disagreed, and

---

at this correlation and concludes that there are only two possibilities: either Asian American students are smarter than everyone else or Harvard thinks they are and assigns them higher ratings accordingly. Instead, it is more likely that factors external to Harvard's admissions process but correlated with race account for Asian American's higher academic ratings. For this reason, everyone agreed that Harvard's academic rating should remain in the logistic regression model even though Professor Arcidiacono showed that -- even when controlling for obvious variables like grades and test scores and other factors like demographics, parental education, geographic region, and characteristics of applicants' high schools -- there is a positive correlation between Asian American identity and Harvard's academic rating. Indeed, when asked what could account for the statistical relationship between the academic rating and race even when controlling for other factors, Professor Arcidiacono replied: "We don't think it's because of race. We think it's because of these unobservable factors."

Z 000145

we hold that the district court did not clearly err in concluding that the more accurate statistical model includes the personal rating.

The district court gave three reasons why the personal rating should be included in the model. First, it credited Harvard's witnesses' testimony that they did not consider race in assigning the personal rating as evidence that race did not influence the personal rating. Id.

Second, the district court found that Professor Arcidiacono's analysis establishing a statistical correlation between race and the personal rating explains only a portion of the variation in personal ratings. Id. Professor Card testified at trial that Professor Arcidiacono's model had a low pseudo-$R^2$ value, indicating a poor fit.[39] A low pseudo-$R^2$ value alone is not sufficient to reject Professor Arcidiacono's model of the personal rating. But it is evidence that important explanatory variables may have been omitted from it.

Third, this evidence of poor fit properly led the district court to inquire into what these omitted variables might

---

[39]   In linear regression analyses, the $R^2$ value "is a statistic that measures the percentage of variation in the dependent variable that is accounted for by all the explanatory variables."  FJC Reference Manual at 345.  For technical reasons not relevant for our purposes, statisticians cannot calculate $R^2$ statistics for logistic regression models and instead typically report an analogous quantity -- the pseudo-$R^2$ value -- as one estimate of a model's goodness of fit.

Z 000146

be.  See id.; FJC Reference Manual at 314 n. 31 ("A very low R-squared ($R^2$) is one indication of an unexplained portion of the multiple regression model that is unacceptably high.  However, the inference that one makes from a particular value of $R^2$ will depend, of necessity, on the context of the particular issues under study and the particular dataset that is being analyzed.")  It concluded that Harvard had not discriminated on the basis of race.  See SFFA II, 397 F. Supp. 3d at 171.

Professor Card testified that non-quantifiable aspects of an applicant's personal essay could contribute to the correlation between race and the personal rating identified by Professor Arcidiacono.  He also presented statistical evidence showing that Asian American applicants receive lower teacher and guidance counselor recommendation ratings than white applicants. Both personal essays and teacher and guidance counselor recommendations factor heavily into applicants' personal ratings, justifying the court's inquiry into what could account for any correlation between these factors and race.  If factors external to Harvard -- like personal essays and recommendations -- correlate with race, affect the personal rating, but are not controlled for in Professor Arcidiacono's model of the personal rating, this calls into question SFFA's contention that race influences (and is not just correlated with) the personal rating.

Z 000147

The district court then analyzed whether these external factors -- personal essays and teacher and guidance counselor recommendations -- correlate with race.  Id. at 169.  It found that non-quantifiable aspects of applicants' personal statements might be correlated with race but are not controlled for in Professor Arcidiacono's model.  Id.

For instance, in Harvard's experience, applicants do choose to write about how "their racial identities have shaped their pre-college experiences" and admissions officers might read these essays[40] as evidence of an applicant's "abilit[y] to overcome obstacles" and therefore infer their "leadership ability or other personal strengths."  Id. at 169-70 & n.48.

Turning to the teacher and guidance counselor recommendations, the district court opined that they sometimes "seemingly presented Asian Americans as having less favorable personal characteristics than similarly situated non-Asian American applicants" and detailed why teacher and guidance

---

[40]   Record evidence supported this conclusion.  One admissions officer testified that the ability to overcome obstacles -- including racial ones -- is a factor in assessing submitted essays and assigning personal ratings.  In addition, a student who had been admitted to Harvard testified about her application essay discussing how her "ethnoracial identity had impacted every decision [she] had made, every experience that [she] had had" and that she "wanted to write about it because [she] felt like it was something important and something of value that [she] could bring to a school like Harvard."

