# Exhibit D

No. _____

# In the Supreme Court of the United States

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Petitioner,*

*v.*

PRESIDENT & FELLOWS OF HARVARD COLLEGE,
*Respondent.*

ON PETITION FOR A WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

## PETITION FOR WRIT OF CERTORARI

Adam K. Mortara
125 South Wacker
Drive, Ste. 300
Chicago, IL 60606
(773) 750-7154

William S. Consovoy
*Counsel of Record*
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548

February 25, 2021          *Attorneys for Petitioner*

i

## QUESTIONS PRESENTED

1. Should this Court overrule *Grutter v. Bollinger*, 539 U.S. 306 (2003), and hold that institutions of higher education cannot use race as a factor in admissions?

2. Title VI of the Civil Rights Act bans race-based admissions that, if done by a public university, would violate the Equal Protection Clause. *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003). Is Harvard violating Title VI by penalizing Asian-American applicants, engaging in racial balancing, overemphasizing race, and rejecting workable race-neutral alternatives?

Z 000158

ii

## RULE 29.6 STATEMENT

Students for Fair Admissions, Inc. (SFFA) has no parent company or publicly held company with a 10% or greater ownership interest in it.

Z 000159

iii

## RELATED PROCEEDINGS

United States District Court (D. Mass):

> *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 14-cv-14176-ADB (June 15, 2015) (order denying motion to intervene)

> *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 14-cv-14176-ADB (June 2, 2017) (order denying motion to dismiss)

> *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 14-cv-14176-ADB (June 2, 2017) (order granting motion for partial judgment on the pleadings)

> *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 14-cv-14176-ADB (Sept. 28, 2018) (order denying motions for summary judgment)

> *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 14-cv-14176-ADB (Sept. 30, 2019) (findings of fact and conclusions of law)

United States Court of Appeals (1st Cir.):

> *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 15-1823 (Dec. 9, 2015) (opinion)

> *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 19-2005 (Nov. 12, 2020) (opinion)

Z 000160

iv

# TABLE OF CONTENTS

Table of Cited Authorities.........................................vii

Opinions Below.....................................................1

Jurisdiction.......................................................1

Statutory Provision Involved.......................................1

Introduction.......................................................2

Statement of the Case..............................................4

    A.  History of Harvard Admissions.....................4

    B.  Harvard's Response to This Lawsuit................6

    C.  Trial Evidence...................................8

        1.  Harvard's Constant Focus on Race.........8

        2.  Harvard's Preferences for Underrepresented Minorities................11

        3.  Harvard's Penalties for Asian Americans...............................12

        4.  Harvard's Rejection of Race-Neutral Alternatives............................17

    D.  Lower Courts' Rulings............................19

Reasons for Granting the Petition.................................20

    I.  The Court should grant certiorari to consider overruling *Grutter*.......................21

        A.  *Grutter* is grievously wrong..................22

        B.  *Grutter* has spawned significant negative consequences...........................29

        C.  *Grutter* has generated no legitimate reliance interests..................................32

Z 000161

v

II. The Court should grant certiorari to consider whether Harvard's admissions program satisfies strict scrutiny. ................ 36

    A.   Harvard penalizes Asian Americans. ... 37

    B.   Harvard engages in racial balancing.... 39

    C.   Harvard does not use race as a mere plus to achieve overall diversity............ 41

    D.   Harvard has workable race-neutral alternatives. .......................................... 42

Conclusion ................................................................ 44

Appendix

Appendix A

    Opinion in the United States Court of Appeals for the First Circuit (Nov. 12, 2020) ......................................... App. 1

Appendix B

    Findings of Fact and Conclusions of Law in the United States District Court District of Massachusetts (Sept. 30, 2019) ...................................... App. 99

Appendix C

    Judgment in a Civil Case in the United States District Court District of Massachusetts (Sept. 30, 2019) .................................... App. 271

vi

Appendix D

      Memorandum and Order on
      Cross-Motions for Summary
      Judgment in the United States
      District Court District of
      Massachusetts (Sept. 28, 2018) .......... App. 273

Appendix E

      Memorandum and Order Granting
      Motion for Partial Judgment on the
      Pleadings in the United States
      District Court District of
      Massachusetts (June 2, 2017) ............ App. 326

Appendix F

      Memorandum and Order Denying
      Motion to Dismiss in the United
      States District Court District of
      Massachusetts (June 2, 2017) ............ App. 328

Z 000163

vii

## TABLE OF CITED AUTHORITIES

### Cases

*Adarand Constructors, Inc. v. Peña,*
   515 U.S. 200 (1995)...........................25, 32, 33, 38

*Batson v. Kentucky,*
   476 U.S. 79 (1986)..............................................33

*Brown v. Board of Education,*
   347 U.S. 483 (1954).........................................2, 33

*Bush v. Vera,*
   517 U.S. 952 (1996)............................................24

*Castaneda v. Partida,*
   430 U.S. 482 (1977)............................................39

*Citizens United v. FEC,*
   558 U.S. 310 (2010)......................................27, 29

*City of Richmond v. J.A. Croson Co.,*
   488 U.S. 469 (1989)...................................2, 29, 34

*Dred Scott v. Sandford,*
   60 U.S. 393 (1857)..............................................22

*Fisher v. Univ. of Tex. at Austin (Fisher I),*
   570 U.S. 297 (2013)...................................*passim*

*Fisher v. Univ. of Tex. at Austin (Fisher II),*
   136 S.Ct. 2198 (2016).................................*passim*

*Franchise Tax Bd. of Calif. v. Hyatt,*
   139 S.Ct. 1485 (2019).........................................21

*Gratz v. Bollinger,*
   539 U.S. 244 (2003).............................................29

*Grutter v. Bollinger,*
   288 F.3d 732 (6th Cir. 2002) (en banc) ..............24

Z 000164

viii

*Grutter v. Bollinger,*
    539 U.S. 390 (2003).....................................*passim*

*Hopwood v. Texas,*
    78 F.3d 932 (5th Cir. 1996)................................ 23

*Janus v. AFSCME,*
    138 S. Ct. 2448 (2018)..............................25, 28, 35

*Knick v. Twp. of Scott,*
    139 S.Ct. 2162 (2019)..............................21, 23, 29

*Lawrence v. Texas,*
    539 U.S. 558 (2003)............................................ 26

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006)............................................... 2

*Metro Broad., Inc. v. FCC,*
    497 U.S. 547 (1990)......................................24, 25

*Miller v. Johnson,*
    515 U.S. 900 (1995)............................................ 24

*Montejo v. Louisiana,*
    556 U.S. 778 (2009)............................................ 33

*Palmore v. Sidoti,*
    466 U.S. 429 (1984)............................................ 23

*Parents Involved in Cmty. Sch. v. Seattle Sch.*
    *Dist. No. 1,* 551 U.S. 701 (2007) ................*passim*

*Plessy v. Ferguson,*
    163 U.S. 537 (1896).........................................2, 22

*Price v. Civil Serv. Comm'n,*
    604 P.2d 1365 (Cal. 1980).................................... 2

*Ramos v. Louisiana,*
    140 S.Ct. 1390 (2020)...................................*passim*

Z 000165

ix

*Regents of Univ. of Calif. v. Bakke,*
    438 U.S. 265 (1978)...................................5, 27, 40

*Republican Party of Minn. v. White,*
    536 U.S. 765 (2002)............................................39

*Schuette v. BAMN,*
    572 U.S. 291 (2014)....................................*passim*

*Shaw v. Hunt,*
    517 U.S. 899 (1996)............................................23

*Shaw v. Reno,*
    509 U.S. 630 (1993)............................................32

*Smith v. Allwright,*
    321 U.S. 649 (1944)............................................33

*Trump v. Hawaii,*
    138 S.Ct. 2392 (2018)..........................................33

*United States v. Playboy Ent. Group, Inc.,*
    529 U.S. 803 (2000).......................................38, 39

*Wygant v. Jackson Bd. of Educ.,*
    476 U.S. 267 (1986)............................................23

## Constitutional Provisions, Statutes & Rules

28 U.S.C. §1254(1)......................................................1

42 U.S.C. §2000d ................................................1, 36

Decl. of Independence, 1 Stat. 1 (July 4, 1776)........22

S.Ct. R. 10(c) ...........................................................20

U.S. Const. amend. XIV, §1 .....................................22

## Other Authorities

2 Cong. Rec. 4083 (1874)..........................................22

x

Bernstein, *The Modern American Law of Race* (May 2020), bit.ly/3nBMhhL ................................ 7

Blumstein, *Grutter and Fisher: A Reassessment and a Preview*, 65 Vand. L. Rev. En Banc 57 (2012) .................................................................... 24

