UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | |
| Plaintiff, | |
| v. | Civil Action No. 21-CV-11530-ADB |
| ZURICH AMERICAN INSURANCE COMPANY, | |
| Defendant. | |

**PLAINTIFF PRESIDENT AND FELLOWS OF HARVARD COLLEGE'S
RESPONSE IN OPPOSITION TO DEFENDANT ZURICH AMERICAN
INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ..................................................................................... 3

    A.    The SFFA Action ................................................................................ 3

    B.    Harvard's Insurance Coverage for the SFFA Claim .................................. 4

    C.    Zurich's Records Indicate It Had Knowledge of the SFFA Action During the Relevant Time Period and When It Set Rates ......................................... 6

ARGUMENT ....................................................................................................... 9

I.     STANDARD OF REVIEW ............................................................................. 9

II.    THE PURPOSE OF NOTICE UNDER A CLAIMS-MADE INSURANCE POLICY WAS MET HERE ............................................................................................... 9

III.   TECHNICAL NON-COMPLIANCE WITH A CONTRACT PROVISION DOES NOT EXCUSE A PARTY'S OBLIGATIONS WHEN THE PURPOSE OF THAT PROVISION WAS MET ....................................................................................... 10

IV.   THE CASES CITED BY ZURICH DO NOT EXCUSE ZURICH'S COVERAGE OBLIGATIONS, GIVEN ZURICH'S ACTUAL NOTICE OF THE SFFA ACTION ...... 12

    A.    The Key Supreme Judicial Court Decisions Did Not Involve Actual Notice Like Zurich Had Here ............................................................................ 12

    B.    The Other Cases on Which Zurich Relies Are Distinguishable, and Actually Support Harvard ............................................................................... 13

V.    AT A BARE MINIMUM, THE MOTION RAISES DISPUTED ISSUES OF FACT THAT PRECLUDE SUMMARY JUDGMENT ............................................................ 16

    A.    There Is a Dispute as to Whether Zurich Had Actual Notice of the SFFA Action During the Notice Period ..................................................................... 16

    B.    There Is a Dispute as to Zurich's Knowledge When Setting Harvard's Insurance Rates and Premiums ........................................................................... 18

CONCLUSION .................................................................................................. 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*BioChemics, Inc. v. Axis Reins. Co.*,
    83 F. Supp. 3d 405 (D. Mass. 2015), *aff'd*, 924 F.3d 633 (1st Cir. 2019)..............13

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
    284 F.3d 302 (1st Cir. 2002).................................................................................9, 18

*Catlin Specialty Ins. Co. v. American Superconductor Corp.*,
    32 Mass. L. Rptr. 93, 2014 WL 840693 (Mass. Super. Ct. Jan. 29, 2014)..............13

*Chas. T. Main, Inc. v. Fireman's Fund Ins. Co.*,
    406 Mass. 862 (1990) ...............................................................................9, 13, 18

*Commonwealth v. Olivo*,
    369 Mass. 62 (1975) ..............................................................................1, 12, 13

*Dufficy Enters., Inc. v. Berarducci*,
    No. 1784-CV-03292 BLS, 2020 WL 12309011 (Mass. Super. Ct. June 7,
    2020) ...............................................................................................................11

*EventMonitor, Inc. v. Leness*,
    473 Mass. 540 (2016) ......................................................................................11

*Fanaras Enters. Inc. v. Law Offices of Roger Allen Doane*,
    1 Mass. L. Rptr. 145, 1993 WL 818902 (Mass. Super. Ct. Sept. 7, 1993). ............14

*Fin. Res. Network, Inc. v. Brown & Brown, Inc.*,
    867 F. Supp. 2d 153 (D. Mass. 2012) .....................................................................9

*Flynn v. New England Ins. Co.*,
    No. 96-1193D, 1998 WL 150384 (Mass. Super. Ct. Mar. 16, 1998) ...............13, 15

*Gargano v. Liberty Int'l Underwriters, Inc.*,
    572 F.3d 45 (1st Cir. 2009)...................................................................................13

*In re John J. Sullivan, Inc.*,
    128 B.R. 7 (D. Mass. 1990) ...............................................................12, 13, 18

*Lexington Ins. Co. v. Newell Health Care Sys., Inc.*,
    10 Mass. L. Rptr. 406, 1999 WL 753487 (Mass. Super. Ct. July 6, 1999) ............16

*Nat'l Union Fire Ins. Co. v. Talcott*,
    931 F.2d 166 (1st Cir. 1991)................................................................................13

**Page(s)**

*New England Env't Techs. v. Am. Safety Risk Retention Grp., Inc.,*
   738 F. Supp. 2d 249 (D. Mass. 2010) ...................................................................................10

*Northbrook Excess & Surplus Ins. Co. v. Med. Malpractice Joint Underwriting
   Ass'n,*
   No. 85-751-Y, 1988 U.S. Dist. LEXIS 17954 (D. Mass. March 9, 1988).........................15, 16

*Snow v. Harnischfeger Corp.,*
   12 F.3d 1154 (1st Cir. 1993) ...............................................................................................9

*Tenovsky v. Alliance Syndicate, Inc.,*
   424 Mass. 678 (1997) ......................................................................................9, 10, 13, 18

**Other Authorities**

Fed. R. Civ. P. 56 ........................................................................................................1, 9, 17

Local Rule 56.1 ....................................................................................................................3

NOW COMES Plaintiff President and Fellows of Harvard College ("Harvard") which hereby opposes the motion for summary judgment filed by Defendant Zurich American Insurance Company ("Zurich"), subject to the objections and arguments presented in Harvard's pending motion for discovery pursuant to Rule 56(d).