Z 000148

counselor recommendation letters might correlate with race for reasons unrelated to Harvard. Id. at 170-71.

Whether or not the applicant came from a privileged background was one likely factor. Privileged students likely have better access to schools with low student-to-teacher ratios and teachers and guidance counselors with more time to write strong, individualized recommendations. See id. at 170. Privileged students likely receive better recommendations than less privileged students. See id. Privilege is correlated with race. One of Harvard's amici expands on this point, citing research that Asian American students are more likely than white students to attend public high schools where overloaded teachers and guidance counselors may provide more perfunctory recommendations. Likewise, the district court reasoned that a "student that works part time and a student that does not may receive different recommendations even with the same academic performance and without reference to race." Id. at 170-71. Because working part time likely correlates with race, it is plausible that race is also correlated with the quality of recommendations.[41] The finding

---

[41] The district court's reasoning does not itself imply that teachers and guidance counselors are racially biased and should not be so understood. Nor does it imply that Harvard must accept such a characterization. Because race likely correlates with privilege (resulting in applicants in some racial groups having teachers that are stretched thinner than applicants in others) or participation in school-sponsored extracurricular activities (resulting in applicants in some racial groups having

Z 000149

that teacher and guidance counselor recommendations correlate with race but were not accounted for in Professor Arcidiacono's model was not erroneous.[42]

SFFA also argues that the district court engaged in speculation with "zero evidentiary basis" by considering how these omitted variables could be correlated with race and affect the validity of Professor Arcidiacono's model.  The argument is based on a misperception of the requirements for statistical analysis. The district court credited Professor Card's testimony and analysis that the omitted variables discussed above -- the qualitative components of teacher and guidance counselor recommendations and personal essays -- called Professor Arcidiacono's analysis of the personal rating into question.  Id. It was not erroneous for the district court to find that the personal rating was not influenced by race in a way that precluded its use in a logistic regression model.

less teacher interaction than applicants in others), teachers or guidance counselors do not have to be biased to write more generic or less enthusiastic letters for applicants based on race.  An alternative explanation is that race correlates with how well teachers or guidance counselors know their students.

[42]  Contrary to SFFA's argument, the school support ratings that Professor Arcidiacono included as control variables in his model do not account for these biases because they reflect assessments of teacher and guidance counselor recommendations as a whole. As Professor Card testified, Professor Arcidiacono cannot control for the specific portions of recommendation letters that inform the personal rating specifically and might be correlated with race.

Z 000150

2.   <u>The District Court Did Not Err by Crediting Harvard's Expert's</u>
     <u>Logistic Regression Model Including the Personal Rating</u>

Because the court did not err in concluding that the personal rating was not influenced by race, it was not erroneous to consider a logistic regression model of Harvard's admissions process including it.  Because all parties agree that Harvard considers the personal rating in its admission decisions, it should be included in any model of Harvard's admissions process unless there is a strong reason to exclude it.  See FJC Reference Manual at 313-14.  As Professor Card and Harvard's admissions officers testified, the personal rating includes information that is not accounted for elsewhere in the experts' models but is important to Harvard's admissions process.  And since race is correlated with the personal rating but not influenced by it, excluding it would increase the risk of misleading regression results.  See FJC Manual at 314 ("Failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect that actually is caused by the excluded variable.").  Without the personal rating, the model would suffer from omitted variable bias. The court properly credited a logistic regression model including the personal rating.

3.    The District Court Did Not Err by Concluding That the
      Statistical Evidence Did Not Show That Harvard Intentionally
      Discriminated Against Asian Americans

          We repeat that the statistical model using the personal
rating showed no discrimination against Asian Americans.  Rather,
it shows that Asian American identity has a statistically
insignificant overall average marginal effect[43] on admissions
probability of -.08%.  This means that, on average, the model shows
that an Asian American student has a .08% lower chance of admission
to Harvard than a similarly situated white student and that this
effect is statistically insignificantly different from zero.