Bollinger, *A Comment on Grutter and Gratz v. Bollinger*, 103 Colum. L. Rev. 1589 (2003) ........ 28

Dershowitz & Hanft, *Affirmative Action & the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379 (1979) ........................................................................ 5

Graf, *Most Americans Say Colleges Should Not Consider Race or Ethnicity in Admissions*, Pew (Feb. 25, 2019), pewrsr.ch/2Xq43K0 .................. 33

Haidt, *Viewpoint Diversity in the Academy*, bit.ly/2LOGnfM ..................................................... 32

Pierre, *Demands for Segregated Housing at Williams College Are Not News*, NAS (May 8, 2019), bit.ly/2KasdoS ...................................................... 32

Rubenfeld, *Affirmative Action*, 107 Yale L.J. 427 (1997) ..................................... 28

Schuck, *Affirmative Action: Past, Present, and Future*, 20 Yale L. & Pol'y Rev. 1 (2002)............ 28

Smith & Rosales, *Latino Students Make Up Largest Ethnic Group of Students Admitted to UC*, EdSource (July 16, 2020), bit.ly/38yI3mN......... 35

Stiksma, *Understanding the Campus Expression Climate: Fall 2019*, bit.ly/2XJN45v ................... 32

Z 000167

xi

Ting, *'They Lost Partly Because of That Ad': How No on Prop. 16 Organizers Knew the Measure Would Fail*, SF Gate (Dec. 2, 2020), bit.ly/2XBrmAZ... 34

Weybright, *Study Finds Increasing Discrimination Against Asians and Asian Americans*, WSU Insider (Nov. 4, 2020), bit.ly/39rc9YI................ 31

Z 000168

## OPINIONS BELOW

The First Circuit's opinion is reported at 980 F.3d 157 and is reproduced in the Appendix at App.1-98. The District of Massachusetts' opinion is reported at 397 F.Supp.3d 126 and is reproduced at App.99-270.

## JURISDICTION

The First Circuit's judgment was entered on November 12, 2020. Due to COVID-19, the time to file this petition was extended to April 12, 2021. This Court has jurisdiction under 28 U.S.C. §1254(1).

## STATUTORY PROVISION INVOLVED

The pertinent statute is §601 of Title VI of the Civil Rights Act of 1964:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. §2000d.

2

## INTRODUCTION

"It is a sordid business, this divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part, concurring in the judgment in part, and dissenting in part). "'[D]iscrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society.'" *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in the judgment). "'[E]very time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all.'" *Fisher v. Univ. of Tex. at Austin (Fisher I)*, 570 U.S. 297, 316 (2013) (Thomas, J., concurring).

"Our nation gave its word over and over again: it promised in every document of more than two centuries of history that all persons shall be treated Equally." *Price v. Civil Serv. Comm'n*, 604 P.2d 1365, 1390 (Cal. 1980) (Mosk, J., dissenting). "Our constitution," as Justice Harlan recognized, "is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (dissent). The Court vindicated the promise of equality in *Brown v. Board of Education*, 347 U.S. 483 (1954), rejecting "'any authority … to use race as a factor in affording educational opportunities.'" *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 747 (2007). Ten years later, Congress passed Title VI of the Civil Rights Act to extend *Brown's* command to private universities that accept federal funds.

3

Yet *Grutter v. Bollinger*, 539 U.S. 390 (2003), abandoned the principle of racial neutrality that *Brown* and Title VI vindicated. *Grutter* did so by improperly affording broad deference to university administrators to pursue a diversity interest that is far from compelling. To this end, *Grutter* endorsed racial objectives that are amorphous and unmeasurable and thus incapable of narrow tailoring. Unsurprisingly then, universities have used *Grutter* as a license to engage in outright racial balancing. This case shows that judicial scrutiny under *Grutter* is anything but strict.

But given Harvard's flagrant violations of Title VI, it fails strict scrutiny even under *Grutter*. Harvard's mistreatment of Asian-American applicants is appalling. Harvard penalizes them because, according to its admissions office, they lack leadership and confidence and are less likable and kind. This is reason enough to grant review. That Harvard engages in racial balancing and ignores race-neutral alternatives also proves that Harvard does not use race as a last resort. All of this makes intervention that much more urgent.

This case is the kind of important individual-rights dispute that this Court has not hesitated to hear. Review thus would be warranted if the defendant were any university subject to Title VI. But it isn't just any university. It's Harvard. Harvard has been at the center of the controversy over ethnic- and race-based admissions for nearly a century. The Court should grant certiorari.

Z 000171

4

## STATEMENT OF THE CASE

SFFA filed this case in 2014. Until this litigation, Harvard had described its admissions program only in untested amicus briefs; no court or litigant had ever given "close analysis to the evidence of how the process works in practice." *Fisher I*, 570 U.S. at 313. SFFA conducted that analysis over six years of litigation, including a three-week trial. The evidence should convince this Court that Harvard's admissions program was never legal. And because *Grutter* used Harvard as its north star, 539 U.S. at 335-39, the evidence fundamentally undermines that precedent too.

### A. History of Harvard Admissions

For much of its existence, Harvard admitted students who passed a required exam. CA1.Joint.App'x (JA) 426. In the early 1920s, however, Harvard's leaders became alarmed by the growing number of Jewish students who were getting in. JA.428-30. Although Harvard "prefer[red] to state frankly" that it was "directly excluding all [Jews] beyond a certain percentage," it recognized that an explicit quota would "cause at once some protest." JA.429.

Harvard thus created a holistic admissions system to "reduce the number of Jews." JA.435. Instead of test scores alone, Harvard placed "greater emphasis" on "character," "fitness," and other subjective criteria. JA.400. By making its admissions priorities "less obvious," Harvard believed it could hide its true motives. JA.429. Harvard could say that race was "part of the record," but not "the whole record," so no

Z 000172

5

student would ever "be kept out on grounds of race." JA.438.

A half-century later, Harvard submitted an amicus brief in *Bakke*, touting its program as a blueprint for how to use race. Known as the "Harvard Plan," Harvard said its admissions process "treats each applicant as an individual." *Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265, 318 (1978) (opinion of Powell, J.). In reality, the Harvard Plan was "*inherently capable* of gross abuse and [*had*] *in fact been deliberately* manipulated for the specific purpose of perpetuating religious and ethnic discrimination in colleges admission." Dershowitz & Hanft, *Affirmative Action & the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979). After denying it for years, Harvard now admits that it used holistic admissions to discriminate against Jews; but it claims "nothing like that [will] ever happen[] again." JA.1664:20-1666:14; JA.519:4-13; D.Ct. Docket (Dkt) 577.

Yet Harvard boasts that it uses race today in the same manner that it devised in the 20th century. According to Harvard, a student's race is "one part of [a] whole-person review." JA.651:18-652:21. But unlike other diversity factors, Harvard automatically awards racial preferences to African Americans and Hispanics, "regardless of whether [they] write about that aspect of their backgrounds [in their applications] or otherwise indicate that [their race] is an important component of who they are." App.116; JA.655:14-658:7; JA.2503:13-2504:1; JA.3282:5-3283:15. Although college admissions are zero sum, *Fisher v.*

Z 000173

6

*Univ. of Tex. at Austin* (*Fisher II*), 136 S.Ct. 2198, 2227 n.4 (2016) (Alito, J., dissenting), Harvard says that being white or Asian American is "never a negative" in its process, JA.1606:13-1607:2. Harvard also denies that it uses race to achieve a "critical mass" of underrepresented minorities. JA.3710-11.

## B. Harvard's Response to This Lawsuit

In November 2014, SFFA sued Harvard in the District of Massachusetts for violations of Title VI. A 501(c)(3) voluntary membership organization, SFFA is dedicated to defending the right to equality in college admissions. App.330. SFFA sued on behalf of its members, including Asian-American students who were denied admission to Harvard and who stand ready and able to apply to transfer if Harvard stops racially discriminating. App.330 & n.4. The United States supported SFFA below, agreeing that the evidence proves Harvard is violating Title VI.

SFFA's lawsuit precipitated a flurry of activity at Harvard. Almost immediately Harvard started admitting Asian-American applicants at a higher rate. In the five years before this suit, Harvard had never admitted Asian Americans at a higher rate than whites (to a statistically significant degree). But Harvard did so for the class of 2019—the first admissions cycle "after the allegations of discrimination that led to this lawsuit emerged." App.171 n.44; JA.2230:10-2231:1. As this case progressed, Harvard repeatedly announced that it had admitted record numbers of Asian

Z 000174

7

Americans compared to the year before. Dkt.452 at 29.[1]

This litigation also revealed Harvard's longtime defiance of this Court's precedent. Despite *Grutter*'s command in 2003, Harvard had *never* examined "the viability of race-neutral alternatives." App.153. It never formed a committee to consider eliminating race until after SFFA filed this suit. App.152-53. That committee did not collect data, take testimony, or run simulations. App.152-53. It instead "worked with Harvard's attorneys," reviewed "the analyses done by the experts in this case," and issued a report "drafted by Harvard's attorneys." App.153; JA.4413-31. Unsurprisingly, the committee found that Harvard had no workable race-neutral alternatives.