## PRELIMINARY STATEMENT

> "A party may not shut his eyes to the means of knowledge which he knows are at hand, and thereby escape consequences which would flow from notice if it had actually been received."

*Commonwealth v. Olivo*, 369 Mass. 62, 69 (1975).

This case is about Zurich's actual notice of the underlying litigation *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (Harvard Corporation)*, No. 1:14-cv-14176-ADB (the "SFFA Action"), and Zurich's improper attempt to avoid its obligations for the resulting insurance claim (the "SFFA Claim") solely on the grounds that Zurich purportedly did not have timely notice of the SFFA Action.

As the cases cited by Zurich make clear, the purpose of the notice requirement under "claims made" insurance policies is to ensure that the insurance company knows about claims at the end of the policy period and can set rates appropriately going forward. That purpose was met here. Zurich surely knew about the SFFA Action in the year after it was filed, especially given the significant, ongoing attention that the suit received in national and local news, and as indicated by what has been produced so far from Zurich's underwriting files.

By receiving actual notice of the SFFA Action during the notice period and taking the opportunity to set Harvard's premiums with that knowledge going forward, Zurich received the benefit of the bargain it struck under the Policy. Zurich's own internal documents admit that the SFFA Action presented "no material change" to Zurich's exposure and that the sale of insurance to Harvard had been very profitable for Zurich. Yet having received the benefit of the bargain

for itself, Zurich nevertheless seeks to strip Harvard of the most essential part of the deal for any policyholder—payment of a covered claim.

The notice requirement is not an escape hatch for insurance companies to avoid liability to policyholders due to technical noncompliance. Where an insurance company knows about a claim and sets rates and premiums with that knowledge, then the purpose of the notice requirement is met. Allowing the insurance company to avoid coverage on a purported "late notice" ground in such cases only serves to punish the policyholder for no valid reason, while delivering a windfall to the insurance company that had notice of the claim all along. Zurich's attempt to do just that here – while simultaneously withholding critical evidence from Harvard and the Court – must not be allowed.

Insurance is not a game of cat and mouse, and Zurich fails to cite a single case that permitted an insurance company to escape its obligations under the circumstances present here. To the contrary, Massachusetts courts do not allow parties to escape their contractual obligations based on technical non-compliance with a contract term when the purpose of that term was fully satisfied. Zurich's attempt to do just that here must be rejected.

At the very least, the evidence currently available (despite Zurich's efforts to withhold the most relevant evidence) presents disputed issues of fact that preclude summary judgment. If Zurich's late notice defense were really a simple matter of law, Zurich's Motion would be presented on a stipulated set of undisputed facts. Just as Harvard admitted it did not provide formal notice until May 2017, Zurich would admit that it had actual notice during the notice period. But Zurich neither admits such a thing nor denies it, all while blocking discovery about that critical issue. Similarly, Zurich would admit that its underwriters were aware of the SFFA Action at the time that they underwrote Harvard's policies in 2014, 2015 and 2016. But Zurich

neither admits nor denies this important fact and seeks to block almost all discovery into that issue as well.  Clearly, these are contested issues of material fact.  Because of Zurich's tactical decision, the evidence to evaluate these important issues are not before the court. Under such circumstances, summary judgment is not appropriate here.  For the reasons set forth herein, Harvard respectfully requests that the Court deny Zurich's summary judgment motion.

## STATEMENT OF FACTS

### A.    The SFFA Action

On November 17, 2017, Students For Fair Admissions, Inc. commenced an action against Harvard in this Court, captioned *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (Harvard Corporation) et al.*, Case No. 1:14-cv-14176 (the "SFFA Action"). (HSUMF ¶ 1).[1]  The SFFA Action generally alleges that Harvard administers its student admissions process in violation of Title VI of the Civil Rights Act of 1964.  (HSUMF ¶ 17).  The SFFA Action progressed through extensive pre-trial discovery and motion practice, resulting in a three-week trial with judgment entered by this Court in favor of Harvard on all counts. (HSUMF at ¶¶ 18-20).  SFFA appealed to the United States Court of Appeals for the First Circuit, and on November 12, 2020, the First Circuit affirmed this Court's decision.  (HSUMF at ¶¶ 21-22). Thereafter, SFFA filed a petition for *certiorari* to the Supreme Court of the United States, which was granted, and that appeal is now pending before the Supreme Court.  (HSUMF at ¶¶ 23-24).

The SFFA Action, which involves a legal challenged to Harvard College's admissions process, was widely reported in national news coverage from the outset.  (HSUMF at ¶¶ 17, 37; *see also, e.g.*, Nick Anderson, *Lawsuits allege unlawful racial bias in admissions at Harvard, UNC-Chapel Hill*, THE WASHINGTON POST (Nov. 17, 2014);  Sam Sanders, *New Affirmative*

---

[1]    References to "HSUMF" are references to Harvard's response to Zurich's Local Rule 56.1 Statement of Undisputed Material Facts and Harvard's Counterstatement of Undisputed Material Facts.