          SFFA relies on one aspect of the statistical analysis
presented.  SFFA's preferred model without the personal rating
shows a statistically significant overall average marginal effect
of -0.34%.  This means that, on average, the model shows that an
Asian American student has a .34% lower chance of admission to

----

          [43]    The "average marginal effect" of Asian American identity
is computed by first taking every applicant in the sample and
calculating two probabilities using the logistic regression model:
their probability of admission if they were Asian American and
their probability of admission if they were not Asian American.
The difference in the two probabilities is called marginal effect
of being Asian American for that applicant.  The marginal effect
of being Asian American differs for every applicant depending on
other aspects of their application.  The average marginal effect
is the average of the marginal effects across all applicants.

          The overall average marginal effect uses data from all six
admissions cycles analyzed by the experts.  The experts also
analyzed the average marginal effect in each admissions cycle.

Z 000152

Harvard than a similarly situated white student and that this effect is statistically significantly different from zero. But because the average marginal effect is calculated using all applicants to Harvard, including many applicants whom Harvard is unlikely to admit, this number does not establish that being Asian American matters for the small subset of applicants who have a realistic chance of being admitted to Harvard.

The statistically significant negative overall average marginal effect of Asian American identity in SFFA' preferred model is also not robust.[44] In addition to disappearing entirely when the personal rating is included in the model, it is almost undetectable on a year-by-year basis even within SFFA's preferred model. The average marginal effect of Asian American identity in the model excluding the personal rating is only statistically significantly negative in one of the six years analyzed.[45] In five of the six admissions cycles, the effect is statistically

---

[44]   We use the word "robust" in the technical sense.   A statistic or procedure is robust when it "does not change much when data or assumptions are modified slightly."   FJC Reference Manual at 295; see also id. at 295, 322 (defining "robust" and explaining that "[t]he issue of robustness . . . is of vital importance").

[45]   For the classes of 2014, 2015, and 2016, Asian American identity had a negative but statistically insignificant average marginal effect on admissions chances.   For the classes of 2017 and 2019, Asian American identity had a positive but statistically insignificant average marginal effect.   It is only in 2018 that the average marginal effect is statistically significantly negative.

Z 000153

indistinguishable from zero.  Indeed, in two years, the model shows that Asian American identity actually has a positive effect on an applicant's chance of admission to Harvard.

Based on this evidence, the district court found that regardless of whether the personal rating is included or not, the average marginal effect on Asian American identity is close to zero.  Id. at 175.  It found that the effect of Asian American identity varies by admissions cycle and is not always negative in each admission cycle.  Id.  Indeed, it found that Asian American identity could be a positive factor if the model "was better able to account for unobserved factors."  Id.  It reasoned that "[i]t is also possible that the negative coefficient and average marginal effect reflect a very slight implicit bias that could have played a modest role in lowering Asian Americans' admissions probability in some of the 2014-2019 admissions cycles" but that, if there were any implicit bias, "the effect was so slight that it went unnoticed by careful and conscientious observers within the Admissions Office."  Id.

Finally, SFFA argues that "the district court recognized that one likely explanation for why Asian Americans are penalized in the admissions process is Harvard's 'implicit bias'" and that "calling the bias 'implicit' does not make it legal."  First, the district court called this effect "possible," not likely.  Id. Next, as the court recognized, this possibility was "unsupported

Z 000154

by any direct evidence" before it.  Id. at 171.  Indeed, there was ample non-statistical evidence suggesting that Harvard admissions officers did not engage in any racial stereotyping, and the court determined that "no credible evidence . . . corroborates the improper discrimination suggested" by SFFA's preferred model.  Id. at 203.  The district court's speculation about what might have caused a statistically significant effect in one of the two models it considered does not transform its finding that there was no "intent by admissions officers to discriminate based on racial identity" into clear error.  Id. at 175.

The district court did not clearly err in finding that Harvard did not intentionally discriminate against Asian Americans.  See Torres-Lazarini v. United States, 523 F.3d 69, 72 (1st Cir. 2008) ("When the evidence presented at a bench trial supports plausible but competing inferences, the court's decision to favor one inference is not clearly erroneous."); see Cape Fear, Inc. v. Martin, 312 F.3d 496, 500 (1st Cir. 2002).

### IV.

Harvard has an "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies." Fisher II, 136 S. Ct. at 2215.  The issue before us is whether Harvard's limited use of race in its admissions process in order to achieve diversity in the period in question is consistent

Z 000155

with the requirements of Supreme Court precedent.   There was no error.

Affirmed.   No costs are awarded.

Z 000156