Finally, just weeks before the trial began, Harvard amended its "reading procedures"—its formal guidance for reviewing applications. SFFA never would have discovered these changes, except one of Harvard's witnesses inadvertently mentioned them at trial. App.106 n.2. In the new reading procedures, Harvard provided—for the first time ever—"written guidance on how to consider race in the admissions process." App.121-22. Harvard also added guidelines for assigning the "personal rating," Harvard's score for an applicant's "leadership," "self-confidence," "likeability," and "kindness." App.19. Harvard revamped its guidance on this highly subjective rating to "make

---

[1] SFFA uses the term "Asian American" only because Harvard does. The term is incoherent, sweeping in "wildly disparate national groups" with little in common. Bernstein, *The Modern American Law of Race* 9-10 (May 2020), bit.ly/3nBMhhL.

8

sure [its] admissions officers d[o] not fall prey to im-
plicit bias or racial stereotyping about Asians."
JA.3287:18-3288:23.

## C.  Trial Evidence

After bifurcating liability and remedies, the dis-
trict court held a three-week bench trial in late 2018.[2]
The court heard from eighteen Harvard employees,
four experts, and eight students. App.106. SFFA's ex-
perts were Peter Arcidiacono, a "highly respected
economist[]," and Richard Kahlenberg, a leading ex-
pert on race-neutral alternatives. App.166 n.40;
App.208-09 n.50. The trial exposed, for the first time
in history, how Harvard actually uses race.

### 1.  Harvard's Constant Focus on Race

Harvard uses race at every stage of the admis-
sions process. To begin, Harvard recruits high-school
students differently based on race. App.154-56. Afri-
can-American and Hispanic students with PSAT
scores of 1100 and up are invited to apply to Harvard,
but white and Asian-American students must score a
1350. JA.577:6-581:20; JA.3741. In some parts of the
country, Asian-American applicants must score
*higher* than all other racial groups, including whites,
to be recruited by Harvard. JA.585:15-594:8; JA.3741.

---

[2] Before trial, the court granted Harvard judgment on the
pleadings on two counts, including SFFA's claim that this Court
should overrule *Grutter* and outlaw race-based admissions.
App.326-27. Harvard conceded that "SFFA ... may, at the appro-
priate time, ask the Supreme Court to overrule ... *Grutter*."
Dkt.186 at 13.

Z 000176

9

When asked about this disparity, Harvard's long-serving dean of admissions, William Fitzsimmons, deployed a stereotype: Harvard preferred the white students who probably "lived [in the rural areas] for their entire lives," not the Asian-American students who lived there for only "a year or two." JA.591:4-8.

As admissions decisions are made, Harvard monitors the racial makeup of each class through "one-pagers." App.135-36. A one-pager is a document that compares select admissions statistics (including racial percentages) from the current year to the prior year. Because Harvard's database is updated daily, a one-pager provides a real-time assessment of the class's current racial makeup. App.135-36; *e.g.,* JA.4143-45. Admissions leaders receive and review one-pagers throughout the admissions cycle. JA.1871:14-1883:10; App.136-37; JA.5982; JA.4113-46.

Dean Fitzsimmons regularly informs the entire office of the racial makeup of the class and how it compares to the year before. App.136-37; JA.1392:21-24; JA.2000:2-16; JA.2516:22-2518:4; JA.4090; JA.4084. If Fitzsimmons believes a racial group is "underrepresented," he will "talk about it and give it attention." JA.1392:21-1393:16; App.136-37. If the process is nearing the end and a certain racial group is "surprisingly or notably underrepresented," the admissions office will "go back and look at those cases." JA.1394:6-20; App.136-37. Harvard's goal is to avoid having "a dramatic drop-off" from the prior year. App.136; JA.1395:15-1397:11.

Z 000177

10

Harvard's focus on the class's racial makeup continues until final decisions are made. JA.4138-46; JA.4011. Harvard uses race during the "lop" process—the winnowing of the tentatively admitted class to the final number. App.133. Before this process starts, Dean Fitzsimmons again announces the class's current racial composition. JA.2113:1-14. Applicants are then placed on a "lop list" that includes only four datapoints: legacy status, recruited-athlete status, financial-aid eligibility, and race. JA.4156; JA.2048.14-2049:1. Race is often the reason that someone gets lopped. As the admissions process neared conclusion in 2013, for example, Fitzsimmons asked an admissions officer to bring him "his ethnic stats" because the full committee needed to lop 28 more applicants. JA.4112; JA.1868:22-1871:1.

With its meticulous attention to race, Harvard has kept the racial makeup of its classes remarkably stable. In the decade before this lawsuit was filed, Harvard's racial percentages barely moved:

| Share of Students Admitted to Harvard by Race | | | |
|---|---|---|---|
| | African-American Share of Class | Hispanic Share of Class | Asian-American Share of Class |
| Class of 2009 | 11% | 8% | 18% |
| Class of 2010 | 10% | 10% | 18% |
| Class of 2011 | 10% | 10% | 19% |
| Class of 2012 | 10% | 9% | 19% |
| Class of 2013 | 10% | 11% | 17% |
| Class of 2014 | 11% | 9% | 20% |
| Class of 2015 | 12% | 11% | 19% |
| Class of 2016 | 10% | 9% | 20% |
| Class of 2017 | 11% | 10% | 20% |
| Class of 2018 | 12% | 12% | 19% |

11

JA.5744. The United States thought this "manifest steadiness" in "the racial composition of successive admitted classes" "speaks for itself." CA1.U.S.Br. 12-13.

## 2. Harvard's Preferences for Underrepresented Minorities

Harvard's admissions data revealed astonishing racial disparities in admission rates among similarly qualified applicants. SFFA's expert testified that applicants with the same "academic index" (a metric created by Harvard based on test scores and GPA) had widely different admission rates by race.

Admit Rates by Race/Ethnicity and Academic Decile

| Academic Decile | White | Asian American | African American | Hispanic | All Applicants |
|---|---|---|---|---|---|
| 10 | 15.3% | 12.7% | 56.1% | 31.3% | 14.6% |
| 9 | 10.8% | 7.6% | 54.6% | 26.2% | 10.4% |
| 8 | 7.5% | 5.1% | 44.5% | 22.9% | 8.2% |
| 7 | 4.8% | 4.0% | 41.1% | 17.3% | 6.6% |
| 6 | 4.2% | 2.5% | 29.7% | 13.7% | 5.6% |
| 5 | 2.6% | 1.9% | 22.4% | 9.1% | 4.4% |
| 4 | 1.8% | 0.9% | 12.8% | 5.5% | 3.3% |
| 3 | 0.6% | 0.6% | 5.2% | 2.0% | 1.7% |
| 2 | 0.4% | 0.2% | 1.0% | 0.3% | 0.5% |
| 1 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

App.179-80; JA.6008-09. For example, an Asian American in the fourth-lowest decile has virtually no chance of being admitted to Harvard (0.9%); but an African American in that decile has a higher chance of admission (12.8%) than an Asian American in the *top* decile (12.7%).

12

SFFA's regression analysis showed "substantial" preferences for African-American and Hispanic applicants. JA.2290:22-2291:8; JA.6017. Harvard's expert, David Card, agreed. If Harvard eliminated racial preferences and adopted no race-neutral alternatives, Card found that the African-American share of the class would fall from 14% to 6% and the Hispanic share would fall from 14% to 9%. App.209-10; JA.6121. In absolute terms, then, race was "determinative" for at least "45% of all admitted African American and Hispanic applicants"—or "nearly 1,000 students" over a four-year period. App.209.

Harvard's expert also testified that race gives African-American and Hispanic applicants with a real shot at getting into Harvard a "big increase in the probability of admission." JA.3039:25-3050:17; JA. 6112; JA.5747. For competitive African-American applicants, the boost they get for race is comparable to the boost any applicant would get for scoring a "1" on the academic, extracurricular, or personal rating. JA.5747; JA.6112. These "1" ratings are incredibly rare; less than 0.5% of applicants receive them. JA.4527; JA.4530. Harvard thus treats a student's skin color like authoring "original scholarship," obtaining "near-perfect scores and grades," or winning "national-level" awards. JA.3727-28.