*Action Cases Say Policies Hurt Asian-Americans*, NPR (Nov. 20, 2014), *available at*
https://www.npr.org/sections/codeswitch/2014/11/20/365547463/new-affirmative-action-cases-
say-policies-hurt-asian-americans; *Harvard under fire; Affirmative Action.*, THE ECONOMIST, at
p. 26 (Nov. 29, 2014), *available at*
https://link.gale.com/apps/doc/A391709758/EAIM?u=mlin_b_bpublic&sid=bookmark-
EAIM&xid=ca048071; Douglas Belkin, *Harvard Accused of Bias Against Asian-Americans*,
WALL STREET JOURNAL (May 15, 2015), *available at* https://www.wsj.com/articles/asian-
american-organizations-seek-federal-probe-of-harvard-admission-policies-1431719348; Ellen
Rosen, *Asian-American Groups Target Harvard, UNC for Alleged Racial Bias in Admissions*,
INSURANCE JOURNAL (May 18, 2015), *available at*
https://www.insurancejournal.com/news/national/2015/05/18/368570.htm.

In addition to the SFFA Action, the United States Department of Justice ("DOJ") opened
an investigation into Harvard's admissions practices in September 2017. (HSUMF at ⁋ 25).
Harvard has incurred defense costs in connection with both the SFFA Action and the DOJ
investigation, including for the collection and production of thousands of business records.
(HSUMF at ⁋⁋ 18-24, 26, 30).

### B. Harvard's Insurance Coverage for the SFFA Claim

The SFFA Action and the DOJ investigation are part of a single claim for insurance
coverage (the "SFFA Claim") and are covered under an Educational Institution Risk Protected
liability insurance policy that National Union Fire Insurance Company of Pittsburgh, Pa.
("AIG") sold to Harvard (the "AIG Policy"). (HSUMF at ⁋⁋ 11, 27, 29). The AIG Policy has a
$25,000,000 aggregate limit of liability, with a $2,500,000 self-insured-retention. (HSUMF at ⁋
28 and Dkt. 1-2) AIG covered the defense of the SFFA Action as well as the cost of responding
to the DOJ investigation, treating both as a single claim subject to one retention and limit of

liability.  (HSUMF at ¶ 29).  The defense costs Harvard has incurred exceed the AIG Policy's aggregate limits and are within the limits of Zurich's excess insurance policy.  (HSUMF at ¶ 30).

Zurich sold to Harvard a Zurich Excess Select Insurance Policy bearing policy number IPR 3792308-03 for the Policy Period of November 1, 2014 to November 1, 2015 (the "Zurich Policy").  (HSUMF at ¶ 4 and Dkt. 1-1).  The Zurich Policy covers defense costs up to an aggregate limit of liability of $15,000,000.  (Dkt. 1-1).  The Zurich Policy is a follow form insurance policy excess to the AIG Policy.  (HSUMF at ¶ 5).  Thus, under the policy terms, Zurich must have notice of a claim no later than ninety days after the end of the policy period (that is, January 30, 2016).  (HSUMF at ¶¶ 3, 7).

In the spring of 2017, even though the defense costs incurred were still tens of millions of dollars shy of reaching Zurich's excess layer, it appeared possible that the cost of defending the SFFA Action might grow significantly, so Harvard gave formal notice of the SFFA Action to Zurich.  (HSUMF at ¶¶ 31, 61).  In response to that formal notice, Zurich denied coverage of the SFFA Action by letter dated October 25, 2017, based solely on the defense that the formal notice Harvard provided was late.  (HSUMF at ¶¶ 16, 32).  Zurich acknowledged that the SFFA Action would be a covered claim but for the purported late notice, and it asserted no defenses to coverage other than for late notice.  (HSUMF at ¶ 32).

Harvard disputed Zurich's denial of coverage, observing that Zurich surely had actual notice of the SFFA Action through media reports and its own underwriting efforts.  (HSUMF at ¶ 34).  On March 10, 2021, Harvard advised Zurich to preserve all documents regarding its actual knowledge of the SFFA Action from November 2014 through at least January 30, 2016.  (HSUMF at ¶ 34).  Zurich refused to withdraw its late notice defense, so Harvard initiated this coverage action on September 17, 2021.  (Dkt. 1).  During discovery in this Action, Zurich has

refused to answer interrogatories asking whether it preserved documents about its actual notice of the SFFA Claim, and Zurich has largely refused to search for documents maintained in the locations most likely to confirm its actual notice of the SFFA Action during November 2014 through January 30, 2016—thereby forcing Harvard to file a Motion To Compel.  (Dkt. 31-33).

### C.     Zurich's Records Indicate It Had Knowledge of the SFFA Action During the Relevant Time Period and When It Set Rates

Although most of the documents Harvard requested from Zurich have been improperly withheld during discovery, Zurich did produce certain underwriting materials that reveal its diligence into its account with Harvard, and from which the Court may reasonably infer that Zurich had actual knowledge of the SFFA Action.  Those materials include annual "Deal Memos" summarizing Zurich's annual underwriting and renewal of Harvard's insurance, which reveal the following details, yet the evidence referenced therein have not been produced:

- The annual Deal Memos include a section entitled "Recent Developments / Articles" that refers to "attached articles and recent press" (HSUMF at ¶¶ 40-42, and Declaration of Ethan W. Middlebrooks ("Middlebrooks Dec.") Ex. L at Zurich-E-0001221, Zurich-E-0001309, Zurich-E-0001278).