### 3.  Harvard's Penalties for Asian Americans

The trial revealed that Harvard has long known its process discriminates against Asian Americans. In 1990, a federal investigation found that Harvard's officers were deploying "recurring characterizations at-

Z 000180

13

tributed to Asian-American applicants," such as "'quiet/shy, science/math oriented, and hard workers.'" App.156-57. Harvard did nothing in response to this finding of anti-Asian stereotyping. It "did not hold a meeting or otherwise require that its admissions officers modify their evaluation practices." App.158. Harvard instead warned admissions officers to be more careful because their "comments may be open to public view at a later time." JA.1116:20-1117:17; JA.3735.

In December 2012—after David Brooks published an article in the New York Times suggesting that Harvard has an Asian quota—Harvard asked its Office of Institutional Research (OIR) to research Brooks' claims. JA.745:16-759:16; App.140-45. OIR's first report found "evidence that Asians are disadvantaged in the admissions process" and that Harvard's "personal rating" was to blame. JA.1963:19-1964:11; JA.3742-58. OIR's second report found that Harvard's preferences for legacies and athletes could not explain why white applicants were faring better than Asian Americans. JA.791:24-800:25; JA.3790-93; App.144.

A few months later, OIR found statistically significant evidence that being Asian American is "negatively correlated" with admission. JA.1174:9-1177:20; App.148. OIR's memorandum to Dean Fitzsimmons contained a chart showing the penalty:

Z 000181

14

Table: Logistic Regression Predicting Admission from Classes 2009 through 2016

| Variable | Coefficient Estimate | P-value |
|---|---|---|
| Athletic rating of 1 | 6.33 | 0.00 |
| Personal Rating 1 or 2 | 2.41 | 0.00 |
| Legacy | 2.40 | 0.00 |
| African American | 2.37 | 0.00 |
| Native American | 1.73 | 0.00 |
| Extracurricular 1 or 2 | 1.58 | 0.00 |
| Academic 1 or 2 | 1.31 | 0.00 |
| Standardized Academic Index | 1.29 | 0.00 |
| Hispanic | 1.27 | 0.00 |
| CSS self-reported income less than or equal to $60K | 0.98 | 0.00 |
| International | 0.24 | 0.00 |
| Asian | -0.37 | 0.00 |
| Constant | -6.23 | 0.00 |
| Unknown/Other | -0.03 | 0.41 |
| Female | 0.00 | 0.87 |

N = 192,359; Pseudo R2 = 0.45

JA.3956-57 (page break omitted). OIR warned Fitz-simmons not to "shar[e] these results publicly" because "there are demographic groups that have negative effects." JA.3957. Asian Americans were the only "demographic group" with "negative effects." JA.3957; JA.844:8-845:11; *see* JA.3953 (acknowledging that the "controversial findings" were "around Asians"). A follow-up report again found a "negative chance of getting into Harvard by virtue of being Asian." JA.853:10-18; JA.3969-70; App.148-49.

Despite OIR's findings, Harvard sounded no alarms, ordered no additional research, and made no changes to its admissions process. App.144-45; App.149-50. OIR's findings, Dean Fitzsimmons later testified, were "absolutely consistent" with what he "already knew" about Harvard admissions. JA.896:17-897:8; JA.799:11-802:25.

Z 000182

15

The undisputed expert testimony at trial confirmed OIR's findings. Harvard admits Asian Americans at lower rates than whites, even though Asian Americans receive higher academic scores, extracurricular scores, and alumni-interview scores. App.170; App.172; App.262; JA.4530. According to an unrebutted model of the personal rating, Asian Americans receive the lowest personal ratings among all races, and the "negative relationship between Asian American identity and the personal rating" is "statistically significant." App.189-90; App.172-73; App.262. Unsurprisingly then, a statistical model accepted by the district court showed a "statistically significant" penalty against Asian Americans in admissions outcomes. App.203.

Harvard's admissions officers uniformly deny that Asian-American applicants have lower personal qualities than applicants of other races. JA.1437:20-1438:9; JA.2055:1-23; JA.1893:1-4; JA.711:5-712:4. Harvard also insists that race does not influence the personal rating. But the actual ratings reveal a clear racial hierarchy—with African Americans receiving the highest personal ratings, followed by Hispanics, then whites, then Asian Americans coming in last:

Z 000183

16

Percentage of Applicants Receiving a 1 or 2 on the Personal Rating
by Race/Ethnicity for Top 4 Academic Deciles



JA.6005. This same hierarchy occurs on the overall
rating, where Harvard admits it uses race.

Percentage of Applicants Receiving a 1 or 2 on the Overall Rating
by Race/Ethnicity for Top 4 Academic Deciles



Z 000184

17

JA.6003. Harvard has never offered a race-neutral explanation for this racial stratification on the personal rating.

### 4. Harvard's Rejection of Race-Neutral Alternatives

At trial, SFFA presented simulations that projected Harvard's admitted class under various race-neutral alternatives. App.217-20; JA.5983-5988. The baseline was Harvard's actual class of 2019, which was 40% white, scored in the 99th percentile on the SAT, and was 82% wealthy.



JA.5983.

One of SFFA's proposals would eliminate Harvard's racial preferences; eliminate Harvard's preferences for the children of donors, alumni, and faculty/staff; and increase Harvard's socioeconomic boost to roughly one-half the size of what a recruited athlete

Z 000185

18

gets. JA.5987; JA.1491:15-1505:18. Under SFFA's simulation, white admissions would decrease, combined African-American and Hispanic admissions would increase, Asian-American admissions would increase, and socioeconomic diversity would dramatically improve. JA.5988; JA.5789. Academic characteristics would remain superb, with high-school GPAs remaining the same and SAT scores falling only slightly to the 98th percentile.



JA.5988; *see* JA.5789.

Harvard did not dispute the accuracy of SFFA's simulation. Instead, Harvard's witnesses insisted that it was "very important" to continue giving preferences to the children of donors, alumni, and staff/faculty. JA.2787:7-2791:11; JA.4109-11. Harvard wants to keep these preferences even though they disproportionately benefit white and wealthy applicants,

Z 000186

19

JA.5926; JA.1492:6-1493:9, and even though Harvard's $37 billion endowment makes it "the richest university in the entire country," JA.1514:7-1516:25; JA.3708.

## D.  Lower Courts' Rulings

In September 2019, the district court entered judgment for Harvard. The district court held (for the third time) that SFFA has Article III standing. App.222; App.330-50; App.298-301. But it ruled for Harvard on the merits. The court concluded that Harvard's use of race was consistent with this Court's precedents. App.223-66.

The district court declined to hold that Harvard penalizes Asian Americans. It credited SFFA's models showing statistically significant discrimination. App.203. The court even admitted there "may be … discrimination or implicit bias at work to the disadvantage of Asian American applicants." App.245. But the court concluded that the evidence was "inconclusive" because Harvard's witnesses said they did not do it, the observed discrimination affected *only* 150 Asian-American applicants over six years, and the court could imagine other "conceivable" explanations for the disparities. App.256-66.

The First Circuit affirmed. It confirmed that SFFA has standing. App.51-55. But it held that Harvard's admissions program satisfies strict scrutiny because it does not penalize Asian Americans, engage in racial balancing, overuse race, or neglect race-neutral alternatives. App.61-98.

20

## REASONS FOR GRANTING THE PETITION

The Court should hear this case for two independent reasons.

First, *Grutter* should be overruled. *Grutter*'s core holding—that universities can use race in admissions to pursue student-body diversity—is plainly wrong. It satisfies all the criteria that this Court considers when overruling precedents. Only this Court can overrule its own precedent, and whether to overrule *Grutter* is "an important question of federal law that has not been, but should be, settled by this Court." S.Ct. R. 10(c). That question was not raised in the *Fisher* litigation—the only other time this Court evaluated a university's race-based admissions under *Grutter*. *Fisher I*, 570 U.S. at 311, 313. And this case is the ideal vehicle to reconsider *Grutter*, given the outsized role that Harvard played in the Court's analysis.

Second, Harvard's admissions program does not comply with this Court's precedents. At Harvard, race is not a "plus" that is always "beneficial"; it's a minus for Asian Americans. *Fisher II*, 136 S.Ct. at 2207. At Harvard, race is not a "'factor of a factor of a factor'"; it is an anvil on the scale that dominates the entire process. *Id.* At Harvard, race is not a "'temporary'" evil to be repealed as soon as possible; it is a key aspect of identity that Harvard will use until a court makes it stop. *Grutter*, 539 U.S. at 342. In blessing Harvard's program anyway, the First Circuit decided several "important federal question[s] in a way that conflicts with relevant decisions of this Court." S.Ct. R. 10(c); *see, e.g.*, *Fisher I*, 570 U.S. at 303 (certiorari was granted "to review whether the judgment below was

Z 000188

21

consistent with 'this Court's decisions'"); *Fisher II*, 136 S.Ct. at 2205 (similar).