- The annual Deal Memos refer to "litigation summaries" (HSUMF at ¶¶ 43, 44, 46, and Middlebrooks Dec. Ex. L at Zurich-E-0001221, Zurich-E-0001223, Zurich-E-0001309, Zurich-E-0001311), and the Zurich claims handler working on the SFFA Claim even asked about them (HSUMF at ¶ 50).  There also was a note of "monitoring" of "notable" litigation).  (HSUMF at ¶ 46, and Middlebrooks Dec. Ex. L at Zurich-E-0001223, Zurich-E-0001311).

- The annual Deal Memos refer to loss runs[2] that were reviewed by the underwriter each year.  (HSUMF at ¶ 45 and Middlebrooks Dec. Ex. L at Zurich-E-0001175, Zurich-E-0001204, Zurich-E-0001233, Zurich-E-0001263, Zurich-E-0001292).

- An email in Zurich's "claim file" also refers to loss runs. (HSUMF at ¶ 51).

- The annual Deal Memos similarly refer to "loss data in eFile."  (HSUMF at ¶ 47, and Middlebrooks Dec. Ex. L at Zurich-E-0001223, Zurich-E-0001311).

---

[2]  The nature and purpose of loss runs are explained *infra*, at pp. 16-17.

The Court may reasonably infer that the "attached articles and recent press," "litigation summaries," loss runs and "loss data in eFile" referenced above – all of which by Zurich declines to produce in discovery—indicate that Zurich was monitoring information about the SFFA Action and that Zurich had actual knowledge of the SFFA Action.  It verges on unimaginable that Zurich's "monitoring" of "notable" litigation would not capture a legal challenge to Harvard College's admissions practices that was widely covered by the national news media.

Because the information cited in the Deal Memos was part of Zurich's underwriting process, a reasonable factfinder could not but conclude that Zurich had actual knowledge of the SFFA Action when it set rates and premiums for Harvard's insurance policies.  Most importantly, the available evidence shows that Zurich did not increase premiums in response to the SFFA Action *even after it received "formal" notice of the SFFA Claim from Harvard in 2017*.  Indeed, the "Deal Memo" summarizing the November 2017 renewal – six months *after* Zurich received "formal" notice and the first one after that "formal" notice – acknowledges that the claim remained tens of millions of dollars away from reaching Zurich's excess layer, and that "no material changes have occurred in program exposures." (HSUMF at ¶¶ 61-62).

In fact, notwithstanding Zurich's actual knowledge of the SFFA Action, it did not seek to increase rates or premiums until AIG sought to do so in November 2018.  At the point of the November 2016 renewal, the defense costs incurred for the SFFA Action – which would have been reflected in the loss runs and "loss data in eFile" referenced in Zurich's underwriting file – were well below the $27.5 million attachment point of Zurich's excess policy, and Zurich actually decreased the premiums charged that year (HSUMF at ¶¶ 57-58), apparently as part of an ongoing effort to supplant AIG as the underwriter of the primary layer of Harvard's insurance program (HSUMF at ¶ 48).  Even after Zurich received "formal" notice of the SFFA Claim in

May 2017 (HSUMF at ¶ 12), it concluded that "no material changes ha[d] occurred in program exposures" and Zurich did not increase premiums at the November 2017 renewal (HSUMF at ¶ 62). By the time of the November 2018 renewal, AIG had paid out approximately $9.5 million in defense of the SFFA Action and effectively increased premiums by reducing the amount of its limits. (HSUMF at ¶¶ 63-64). It was only then that Zurich sought to increase the premiums charged for Harvard's excess D&O coverage (HSUMF at ¶ 65), after years of operating at a significant profit off Harvard's premiums. (HSUMF at ¶ 66) (Deal Memos described Harvard as "a 100% profitable account").

In short, what little evidence Zurich has produced to date shows that even if Zurich had received "formal" notice prior to January 30, 2016, it still would not have raised premiums sooner. Against these facts, any suggestion from Zurich that it required receipt of notice directly from Harvard at an earlier date so that it could take account of the SFFA Claim in setting Harvard's insurance rates is not credible.

The underwriting evidence is just one source of proof that Zurich had actual knowledge of the SFFA Action, which was the subject of widespread reporting in the national news media. (HSUMF at ¶ 37). In Harvard's experience, Zurich employees working on Harvard's account consistently were knowledgeable about and apprised of such newsworthy developments. (HSUMF at ¶ 53). For example, personnel including Client Relationship Leader Susan Fortin often discussed reports about current events concerning Harvard at annual meetings, in renewal meetings, and on phone calls—without prompting from Harvard. (HSUMF at ¶ 54). This attention to Harvard and its risk profile was consistent with Zurich's ongoing effort during the 2014-2016 timeframe to assume the primary position on Harvard's insurance program. (HSUMF at ¶ 55). Zurich's actual knowledge of the SFFA Action and use of such information

to set policy rates for Harvard's account present important issues of material fact that are in dispute here.

**ARGUMENT**

## I.    STANDARD OF REVIEW

A party is entitled to summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To prevail on a motion for summary judgment, the moving party must establish the non-existence of any genuine issue of fact material to a judgment in its favor. *Snow v. Harnischfeger Corp.*, 12 F.3d 1154, 1157 (1st Cir. 1993).  To defeat a motion for summary judgment, "the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 308 (1st Cir. 2002) (citing *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993)). The Court construes record evidence "'in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party.'" *Id.* (quoting *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000)).