## I.   The Court should grant certiorari to consider overruling *Grutter*.

Overruling precedent is always serious, "[b]ut *stare decisis* is not an inexorable command." *Franchise Tax Bd. of Calif. v. Hyatt*, 139 S.Ct. 1485, 1499 (2019) (cleaned up). This Court considers overruling a precedent virtually every Term, many of this Court's "most notable and consequential decisions" overruled precedent, and almost "every current Member of this Court" voted to overrule "multiple constitutional precedents" in "just the last few Terms." *Ramos v. Louisiana*, 140 S.Ct. 1390, 1411 (2020) (Kavanaugh, J., concurring in part) (collecting cases). That's because stare decisis "'is at its weakest when [this Court] interpret[s] the Constitution,'" as it did in *Grutter*. *Knick v. Twp. of Scott*, 139 S.Ct. 2162, 2177 (2019).

When deciding whether to overrule a precedent, this Court considers "a number of factors." *Hyatt*, 139 S.Ct. at 1499. Those factors can be organized into "three broad considerations":

1.   Is the prior decision "not just wrong, but grievously or egregiously wrong"?

2.   Has the prior decision "caused significant negative jurisprudential or real-world consequences"?

3.   Would overruling the prior decision "unduly upset reliance interests"?

22

*Ramos*, 140 S.Ct. at 1414-15 (Kavanaugh, J., concurring in part). These considerations all point in the same direction here: *Grutter* should be overruled.

## A.  *Grutter* is grievously wrong.

*Grutter* was wrong the day it was decided. Despite reaffirming that "all" racial classifications must satisfy strict scrutiny, *Grutter* held that "student body diversity" can "justify the use of race in university admissions." 539 U.S. at 325-26. That holding departs from the Constitution's original meaning, contradicts other precedents, has eroded over time, and has no true defenders.

*Grutter* has no support in the Fourteenth Amendment's "historical meaning." *Ramos*, 140 S.Ct. at 1405. As written, the Fourteenth Amendment contains no exceptions: it protects "any person" from denials of "the equal protection of the laws." §1. The Amendment, according to its framers, enshrines the principle that "free government demands the abolition of all distinctions founded on color and race." 2 Cong. Rec. 4083 (1874). That principle was not new: the self-evident truth that "all men are created equal" was a cornerstone of the American founding. Decl. of Independence, 1 Stat. 1 (July 4, 1776). While the country long violated that principle in practice, *e.g.*, *Dred Scott v. Sandford*, 60 U.S. 393 (1857); *Plessy*, 163 U.S. 537, those violations did not alter or diminish the principle itself. As Justice Harlan immediately recognized in *Plessy*, "Our constitution is color-blind, and neither knows nor tolerates classes among citizens." 163 U.S. at 559 (dissent). His dissent was ultimately vindicated in *Brown*, where this Court denied "'any authority …

Z 000190

23

to use race as a factor in affording educational opportunities.'" *Parents Involved*, 551 U.S. at 747. Because *Brown* is right, *Grutter* is wrong.

*Grutter* also "conflicted with" this Court's broader equal-protection jurisprudence. *Knick*, 139 S.Ct. at 2178. Despite the absolutism of the constitutional text, this Court has held that racial classifications are legal if they satisfy strict scrutiny. But this Court often rejects interests as not compelling enough to justify racial classifications. Protecting a child's best interests isn't enough. *Palmore v. Sidoti*, 466 U.S. 429, 433-34 (1984). Neither is remedying societal discrimination. *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996). Creating a racially diverse faculty to provide "role models" for minority students isn't compelling either. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274-76 (1986) (plurality). Why these interests are not compelling—but "'cross-racial understanding'" and "livelier" "classroom discussion" are, *Grutter*, 539 U.S. at 330—is impossible to explain. *Grutter* should have rejected these all-too-familiar justifications for sorting students by race. *See Fisher I*, 570 U.S. at 320-30 (Thomas, J., concurring).

*Grutter*'s diversity rationale is not only uncompelling; it flouts basic equal-protection principles. Although *Grutter* praised the "educational benefits" of student body diversity writ large, its assumption that a university can predict, based solely on race, an applicant's "views" or "experience[s]" is little more than racial stereotyping. 539 U.S. at 333; *see Hopwood v. Texas*, 78 F.3d 932, 946 (5th Cir. 1996). The Fourteenth Amendment normally forbids "the assumption

Z 000191

24

that race or ethnicity determines how [individuals] act or think." *Metro Broad., Inc. v. FCC*, 497 U.S. 547, 602 (1990) (O'Connor, J., dissenting); *see Bush v. Vera*, 517 U.S. 952, 985-86 (1996). If a university wants to admit students with certain experiences (say, overcoming discrimination), then it can evaluate whether individual applicants have that experience. It cannot simply use "race as a proxy" for certain experiences or views. *Miller v. Johnson*, 515 U.S. 900, 914 (1995). Especially not today, "in a society in which [racial] lines are becoming more blurred." *Schuette v. BAMN*, 572 U.S. 291, 308 (2014) (plurality).

The educational benefits that *Grutter* identified are similarly suspect. *Grutter* insisted that race-based admissions would "break down racial stereotypes" and "'prepare[] students for an increasingly diverse workforce and society.'" 539 U.S. at 330. *Grutter* thus treats underrepresented minorities not as the beneficiaries of racial preferences, but as *instruments* to provide educational benefits for other, mostly white students. Blumstein, *Grutter and Fisher: A Reassessment and a Preview*, 65 Vand. L. Rev. En Banc 57, 65-66 (2012). "This is affirmative action gone wild." *Fisher II*, 136 S.Ct. at 2232 (Alito, J., dissenting).

Even accepting *Grutter*'s perverse logic, the Court required no proof that "a 'critical mass' of underrepresented minorities [wa]s necessary" to secure any educational benefits. 539 U.S. at 333; *see* 288 F.3d 732, 804-05 (6th Cir. 2002) (en banc) (Boggs, J., dissenting). The Court simply deferred to the law school's "experience and expertise." 539 U.S. at 333. But that logic

25

"exhumes *Plessy*'s deferential approach to racial classifications." *Metro Broad.*, 497 U.S. at 632 (Kennedy, J., dissenting). The schools defending segregation, after all, also wanted courts to defer to their experience and expertise. *Fisher I*, 570 U.S. at 320-30 (Thomas, J., concurring). But the *Brown* Court rightly refused because, contrary to *Grutter*, the law presumes that racial classifications "exacerbate rather than reduce racial prejudice." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 229 (1995).

*Grutter*'s narrow-tailoring reasoning cannot "'withstand careful analysis'" either. *Janus v. AF-SCME*, 138 S.Ct. 2448, 2481 n.25 (2018). Narrow tailoring normally demands proof that racial classifications are "necessary" to achieve the compelling interest—that race was a "'last resort.'" *Parents Involved*, 551 U.S. at 734-35. But *Grutter* demands much less. Race need only have a "minor" impact on diversity. *Fisher II*, 136 S.Ct. at 2212. Universities can reject race-neutral alternatives that, quite circularly, "may well compromise [their] own definition of … diversity." *Id.* at 2214. Universities can also reject alternatives that would compromise their "reputation for academic excellence." *Id.* at 2213. And universities can reject "facially neutral" alternatives, like percentage plans, that would knowingly "boost minority enrollment." *Id.*

This last holding is particularly indefensible. Facially neutral policies are, at the very least, *more narrowly tailored* than "individual racial classifications." *Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring in part and concurring in the judgment). They

26

"are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race." *Id.* Strict scrutiny requires universities to try them "before turning to racial classifications." *Fisher I*, 570 U.S. at 312.