## II.   THE PURPOSE OF NOTICE UNDER A CLAIMS-MADE INSURANCE POLICY WAS MET HERE

The Massachusetts cases evaluating notice under a "claims made" insurance policy clearly state that the purpose of the notice requirement is to ensure that the insurance company knows about claims at the end of the policy period, so that it can set rates accordingly going forward.  *Tenovsky v. Alliance Syndicate, Inc.*, 424 Mass. 678, 680-81 (1997); *Chas. T. Main, Inc. v. Fireman's Fund Ins. Co.*, 406 Mass. 862, 865 (1990); *Fin. Res. Network, Inc. v. Brown &*

*Brown, Inc.*, 867 F. Supp. 2d 153, 179 (D. Mass. 2012); *New England Env't Techs. v. Am. Safety Risk Retention Grp., Inc.*, 738 F. Supp. 2d 249, 256 (D. Mass. 2010).

In *Tenovsky*, the Supreme Judicial Court reiterated its position that "[f]airness in rate setting is the purpose of a requirement that notice of a claim be given within the policy period or shortly thereafter." 424 Mass. at 680-81 (citing *Chas. T. Main*, 406 Mass. at 864). The Court further reasoned that "[i]f a claim is made against an insured, but the insurer does not know about it until years later, the primary purpose of insuring claims rather than occurrences is frustrated." *Id.* at 681 (citing *Chas. T. Main*, 406 Mass. at 865). By contrast, if an insurance company has actual knowledge about a policyholder's claim during the relevant time period set by a policy, the purpose of noticing claims is met, and any requirement that notice be given directly by the policyholder exalts form over substance: the insurance company has a fair opportunity to set rates going forward.

An insurance company that had actual knowledge of a claim, and set premiums in consideration of such notice, must not escape its obligation to pay the claim, simply by pretending that it lacked notice of the claim. To reward such conduct delivers a windfall to the insurance company, which charged premiums based on its assessment of the risk in light of the known claim to a profitable advantage (*see* HSUMF at ¶ 66), yet deprives the policyholder coverage for that claim.

## III.  TECHNICAL NON-COMPLIANCE WITH A CONTRACT PROVISION DOES NOT EXCUSE A PARTY'S OBLIGATIONS WHEN THE PURPOSE OF THAT PROVISION WAS MET

Zurich argues that whether or not it had actual knowledge of the SFFA Action is irrelevant, because the failure to receive notice directly from Harvard at a particular mailing address fully excuses Zurich's coverage obligations. Motion at pp. 3, 7, 9-13. That argument conflicts with equitable principles fundamental to Massachusetts contract law.

When the essential purpose of a contractual provision has been met, a technical breach of that provision does not relieve the other party from its obligations under the contract. *See EventMonitor, Inc. v. Leness*, 473 Mass. 540, 547 (2016). In *EventMonitor,* a former employee breached his employment contract by failing to return all proprietary information when leaving the company and the company used that alleged breach as a justification to cease severance payments otherwise required under the contract. *Id.* at 543-44. Specifically, the former employee had copied proprietary information to a backup cloud server, and had not deleted that backup when he left the company (and never had permission to make such copy). *Id.* at 544-45. The Supreme Judicial Court held that while the employee technically did breach the contract provision, the purpose of the provision was to protect the confidentiality of the company's proprietary information, and that purpose had been achieved, as there was no evidence that any information had been accessed by or shared with others. *Id.* at 546-47. Because the essential purpose of the contractual clause was met, the Court required the company to honor its end of the bargain, and make the severance payments to the former employee. *Id.* As noted by Judge Green in a recent decision in the Suffolk County Business Litigation Session, "[e]ven where the purpose of a term is essential, a technical breach of that term will not necessarily be a material breach, where its purpose remains unaffected." *Dufficy Enters., Inc. v. Berarducci*, No. 1784-CV-03292 BLS, 2020 WL 12309011 at *29 (Mass. Super. Ct. June 7, 2020) (*citing EventMonitor*, 473 Mass. at 546-48).

The scenario here is the same: Harvard may not have provided formal notice at the address set forth in the Zurich Policy until May 2017, but because Zurich had actual notice during the notice period and was able to apply such knowledge to set rates going forward, the

essential purpose of the notice provision was met here. Accordingly, Massachusetts law does not permit Zurich to escape its contractual obligations in this case.

Similarly, Massachusetts courts do not permit a party to duck its obligations by feigning ignorance of facts actually known:

> [A] party to a transaction, whose rights are liable to be injuriously affected by notice, cannot willfully shut [its] eyes to the means of acquiring knowledge which [it] knows are at hand, and thus escape the consequences which would flow from the notice had it been actually received.

*In re John J. Sullivan, Inc.*, 128 B.R. 7, 12 (D. Mass. 1990) (*quoting Conte v. School Committee of Methuen*, 4 Mass. App. 600, 605 (Mass. App. Ct. 1976) (*citing The Lulu*, 77 U.S. 192, 202 (1869)). "It is equally well settled that '(n)otice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would develop.'" *Olivo*, 369 Mass. at 69 (citations omitted).

Zurich's actual knowledge of the SFFA Action during the notice period, and its corresponding ability to set rates for Harvard's insurance going forward, vitiate Zurich's "late notice" defense here.