*Grutter*'s "foundations" have also "sustained serious erosion." *Lawrence v. Texas*, 539 U.S. 558, 576 (2003). Legally speaking, *Grutter* has no foundations, "[g]iven how unmoored it was from the start." *Ramos*, 140 S.Ct. at 1405. But to the extent "later developments could have done more to undermine" *Grutter*, "they have." *Id.*

Every time the lower courts have extended *Grutter*, this Court has reversed. *Grutter* cannot be applied to K-12 students. *Parents Involved*, 551 U.S. at 722-25. *Grutter* creates no right to race-based admissions. *Schuette*, 572 U.S. at 300-14. And this Court "clarified" that *Grutter* does not weaken the narrow-tailoring standard that applies to other racial classifications. *Fisher II*, 136 S.Ct. at 2209; *see Fisher I*, 570 U.S. at 312-14. Even in the one case that upheld an admissions policy under *Grutter*, this Court stressed that its decision was "*sui generis*" and had "limit[ed]

Z 000194

27

value for prospective guidance." *Fisher II*, 136 S.Ct. at 2208-09.[3]

In terms of factual foundations, this litigation revealed that *Grutter* rests on a lie. *Grutter* used Harvard as its model for how to use race. 539 U.S. at 335-39. But while Harvard insinuated that it uses race as one small factor to break ties between qualified candidates, *Bakke*, 438 U.S. at 323-24, it actually obsesses over race throughout its process and awards massive preferences to certain groups. Harvard also neglected to mention that its policies were designed to screen out disfavored minorities—first Jews, now Asian Americans.

And while this Court was tying its precedent to Harvard's admissions program, Harvard was never tying its admissions program to this Court's precedent. Harvard does not use race to enroll "a 'critical mass' of underrepresented minorities." *Grutter*, 539 U.S. at 333. Though critical mass is the only concept this Court has ever approved, Harvard does not share that goal, use that metric, or even understand what "critical mass" means. Harvard also disagrees that race-based admissions are "'a temporary matter'" that should "terminate ... as soon as practicable." *Id.* at

---

[3] Harvard thinks *Fisher II* "reaffirmed *Grutter*." Dkt.186 at 4. But Ms. Fisher did not "ask[]" the Court "to overrule [*Grutter*]," so this Court did not "consider how much weight to give *stare decisis* in assessing [*Grutter*'s] continued validity." *Citizens United v. FEC*, 558 U.S. 310, 376-77 (2010) (Roberts, C.J., concurring). "The Court's unwillingness to overturn [*Grutter*]" in *Fisher II* thus "cannot be understood as a *reaffirmation* of that decision." *Id.* at 377.

28

342-43. Since *Grutter*, Harvard has not decreased its use of race at all. And Harvard thumbed its nose at even the most minimal requirements from *Grutter*. Until SFFA brought this suit, Harvard had never even attempted "serious, good faith consideration of workable race-neutral alternatives." *Id.* at 340.

Harvard's disregard for *Grutter* is not unusual; essentially no defenders of race-based admissions "support the line that it has taken this Court over 40 years to draw." *Janus*, 138 S.Ct. at 2481-82. Several Justices have maintained, contrary to *Grutter*, that policies meant to "benefit" racial minorities should not receive strict scrutiny in the first place. *E.g.*, *Fisher I*, 570 U.S. at 336-37 (Ginsburg, J., dissenting); *Schuette*, 572 U.S. at 373-74 (Sotomayor, J., dissenting); *Parents Involved*, 551 U.S. at 829-37 (Breyer, J., dissenting). Elite universities agree. Shortly after *Grutter* was decided, the defendant in that case confessed that he had pressed "the 'diversity' rationale" as a litigation strategy. Bollinger, *A Comment on Grutter and Gratz v. Bollinger*, 103 Colum. L. Rev. 1589, 1590-91 (2003). He bemoaned that he could not defend racial preferences as "a 'remedy' for past societal discrimination"—what everyone in higher education "really believed." *Id.*; *accord* Schuck, *Affirmative Action: Past, Present, and Future*, 20 Yale L. & Pol'y Rev. 1, 34-36 (2002); Rubenfeld, *Affirmative Action*, 107 Yale L.J. 427, 471-72 (1997).

That no one believes in *Grutter* suggests that *Grutter* is not worth believing in. *Grutter*'s "defenders" are no doubt entitled to "base it on [other] concerns … rather than the reasoning of the opinion itself." *Knick*,

Z 000196

139 S.Ct. at 2178. But they are not entitled to do so while also claiming the mantle of stare decisis. *Citizens United*, 558 U.S. at 384-85 (Roberts, C.J., concurring).

## B. *Grutter* has spawned significant negative consequences.

*Grutter* has also proven "unworkable in practice." *Knick*, 139 S.Ct. at 2178. While the Fourteenth Amendment contains no exceptions to the rule of "racial neutrality," this Court has applied a "case-by-case" approach that reviews each racial classification under "strict scrutiny." *Croson*, 488 U.S. at 518-19 (Kennedy, J., concurring in part and concurring in the judgment). But "the assumption" underlying this approach is that, in practice, "the strict scrutiny standard will operate in a manner generally consistent with the imperative of race neutrality." *Id.* at 519. Strict scrutiny is supposed to approximate an outright ban "because [the standard] forbids the use even of narrowly drawn racial classifications except as a last resort." *Id.*

As it turns out, narrow tailoring does not meaningfully limit universities' use of race. This Court's precedents encourage universities to "resort to camouflage"—to use "winks, nods, and disguises" instead of explicit racial quotas. *Gratz v. Bollinger*, 539 U.S. 244, 304-05 (2003) (Ginsburg, J., dissenting). Obscurity, after all, is the only way a university could navigate *Grutter*'s Delphic instructions. How else could a school seek a "critical mass" of racial minorities without seeking "'some specified percentage'"? 539 U.S. at 329-

30

30. Or make race "'outcome determinative'" for minorities without making it the "defining feature" of their application? *Id.* at 337-39.

The only way to test whether universities' obscure policies satisfy *Grutter*'s vague boundaries is through "prolong[ed]" litigation, *id.* at 348 (Scalia, J., concurring in part and dissenting in part)—an increasingly unrealistic option. This case alone has required over six years of expensive, cumbersome litigation. A few individual applicants (like Allan Bakke, Jennifer Gratz, Barbara Grutter, and Abigail Fisher) have brought these cases in the past. But individuals' claims for prospective relief expire once they graduate, and their claims for damages greatly "narrow" the scope of judicial review. *Fisher II*, 136 S.Ct. at 2210. And nowadays, an individual plaintiff would risk the unspeakable cruelty that Ms. Fisher faced when she sued the University of Texas. *See* Dkt.150-4 (documenting the threats, insults, and harassment). These costs make narrow tailoring an illusory check on universities' use of race.

In addition to these "jurisprudential consequences," *Grutter* has had significant "real-world consequences." *Ramos*, 140 S.Ct. at 1415 (Kavanaugh, J., concurring in part). Most acutely, *Grutter* sustains admissions programs that intentionally discriminate against historically oppressed minorities. Jewish students were the first victims of holistic admissions, and Asian Americans are the main victims today. Asians have faced enormous racial discrimination in this country, from the Chinese Exclusion Act, to the in-

31

ternment of Japanese Americans, to modern scape-goating over COVID-19. Weybright, *Study Finds Increasing Discrimination Against Asians and Asian Americans*, WSU Insider (Nov. 4, 2020), bit.ly/39rc9YI. Every day, Asian Americans are stereotyped as shy, passive, perpetual foreigners, and model minorities who are interested only in math and science. App.160; JA.2585:20-2590:15; JA.3287:3-6.

By considering race alongside subjective criteria like "self-confidence," "likability," and "courage," JA.1423:21-1425:2, App.125-26, universities invite admissions officers to rely on anti-Asian stereotypes. These subjective criteria also conceal unspoken ceilings on Asian-American admissions. The disparities that Asian Americans face compared to their white peers are so stark that, when SFFA showed the data to a high-school counselor, she started crying in her deposition. *See* Dkt.414-3 at 150-55 (explaining that she was crying "[b]ecause these numbers make it seem like there's discrimination, and I love these kids and I know how hard they work").

This discrimination is not news to Asian-American high-schoolers: An entire industry exists to help them appear "less Asian" on their college applications; and the unlevel playing field contributes to their unusually high levels of anxiety, depression, and suicide. CA1-Asian-American-Coalition-Br. 23-26. These ongoing "effects," combined with the "racist origins" of holistic admissions, "strongly support overruling" *Grutter. Ramos*, 140 S.Ct. at 1417 (Kavanaugh, J., concurring in part).

Z 000199

32

More broadly, *Grutter* tells universities that it's okay to treat students differently based on race—a legal imprimatur with well-known repercussions. Racial preferences, this Court has explained, are poisonous. They "stimulate our society's latent race consciousness," "delay the time when race will become ... truly irrelevant," and "perpetuat[e] the very racial divisions the polity seeks to transcend." *Shaw v. Reno*, 509 U.S. 630, 643 (1993); *Adarand*, 515 U.S. at 227-29; *Schuette*, 572 U.S. at 308 (plurality).