## IV. THE CASES CITED BY ZURICH DO NOT EXCUSE ZURICH'S COVERAGE OBLIGATIONS, GIVEN ZURICH'S ACTUAL NOTICE OF THE SFFA ACTION

### A. The Key Supreme Judicial Court Decisions Did Not Involve Actual Notice Like Zurich Had Here

Zurich cites several important Massachusetts cases holding that late notice under a claims made policy is not excused where the lack of notice does not prejudice the insurance company. Motion at pp. 7-9. But Harvard is not making any "no prejudice" argument here. Rather, Harvard's position is that Zurich did have actual notice of the SFFA Action prior to January 30, 2016, as required under the Zurich Policy.

And indeed, the cases Zurich cites do not describe situations like the facts here, where the insurance company had actual notice of the claim during the requisite time period.[3] Thus, none of these cases support the extreme relief Zurich seeks here—excusing its obligation to pay based on a supposed lack of notice when, in fact, Zurich had actual notice of the SFFA Action before January 30, 2016.

**B.    The Other Cases on Which Zurich Relies Are Distinguishable, and Actually Support Harvard**

As noted above, Massachusetts courts have long recognized that notice cannot be dodged by ignoring facts or circumstances already known.  *See In re John J. Sullivan*, 128 B.R. at 12 (*quoting Conte*, 4 Mass. App. at 605 (*citing The Lulu*, 77 U.S. at 202)).  Moreover, "[n]otice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would develop."  *Olivo*, 369 Mass. at 69 (citations omitted).

Despite this long-recognized law, Zurich argues that even if Zurich did have actual knowledge of the SFFA Action during the notice period (a fact that Zurich never actually denies

---

[3]    *See Chas. T. Main*, 406 Mass. at 863 (involving a dispute between a contractor and subcontractor at a power generation facility where insurance company was wholly unaware of any dispute until notified by its policyholder nearly two years after the policy period expired); *Tenovsky*, 424 Mass. at 678-80 (involving an underlying personal injury lawsuit against a general contractor and steel company where the steel company's insurance company only and first learned about the plaintiffs' underlying demand letter, sent during the policy period, and subsequent lawsuit two and half years after the policy expired); *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 47-48 (1st Cir. 2009) (insurance companies did not learn of the claim until after judgment was entered against the policyholder in an underlying action, two years after that underlying action had been initiated); *Nat'l Union Fire Ins. Co. v. Talcott*, 931 F.2d 166, 167 (1st Cir. 1991) (insurance company first learned of underlying litigation after the expiration of the policy period); *BioChemics, Inc. v. Axis Reins. Co.*, 83 F. Supp. 3d 405, 406 (D. Mass. 2015), *aff'd*, 924 F.3d 633 (1st Cir. 2019) (insurance company had no notice of SEC subpoenas until the policyholder sent notice of subsequent subpoenas under a later policy period); *Catlin Specialty Ins. Co. v. American Superconductor Corp.*, 32 Mass. L. Rptr. 93, 2014 WL 840693, at *2-4 (Mass. Super. Ct. Jan. 29, 2014) (unpublished) (insurance company first learned of claim after the policy period, and underwriter testified that if he had known about the claim, he would have changed the terms on renewal); *accord Flynn v. New England Ins. Co.*, No. 96-1193D, 1998 WL 150384 (Mass. Super. Ct. Mar. 16, 1998) (insurance company had learned of a potential allegation of negligence against the policyholder prior to formal notice being given, yet the Court held it was *unreasonable* that the insurance company initially failed to contact the policyholder to obtain more information; it was the policyholder's failure to provide information in response to the insurance company's eventual questions that ultimately led the court to rule that coverage should not be allowed).

in its briefs on the pending motions), this fact would not affect Zurich's "late notice" defense. *See* Motion at pp. 10-12 (*citing Fanaras Enters. Inc. v. Law Offices of Roger Allen Doane*, 1 Mass. L. Rptr. 145, 1993 WL 818902 (Mass. Super. Ct. Sept. 7, 1993); *Flynn v. New England Ins. Co.*, No. 96–1193D, 1998 WL 150384, at *9 (Mass. Super. Ct. Mar. 16, 1998); *Northbrook Excess & Surplus Ins. Co. v. Med. Malpractice Joint Underwriting Ass'n*, No. 85-751-Y, 1988 U.S. Dist. LEXIS 17954 (D. Mass. March 9, 1988)). Yet none of these cases supports depriving Harvard of its right to coverage when Zurich had actual notice of the SFFA Action and, fully aware of that litigation, set premiums going forward.

In *Fanaras*, the policyholder affirmatively told the insurance company that "no claim will be made" under the claims-made policy at issue so that the loss would not affect the policyholder's premiums. As a result, the court held that "it would *be patently unfair* to allow an insured to disclaim coverage, thereby securing a favorable premium for the next policy year, and then require the insurer to provide coverage, because the insurer had knowledge . . . of the claim pending against the insured." 1993 WL 818902, at *4 (emphasis added). Here, the opposite is true. Zurich did have notice of the SFFA Action and knew that Harvard was seeking (and receiving) coverage for that claim under AIG's primary policy, and Zurich had the opportunity to consider that claim when setting Harvard's premiums going forward. Indeed, Zurich even bragged internally that it was making substantial profits on the Harvard account – stating that "this has been a 100% profitable account to [Zurich] since 2010 with a broader profitable relationship across the firm." (HSUMF at ⁋ 66). Thus, in sharp contrast to *Fanaras*, what would be "patently unfair" here would be for Zurich to get exactly what it bargained for under the terms of the contract, set and collect premiums based on its actual knowledge of the SFFA Action, only to then deny the benefit of that same bargain owed to Harvard.