These repercussions are precisely what has reverberated in *Grutter*'s wake. Far from pursuing "'integration of [their] classrooms and residence halls,'" *Grutter* Resp'ts' Br. 5, universities are now openly embracing segregation—encouraging race-specific graduations, housing, orientations, networking, and more. Pierre, *Demands for Segregated Housing at Williams College Are Not News*, NAS (May 8, 2019), bit.ly/2KasdoS. And their obsession with race has impeded their progress toward *Grutter*'s true aim: obtaining a diversity of *viewpoints*. 539 U.S. at 330; *see* Haidt, *Viewpoint Diversity in the Academy*, bit.ly/2LOGnfM; Stiksma, *Understanding the Campus Expression Climate: Fall 2019*, bit.ly/2XJN45v. One of the biggest obstacles to achieving *Grutter*'s aims, it seems, is *Grutter* itself.

### C. *Grutter* has generated no legitimate reliance interests.

*Grutter* cannot be sustained in the name of reliance interests. This Court puts little stock in reliance interests when it overrules precedents, like *Grutter*,

33

that authorize racial classifications. *E.g.*, *Smith v. All-wright*, 321 U.S. 649, 665 (1944) (overruling *Grovey v. Townsend*); *Batson v. Kentucky*, 476 U.S. 79, 95-96 (1986) (overruling *Swain v. Alabama*); *Trump v. Hawaii*, 138 S.Ct. 2392, 2423 (2018) (overruling *Korematsu*). Reliance interests did not deter the Court from dismantling segregation, even though it recognized *Brown*'s "wide applicability" and the "considerable complexity" of enforcement. 347 U.S. at 495.

That's because no one has a legitimate interest in treating people differently based on their skin color. Certainly not an interest that could "outweigh the interest we all share in the preservation of our constitutionally promised liberties." *Ramos*, 140 S.Ct. at 1408. When a decision of this Court "undermines the fundamental principle of equal protection as a personal right," it is "the principle," not the decision, that "must prevail." *Adarand*, 515 U.S. at 235 (opinion of O'Connor, J.).

Because *Grutter* departs so far from our basic ideals, the decision has not "'become part of our national culture.'" *Ramos*, 140 S.Ct. at 1406. *Grutter* "is only two decades old"—a lack of "antiquity" that "cut[s] in favor of abandoning [it]." *Montejo v. Louisiana*, 556 U.S. 778, 793 (2009). And most Americans believe that colleges and universities should not consider race at all when making admissions decisions (73%), including strong majorities of African-Americans (62%) and Hispanics (65%). Graf, *Most Americans Say Colleges Should Not Consider Race or Ethnicity in Admissions*, Pew (Feb. 25, 2019), pewrsr.ch/2Xq43K0. Several States have expressly banned their universities from

Z 000201

34

considering race—including the State that prevailed
in *Grutter*. *Schuette*, 572 U.S. at 298-99. California,
too, has long prohibited racial preferences. In 2020,
despite an expensive and visible campaign to rein-
state racial preferences, Californians voted by double
digits to retain their ban. Ting, *'They Lost Partly Be-
cause of That Ad': How No on Prop. 16 Organizers
Knew the Measure Would Fail*, SF Gate (Dec. 2, 2020),
bit.ly/2XBrmAZ.

Among this Court's precedents, *Grutter* has a
uniquely weak claim to reliance interests because "the
opinion contains its own self-destruct mechanism."
539 U.S. at 394 (Kennedy, J., dissenting). *Grutter* con-
cludes with a warning that the Court expects "racial
preferences will no longer be necessary" in "25 years."
*Id.* at 343 (majority); *accord id.* at 350-51 (Thomas, J.,
concurring in part and dissenting in part). While this
2028 end date was somewhat arbitrary, the principle
underlying it was not. "[A]ll race-conscious admis-
sions programs" must have "a termination point,"
*Grutter* stressed, to ensure that their "'deviation from
the norm of equal treatment'" serves "'the goal of
equality itself.'" *Id.* at 342 (majority) (quoting *Croson*,
488 U.S. at 510). The "'acid test of their justification,'"
*Grutter* noted, is "their efficacy in eliminating the
need for any racial or ethnic preferences at all.'" *Id.* at
343.

If *Grutter* is right—if all race-based admissions
must end and universities must decrease their reli-
ance on race over time—then *Grutter* cannot create
meaningful reliance interests. Anyone treating *Grut-
ter* as a permanent blessing of race-based admissions

35

is failing to heed the opinion itself. No one should be structuring affairs around a practice that federal law "barely—and only provisionally—permits." *Schuette*, 572 U.S. at 317 (Scalia, J., concurring in the judgment).

While overturning *Grutter* will mean that universities can no longer use race in admissions, the burden of changing illegal policies "'is not a compelling interest for stare decisis.'" *Janus*, 138 S.Ct. at 2485 n.27. And the changes here need not be "'extensive.'" *Id.* Most universities "can keep their [admissions] systems exactly as they are"—with holistic, individualized review that considers all legitimate factors— "only they cannot" use race itself as a factor. *Id.* Real diversity would not decline (and would likely improve), given the availability of race-neutral alternatives. The University of California, for example, boasts that it just admitted its "most diverse class" ever, despite the State's ban on racial preferences. Smith & Rosales, *Latino Students Make Up Largest Ethnic Group of Students Admitted to UC*, EdSource (July 16, 2020), bit.ly/38yI3mN. And private institutions like Harvard can keep their admissions policies

Z 000203

exactly the same. They can avoid Title VI's ban on racial discrimination altogether by simply declining to accept federal funds. 42 U.S.C. §2000d.[4]

\* \* \*

This case presents a unique opportunity to rectify *Grutter*'s error. Harvard is where this Court's approval of race-based admissions began, and it is a fitting place for that approval to end. That fact, plus the extensive record developed below, make this case an ideal place to "stop discrimination on the basis of race" by "stop[ping] discrimination on the basis of race." *Parents Involved*, 551 U.S. at 748.

## II. The Court should grant certiorari to consider whether Harvard's admissions program satisfies strict scrutiny.

This Court should also review whether Harvard is complying with existing precedent. If *Grutter* is overruled, this Court will benefit from detailed briefing on the legality of Harvard's admissions policy—the very policy that *Grutter* used as a model. But even if *Grutter* is retained, the First Circuit's decision warrants further review. The court of appeals resolved several important questions about the contours of this Court's precedent—precedent that cries out for clearer rules.

---

[4] Nor would overturning *Grutter* upset any reliance interests of students. Prospective students cannot "rely" on being a certain race. And no admitted student would be affected by SFFA's forward-looking relief. As for current students, ending racial preferences will take time, even in this case. Hardly anyone on campus now will still be there when the first class admitted without racial preferences arrives.

This Court has applied *Grutter* to only one admissions program. And even there, it warned that the university's program was "*sui generis*," that its review was "narrow" and "artificial[]," and that its decision had "limit[ed]" prospective value. *Fisher II*, 136 S.Ct. at 2208-09. Reviewing Harvard's admissions program will provide far more guidance to students, universities, and courts alike.

Under this Court's precedents, Harvard's admissions program must withstand strict scrutiny. As the lower courts recognized, Title VI is coextensive with the Equal Protection Clause. App.56; App.235. Because the Equal Protection Clause requires race-based admissions to satisfy strict scrutiny, Harvard must prove that its admissions program is "narrowly tailored" to achieve "the only interest that this Court has approved in this context": the educational benefits of "student body diversity." *Fisher I*, 570 U.S. at 314-15. Contrary to the decision below, Harvard fails strict scrutiny for four main reasons.

## A. Harvard penalizes Asian Americans.

Under *Grutter*, universities can use race "only as a 'plus.'" 539 U.S. at 334. They cannot discriminate "between whites and Asians" or engage in "'impermissible racial stereotypes.'" *Id.* at 375 (Thomas, J., concurring in part and dissenting in part); *Schuette*, 572 U.S. at 308. Race cannot be a *minus* for any applicant, as such a "divisive" use of race would serve no legitimate purpose. *Fisher II*, 136 S.Ct. at 2207, 2210. As the United States put it, a "race-based admissions program that penalizes 'individuals who are not members of the favored racial and ethnic groups' cannot satisfy

38

narrow tailoring." CA1.U.S.Br. 27 (quoting *Grutter*, 539 U.S. at 341).

Yet Harvard "has repeatedly penalized one particular racial group: Asian Americans." *Id.* at 7. Harvard concedes that Asian Americans suffer a penalty on the personal rating—that changing an applicant's race from white to Asian lowers the personal rating to a statistically significant degree. *Supra* 15. Harvard also concedes that, when this tainted variable is removed, projected Asian-American admissions increase to a statistically significant degree. JA.3223:2-13; JA.3149:1-3152:3; App.203. While Harvard objects to any model that omits the personal rating, the district court ruled that such models are "econometrically reasonable" and "probative." App.199. In a statement that should have come in a ruling *against* Harvard, the district court admitted it could not "clearly say what accounts for" the observed penalties against Asian Americans and could not rule out "overt discrimination or implicit bias" as the cause. App.265; App.245.