The insurance company in *Flynn* (an unreported decision) had learned of an allegation of negligence against the policyholder prior to receipt of formal notice, and the Court specifically stated it was "*unreasonable*" that the insurance company initially failed to contact the policyholder to elicit more information. 1998 WL 150384, at *9 (emphasis added). Here, in contrast, Zurich behaved just as unreasonably: it never contacted Harvard to inquire about the SFFA Action after learning about that suit in the news and/or from loss runs prior to January 30, 2016. Ultimately, in *Flynn*, the policyholder failed to provide information in response to the insurance company's eventual questions, and by the time the information was provided, a final and non-appealable judgment had entered against the policyholder, leading the court to rule that coverage should not be allowed, notwithstanding the insurer's "unreasonable" failure to make inquiries in the first instance. 1998 WL 150384, at *10-11. In contrast here, Zurich had notice of the SFFA Action, had such knowledge when setting Harvard's insurance rates going forward, and received "formal" notice years before the AIG primary policy's limits were exhausted. The *Flynn* court's ruling provides not basis for Zurich to shed its coverage obligations here.

The bench ruling in *Northbrook Excess & Surplus Insurance Co.*, 1988 U.S. Dist. LEXIS 17954, doubtfully has any precedential value at all, as it was vacated by the First Circuit (873 F.2d 1434 (1st Cir. 1989) (Table) and subsequently dismissed on remand for lack of subject matter jurisdiction (128 F.R.D. 10 (D. Mass. 1989), *aff'd*, 900 F.2d 476 (1st Cir. 1990)). Nevertheless, the question presented to the district court in *Northbrook* was *which* of two insurance companies had to pay a claim, not whether the policyholder would forfeit all coverage, as Zurich seeks here. *Northbrook*, 1988 U.S. Dist. LEXIS 17954, at *2. As it happened, the court in *Northbrook* held that the insurance company defendant had actual notice, even if there were some technical imperfections in how it obtained that notice, and the court required that

insurance company to cover the claim.  *See id.* at \*32-38.  That is exactly what Harvard seeks

here.  Accordingly, *Northbrook* does not justify Zurich's attempt to escape its coverage

obligations; to the contrary, it supports upholding Zurich's obligation to pay.

## V.    AT A BARE MINIMUM, THE MOTION RAISES DISPUTED ISSUES OF FACT THAT PRECLUDE SUMMARY JUDGMENT

Zurich's attempts to dodge the question of its actual knowledge and hide related evidence

from Harvard and the Court simply highlight the existence of key disputed issues of fact.  If

Zurich's late notice defense were really a simple matter of law, then Zurich would admit that it

had actual notice during the notice period and its underwriters were aware of the SFFA Action

when they underwrote Harvard's policies in 2014, 2015 and 2016.  But Zurich neither admits nor

denies these important facts and instead attempts to block discovery into them.  (*See* Dkt. 31-33,

39) (respectively, Harvard's motion to compel, which sets forth in detail the discovery sought by

Harvard and which Zurich has refused to produce, and Zurich's response, where Zurich never

addresses the question of whether it had such actual notice).  Clearly, these are contested issues

of material fact that preclude summary judgment here.

### A.    There Is a Dispute as to Whether Zurich Had Actual Notice of the SFFA Action During the Notice Period

Harvard has alleged and the record supports that Zurich had actual knowledge of the

SFFA Action during the relevant time period, including in connection with its underwriting of

Harvard's excess insurance.  (HSUMF at ¶ 56).  Zurich's underwriter referred to "loss runs" each

year.  (HSUMF at ¶ 45).  Loss runs are insurance records summarizing the claims made by a

given policyholder over the years.  They typically are prepared by the broker or primary

insurance company and made available to excess insurance companies even if the referenced

claims do not reach the excess insurance layers.  *See, e.g., Lexington Ins. Co. v. Newell Health*

*Care Sys., Inc.*, 10 Mass. L. Rptr. 406, 1999 WL 753487, at \*3 n.9 (Mass. Super. Ct. July 6,

1999) (describing loss run report as prepared by primary insurance company and listing claims against policyholder with brief descriptions). While Zurich's failure to produce those loss runs is at issue in Harvard's pending Motion To Compel and Rule 56(d) Motion (Dkt. 31-33, 34-36), their very existence and what they will show about Zurich's knowledge of the SFFA Action (and when Zurich had it) at least creates an issue of fact as to Zurich's knowledge—and could well establish an essential part of Harvard's case, if only Zurich would provide the requested discovery. (*See* HSUMF at ¶¶ 40-47 (Deal Memos referring to loss runs and "litigation summaries", as well as "Recent Developments / Articles," none of which were produced yet)).