By nevertheless resolving doubts in Harvard's favor, the lower courts "did not apply the correct standard of strict scrutiny." *Fisher I*, 570 U.S. at 303. Strict scrutiny requires Harvard to carry the burden on every question—including whether it penalizes Asian Americans. *Id.* at 310; *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 818 (2000). The point of strict scrutiny, after all, is to "'smoke out'" any "'racial prejudice or stereotype.'" *Adarand*, 515 U.S. at 226. Harvard thus is not entitled to "the benefit of the doubt." *Playboy*, 529 U.S. at 818. If two "possibilities

were 'equally consistent' with the record" or if "the record was 'not clear,'" then Harvard should have lost. *Id.* at 819. The "burden imposed by [the] strict-scrutiny test" is far too heavy for Harvard to prevail on "'little more than assertion and conjecture.'" *Republican Party of Minn. v. White*, 536 U.S. 765, 781 (2002).

If the lower courts had applied strict scrutiny, they would have found Harvard liable for penalizing Asian Americans. There is no evidence that Asian-American applicants actually have less desirable personal qualities; *Harvard* is the one imposing a racial hierarchy in the personal rating, the same racial hierarchy it admits to imposing in the overall rating. While Harvard's witnesses "assert[ed]" that they "use[] race in a permissible way," *Fisher I*, 570 U.S. at 313, this self-serving testimony is insufficient to carry Harvard's burden, *Castaneda v. Partida*, 430 U.S. 482, 498 n.19 (1977). Harvard's burden is particularly high because it penalizes Asian Americans in the most "subjective" parts of its process. *Id.* at 497. And the burden is higher still because Harvard is a recidivist. It has maintained the same admissions program despite its "sordid history" of discrimination against Jews, a federal investigation uncovering anti-Asian stereotyping, and internal reports revealing anti-Asian penalties. *Ramos*, 140 S.Ct. at 1410 (Sotomayor, concurring). By instead giving Harvard every benefit of the doubt, the lower courts erred.

## B. Harvard engages in racial balancing.

This Court's cases flatly prohibit "'racial balancing.'" *Fisher I*, 570 U.S. at 311. Universities racially balance when they seek "'some specified percentage'"

40

of a particular race. *Grutter*, 539 U.S. at 329. Racial balancing is forbidden because "racial diversity" is not a compelling interest; *Grutter*'s only sanctioned interest is unlocking "the benefits of [broader] student body diversity." *Parents Involved*, 551 U.S. at 733; *Fisher I*, 570 U.S. at 314-15. When universities pay "'[s]ome attention'" to the racial numbers, they must be "working forward from some demonstration of the level of diversity that provides the purported benefits"—not "working backward to achieve a particular type of racial balance." *Grutter*, 539 U.S. at 336; *Parents Involved*, 551 U.S. at 729.

As the United States recognized below, Harvard engages in "deliberate racial balancing." CA1.U.S.Br. 16. Four Justices found impermissible racial balancing in *Grutter* when the number of underrepresented-minority admissions varied 7% over a six-year period. *See* 539 U.S. at 336. Harvard's range is much tighter, moving less than 4%. JA.4435. Such precision is particularly unacceptable for Harvard—a school that doesn't pursue critical mass and that claims to be aggregating thousands of "individualized, case-by-case" decisions. *Bakke*, 438 U.S. at 319 n.53 (opinion of Powell, J.).

But no inferences from the numbers are necessary because Harvard has confessed to racial balancing. The reason its admissions officers consult their "ethnic stats" throughout the process is because they won't tolerate "a dramatic drop-off in some group [from] last year," even if the total number of underrepresented minorities is increasing. *Supra* 9-10. Contrary to *Grutter*, Harvard *does* give race "more or less weight

41

based on the information contained in [the one-pagers]." 539 U.S. at 336. It will "go back and look at those cases" again if a racial group is "underrepresented." *Supra* 9. Indeed, Harvard must achieve a precise racial balance before it makes offers because it has a limited number of beds and, according to Harvard, different races enroll at different rates. App.132-33, App.137. Contrary to the First Circuit's assumption, App.65-67, Harvard has no compelling interest in this kind of racial engineering. *Grutter*, 539 U.S. at 336; *Parents Involved*, 551 U.S. at 726-27.

### C.  Harvard does not use race as a mere plus to achieve overall diversity.

Because all racial classifications must be narrowly tailored, universities must limit their use of race. Racial preferences must be limited in degree: race cannot be "the defining feature" of an applicant's file, and universities must give "serious consideration to all the ways" an applicant contributes to diversity. *Grutter*, 539 U.S. at 337. Racial preferences also "must be limited in time." *Id.* at 342. Universities cannot endorse a "permanent justification for racial preferences," or fail to use "sunset provisions in race-conscious admissions policies *and* periodic reviews to determine whether racial preferences are still necessary." *Id.* (emphasis added).

Harvard is obsessed with race. Harvard awards preferences to everyone who checks the box for "Black" or "Hispanic," whether or not they write about their race or otherwise indicate that it's important. And those automatic racial preferences are enormous. Harvard's reliance on race dwarfs Texas's in 2008 and

42

mirrors Michigan Law's in 2000, even though universities are supposed to be *decreasing* their use of race over time. *Compare* App.209-10, *with Fisher II*, 136 S.Ct. at 2237 (Alito, J., dissenting); *Grutter*, 539 U.S. at 320. At Harvard, race matters more than every other diversity factor and all but the most elusive academic and extracurricular factors. Harvard blinds itself to applicants' religion, for example, even though religion says much more than skin color about an applicant's views and experiences. JA.1383:3-1384:22; JA.1389:22-1390:7. And to get a boost comparable to Harvard's racial preference, an applicant would have to author original scholarship or win a national award. *Supra* 12.

Harvard has no plans to stop—or even decrease—its use of race. JA.3709. Harvard boasts that it uses race the same way it did in the 1970s, and Harvard never considered abandoning race until SFFA sued it. *Supra* 7. Harvard also does not use the concept of "critical mass," does not have a sunset date for its use of race, and does not even accept *Grutter*'s deadline of June 2028. App.72-73; App.316-17. By holding that Harvard need not adopt any of these limitations, the lower courts fundamentally misread this Court's precedent.

### D. Harvard has workable race-neutral alternatives.

Race-based admissions must be "'necessary.'" *Fisher I*, 570 U.S. at 312. Race is not necessary when a "workable race-neutral alternative[]" is available. *Id.* "Workable" does not mean perfect; it means an al-

43

ternative that achieves the educational benefits of diversity "'about as well and at tolerable administrative expense.'" *Id.*

Harvard has at least one workable race-neutral alternative. At trial, SFFA simulated an alternative where Harvard eliminates its preferences for the white and wealthy and increases its preference for the socioeconomically disadvantaged. This simulation would achieve *greater* racial diversity without using race. And it would achieve something that Harvard currently lacks: socioeconomic diversity. *Supra* 17-18.

Contrary to the First Circuit's reasoning, App.75-79, Harvard does not have a compelling interest in maintaining its current practices. Harvard has long insisted that it reviews the "whole person," never "reducing somebody to [a] category," JA.1702:3-1703:3; that it never selects students based on "test scores and grades alone," JA.886:5-888-9; and that it's extremely important to have students "from all economic backgrounds," JA.922:24-923:14. SFFA's simulation helps Harvard finally achieve these goals. It is not "unworkable" because Harvard might see changes to its desired racial percentages, dips in its record-breaking endowment, or negligible differences in chosen majors and SAT scores. *Grutter*, 539 U.S. at 340; *Fisher I*, 570 U.S. at 312.

\* \* \*

The First Circuit violated this Court's precedent in several important ways. If its decision stands, then universities can use race even if they impose racial penalties, make backward-looking racial adjustments,

44

ignore critical mass, eschew sunset provisions, and identify no substantial downsides to race-neutral alternatives. The Court's precedent does not allow this unbridled use of race. If it does, this Court should be the one to say so. And if it does, the precedent is not worth keeping.

## CONCLUSION

This Court should grant certiorari.

Adam K. Mortara
125 South Wacker
Drive, Ste. 300
Chicago, IL 60606
(773) 750-7154

William S. Consovoy
   *Counsel of Record*
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548

February 25, 2021      *Attorneys for Petitioner*

Z 000212