Further, as this Court is well-aware, it is beyond dispute that the SFFA Action was the subject of widespread reports in national news media since the time that lawsuit was filed. *See* (HSUMF at ¶ 37); (Dkt. 1-3 (Complaint Ex. C)) (eight news article); *see also, e.g.*, Nick Anderson, *Lawsuits allege unlawful racial bias in admissions at Harvard, UNC-Chapel Hill*, THE WASHINGTON POST (Nov. 17, 2014); Sam Sanders, *New Affirmative Action Cases Say Policies Hurt Asian-Americans*, NPR (Nov. 20, 2014), *available at* https://www.npr.org/sections/codeswitch/2014/11/20/ 365547463/new-affirmative-action-cases-say-policies-hurt-asian-americans; *Harvard under fire; Affirmative Action.*, THE ECONOMIST, at p. 26 (Nov. 29, 2014), *available at* https://link.gale.com/apps/doc/A391709758/EAIM?u=mlin_b_bpublic&sid=bookmark-EAIM&xid=ca048071; Douglas Belkin, *Harvard Accused of Bias Against Asian-Americans*, WALL STREET JOURNAL (May 15, 2015), *available at* https://www.wsj.com/articles/asian-american-organizations-seek-federal-probe-of-harvard-admission-policies-1431719348; Ellen Rosen, *Asian-American Groups Target Harvard, UNC for Alleged Racial Bias in Admissions*,

INSURANCE JOURNAL (May 18, 2015), *available at*

https://www.insurancejournal.com/news/national/2015/05/18/368570.htm.

If Zurich's underwriters, which were monitoring "Recent Developments/Articles," failed to take note of the SFFA Action, then Zurich "willfully shut [its] eyes to the means of acquiring knowledge which [it] knows are at hand" and Massachusetts law must not support its "late notice" defense. *In re John J. Sullivan, Inc.*, 128 B.R. at 12.

Given these circumstances, there is at least a disputed issue of fact regarding Zurich's actual knowledge of the SFFA Action in the relevant time period that precludes summary judgment.

**B.     There Is a Dispute as to Zurich's Knowledge When Setting Harvard's Insurance Rates and Premiums**

The circumstances surrounding Zurich's knowledge and actions when it set Harvard's insurance premiums also raise disputed issues of fact. As noted above, the purpose of the notice requirement under "claims made" policies is to ensure that the insurance company is informed of ripe claims when it sets the next coverage period's rates. *See Tenovsky*, 424 Mass. at 680; *Chas. T. Main*, 406 Mass. at 865.

Here, the evidence made available to date strongly indicates that Zurich set Harvard's insurance rates and premiums going forward with knowledge of the SFFA Action. *See Cashmere & Camel Hair Mfrs.*, 284 F.3d at 308 (the Court should construe record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party"). That evidence includes the "Deal Memos" summarizing Zurich's annual renewal of Harvard's insurance, which show the following:

- Zurich reviewed articles and recent press for information about recent developments at Harvard during the renewal process. (HSUMF at ¶¶ 40-42, and Middlebrooks Dec. Ex. L at Zurich-E-0001221, Zurich-E-0001309, Zurich-E-

0001278 (showing the annual Deal Memos inclusion of a section entitled "Recent Developments / Articles" that refers to "attached articles and recent press")).

- Zurich underwriters had "litigation summaries" they referenced in connection with the annual Deal Memos, and "monitor[ed]" "notable" litigations. (HSUMF at ▣▣ 43, 44, 46, 50, and Middlebrooks Dec. Ex. L at Zurich-E-0001221, Zurich-E-0001223, Zurich-E-0001309, Zurich-E-0001311).

- The Zurich underwriter had access to and reviewed loss runs each year. (HSUMF at ▣ 45 and Middlebrooks Dec. Ex. L at Zurich-E-0001175, Zurich-E-0001204, Zurich-E-0001233, Zurich-E-0001263, Zurich-E-0001292).

- Other "loss data" was available to Zurich's underwriters in a location called "eFile." (HSUMF at ▣ 47, and Middlebrooks Dec. Ex. L at Zurich-E-0001223, Zurich-E-0001311).

It may be reasonably inferred that these underwriting materials (which Zurich has not yet produced) would confirm that Zurich had knowledge of the SFFA Action when it was underwriting and setting Harvard's premiums.

Most importantly, the available evidence shows that Zurich did not increase premiums in response to the SFFA Action *even after it received "formal" notice of the SFFA Claim in 2017*. The "Deal Memo" summarizing the November 2017 renewal – six months *after* Zurich received "formal" notice, and the first deal memo drafted after receiving "formal" notice – acknowledged that the SFFA Claim was still well away from reaching Zurich's excess layer, concluded that "no material changes have occurred in program exposures," and stated that the premiums and terms of the coverage sold by Zurich were unchanged. (HSUMF at ▣▣ 61-62).

Given these facts, which show that Zurich had timely notice and charged premiums based on that notice, there can be no summary judgment based on supposedly "late" notice here. At a minimum, the circumstances here raise disputed issues of material fact sufficient to defeat the summary judgment that Zurich seeks.

## CONCLUSION

For all the foregoing reasons, Harvard respectfully requests that the Court deny Zurich's motion for summary judgment, together with such other relief as the Court deems just and proper.

Dated:  September 19, 2022

**ANDERSON KILL P.C.**

By: /s/ Marshall Gilinsky
Marshall Gilinsky, Esq. (BBO # 569181)
Ethan W. Middlebrooks, Esq. (*Pro Hac Vice*)
Jade W. Sobh, Esq. (*Pro Hac Vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 278-1000
              (617) 221-5445
E-mail:  mgilinsky@andersonkill.com
E-mail:  emiddlebrooks@andersonkill.com
E-mail:  jsobh@andersonkill.com

*Attorneys for Plaintiff President and Fellows of Harvard College*